UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-61032-CIV-ALTMAN/Hunt

**FREDERIC BLOCK**,

    *Plaintiff*,

v.

**DAVID MATESIC**, *et al.*,

    *Defendants.*
_____/

## **ORDER**

Our Plaintiff, Frederic Block, has brought claims of defamation *per se*, defamation by implication, and conspiracy to defame against David Matesic, Candyce Abbatt, and Joshua Gerstin (the "Defendants"). *See* Second Amended Complaint (the "SAC") [ECF No. 62]. His allegations arise from an allegedly defamatory letter the Defendants emailed out to their condo association (of which Block is also a member). Here's the relevant portion of that letter:

> Recently Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computer's security and privacy settings.

*Id.* ¶ 37.

The Defendants moved to dismiss Block's claims once before. *See* First Motion to Dismiss (the "First MTD") [ECF No. 29]; Response to the First MTD [ECF No. 35]; Reply to the First MTD [ECF No. 46]. At a hearing on that First MTD, *see* Paperless Minute Entry [ECF No. 55], we dismissed the then-operative First Amended Complaint ("FAC") [ECF No. 24] because it was plainly a shotgun

pleading, *see generally* First MTD Hearing Transcript ("First MTD Hr'g Tr.") [ECF No. 59]; *see also* Order Granting in Part and Denying in Part the Motion to Dismiss [ECF No. 56] at 1. But we also outlined, in some detail, our views about the merits of the First MTD. So, to the extent the parties are now attempting to relitigate the issues we already resolved at the First MTD hearing, we hereby incorporate (and adopt in full) the analyses and conclusions we articulated during that hearing.

A few weeks after that hearing, Block filed his SAC, which the Defendants have now moved to dismiss. *See* Motion to Dismiss (the "MTD") [ECF No. 110]. That MTD is now fully briefed and ripe for adjudication. *See* Plaintiff's Response [ECF No. 112]; Defendants' Reply [ECF No. 115]. After careful review, we **DENY** the MTD.

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

**ANALYSIS**

    **I.    Defamation *Per Se***

"Defamation, which includes libel and slander, is generally defined as 'the unprivileged publication of false statements which naturally and proximately result in injury to another.'" *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)). "To state a claim of defamation, the plaintiff must allege that '(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff.'" *Id.* at 865 (quoting *Valencia v. Citibank Int'l*, 728 So. 2d 330, 330 (Fla. 3rd DCA 1999)); *see also Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) ("Defamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory.").

"[A] publication is libellous [sic] per se, or actionable per se, if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). "When determining whether a published statement constitutes libel per se, an arbiter of fact may consider only the four corners of the publication." *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998) (King, J.) (cleaned up) (citing *Barry College v. Hull*, 353 So. 2d 575, 578 (Fla. 3d DCA 1977)). "[T]he language of the document should not be interpreted in the extreme, but construed as the 'common mind' would naturally understand it." *Ibid.* (citing *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962)). In cases of defamation *per se*, "liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the

3

jury to consider punitive damages." *Lawnwood Med. Ctr. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010).

Our Plaintiff has adequately pled a claim of defamation *per se* by alleging that the Defendants' letter "tends to subject [him] to hatred, distrust, ridicule, contempt, or disgrace[.]" *Aflalo v. Weiner*, 2018 WL 3235529, at *2 (S.D. Fla. July 2, 2018) (Moreno, J.).[1] The SAC, after all, alleges that "[a] reasonable reader of Defendants' statements would also come to distrust Plaintiff and hold him in ill repute, as the letter implied that Plaintiff had obtained private information about the reader by illicit or wrongful means." SAC ¶ 53. As we explained at our First MTD Hearing, we think "[a] reasonable inference from [the letter] . . . is that Block, or someone at his employ, must have obtained the emails through some nefarious means like hacking the unit owners' computers." First MTD Hr'g Tr. at 34:9–12. And the Defendants' suggestion that the Plaintiff nefariously obtained his neighbors' email addresses *tends*,[2] we think, to incite distrust or contempt—which is all the Plaintiff had to allege at this preliminary stage of the litigation. *See, e.g.*, *Zimmerman v. Buttigieg*, 521 F. Supp. 3d 1197, 1214 (M.D. Fla. Feb. 23, 2021) (Honeywell, J.) ("Certainly, a statement that attributes racist and white supremacist attributes to someone could subject that person to such harm [hatred, distrust, ridicule, contempt, or disgrace]. . . . The complaint therefore pleads an additional basis for defamation *per se* liability."). We thus conclude, as we did before, that the Plaintiff has successfully pled a claim of defamation *per se*.

Resisting this conclusion, the Defendants advance two arguments—both unavailing. *First*, they insist that the "Plaintiff fails to satisfy a required element of his claim by seeking to substitute a

---

[1] This is the *second* prong under the modern standard, which tends to omit "infectious disease" as an available option. *See, e.g.*, *Aflalo*, 2018 WL 3235529, at *2 ("A written publication . . . rises to the level of libel *per se* if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." (cleaned up)). Because the Plaintiff has stated a viable claim under this second prong, we won't reach the parties' arguments about the "infamous crime" or "trade or profession" prongs, which are *much* closer calls.

[2] Put a pin in this word ("tend") because it'll become important later on.

4

'reasonable person' standard for specific and concrete evidence that Plaintiff has, in fact, *already been subjected to* distrust, ridicule, hatred, contempt, or disgrace by virtue of the Letter." MTD at 8 (emphasis added). To state a claim for libel *per se*, however, "the plaintiff need not show any special damages because *per se* defamatory statements are 'so obviously defamatory and damaging to [one's] reputation that they give rise to an absolute presumption both of malice and damage.'" *Aflalo*, 2018 WL 3235529, at *1 (quoting *Wolfson*, 273 So. 2d at 776). And, with respect to the "reasonable person" standard, "the language of the document should . . . [be] construed as the 'common mind' would naturally understand it." *Ortega Trujillo*, 17 F. Supp. 2d at 1339 (citing *McCormick*, 139 So. 2d at 200). "The 'common mind' rule simply means that the words should be given a *reasonable construction* in view of the thought intended to be conveyed and that which would be a *reasonable construction* of the language by those who heard the same." *Williamson v. Digital Risk, LLC*, 2018 WL 3870064, at *3 (M.D. Fla. Aug. 15, 2018) (Presnell, J.) (cleaned up) (citing *Wolfson*, 273 So. 2d at 778). The Plaintiff's allegation, therefore—that "[a] reasonable reader would . . . come to distrust Plaintiff and hold him in ill repute," SAC ¶ 53—constitutes a "reasonable construction" of the letter as "the common mind would naturally understand it," *Ortega Trujillo*, 17 F. Supp. 2d at 1339.

*Second*, doubling down on their actual-harm position, the Defendants contend that the "Plaintiff fails to allege any damage or injury" because "[the] Plaintiff alleges that eight (8) unit owners who received and read the Letter approached or contacted Plaintiff at various times to express their revulsion at the Association's Letter and what the Association did." MTD at 4 (cleaned up). "In other words," the Defendants say, "based on Plaintiff's own allegations, Plaintiff concedes that the readers were so 'revulsed' by the Letter that they intentionally sought out Plaintiff to express their outrage and 'revulsion' with the Association's actions." *Id.* at 5. For two reasons, we're unpersuaded.

*One*, as we've said, the Plaintiff must allege *only* that the letter *tended* to subject him to distrust—not that it *actually* succeeded in subjecting him to distrust. When "tend" is used as an intransitive

5

verb—as it is here—it means to "have an inclination to a particular quality, aspect, or state." *Tend*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/tend (last visited June 5, 2023). Consider, for instance, the following sentence: "Children tend to enjoy happy music." Of course, this doesn't mean that *all* children will *always* enjoy happy music—only that, when presented with happy music, children "have an inclination" towards happiness, enjoyment, etc. *See, e.g.*, *Watkins v. Session et al.*, 2022 WL 16745386, at *8 (S.D. Fla. Nov. 7, 2022) (Altman, J.) ("We think it reasonable for an officer to conclude that the particular nuisance Watkins admittedly engaged in would—as the statute proscribes—'tend to annoy the community.' That, again, doesn't mean that it *will* in fact annoy the community—only that it's the kind of nuisance that *tends* to."). All of which is to say that, under Florida law, our Plaintiff didn't have to allege that the letter *actually* subjected him to distrust—among these eight neighbors (or anyone else). He only had to allege that the letter *tended* to do so. And he's plainly met that lower bar here. *See, e.g.*, SAC ¶ 53 ("A *reasonable reader* of Defendants' statements *would also come to distrust* Plaintiff and hold him in ill repute, as the letter implied that Plaintiff had obtained private information about the readers by illicit or wrongful means." (emphases added)).

*Two*, and in any event, the letter indisputably reached an audience of *more* than just those eight neighbors. So, even if the "revulsion" of those eight members somehow undermined the Plaintiff's claim, the Plaintiff still alleges that the letter *tended* to subject him to distrust among the broader association community. In his words:

> Many Tower One members who received and read the Defendants' December 18 Letter reported to Plaintiff their belief that the letter accused the Plaintiff of accessing the Association's private email addresses without its authorization, illegally or in breach of the privacy and security of the members. These members *included* eight unit owners acquainted with Plaintiff who approached him or contacted him at various times to express their revulsion at the December 18 Letter and who shared their belief that it had accused Plaintiff of unlawfulness or wrongdoing.

*Id.* ¶ 40 (emphasis added).

And the extent to which the Letter, in fact, tended to subject the Plaintiff to distrust is, to our mind, a question of fact for the jury. *See also Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. 2d DCA 1985) ("The letter indicated that the appellees did not wish to embarrass Perry any further by issuing a statement concerning the factors leading up to his dismissal. Although the term 'embarrass' may have been intended to convey and perhaps did convey only an innocuous meaning, a person of common mind might have construed it to mean that Perry had conducted himself in a shameful manner, or in a manner inconsistent with the proper exercise of his profession. Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense.").

This first part of the MTD is, therefore, **DENIED**.

## II.    Defamation By Implication

"[D]efamation by implication is a well-recognized species of defamation that is subsumed within the tort of defamation." *Jews For Jesus*, 997 So. 2d at 1108. Defamation by implication "applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Ibid.* Defamation by implication, in other words, "arises not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts." *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1123–24 (S.D. Fla. 2021) (Ruiz, J.). Defamation by implication is thus "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise *truthful* statements." *Id.* at 1124 (emphasis added). "Simply put, if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Jews For Jesus*, 997 So. 2d at 1108 (cleaned up). "All of the protections of defamation law that are afforded to the media and

7

private defendants are extended to the tort of defamation by implication." *Ibid.* "[S]pecial damages are not required to be pled in an action for defamation by implication." *Anderson v. Smith*, 2020 WL 10058207, at *5 (M.D. Fla. Mar. 24, 2020) (Schlesinger, J.).

The Plaintiff has alleged three facts about the letter—which, together, "imply a defamatory connection between them[.]" *Corsi*, 519 F. Supp. at 1124. *First*, the letter claimed that "[t]hese unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone." SAC ¶ 37. *Second*, the letter noted that "[n]either the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown." *Ibid. Third*, the letter "advise[d] all members to check and consider updating their computer's security and privacy settings." *Ibid.* As we said at our First MTD Hearing, "by juxtaposing [these three statements], a reasonable juror could find that the defendants had implied that the plaintiff had obtained their emails by some wrongful means and that it had caused security concerns." First MTD Hr'g Tr. at 47:25–48:8. That's plainly sufficient to state a viable claim of defamation by implication at this preliminary stage of the case.

Trying to parry, the Defendants insist that the "Plaintiff does not allege that the Letter contained <u>truthful</u> statements, that were conveyed in such a way as to create a false impression." MTD at 10. *Corsi*, the Defendants say, therefore suggests that we should dismiss the claim. *Ibid.* We disagree. In *Corsi*, the defendants moved to dismiss the defamation-by-implication claim because "the Complaint does not allege how Fairbanks' words were true but gave a false impression[.]" 519 F. Supp. 3d at 1124. The plaintiff in that case, though, bizarrely *failed* to "respond in opposition to the Newsmax Defendants' argument, let alone address or mention his defamation by implication counts." *Ibid.* The defendants, in other words, won this point by default. The court (it's true) went on to say that, on the merits, the complaint "pleads only that Fairbanks' accusations were false, not that they were true and gave a false impression[.]" *Ibid.* But that's simply not our case. Our Plaintiff, as we've seen, *has* alleged

8

that the "Defendants' published statements concerning Plaintiff *created false suggestions, impressions and/or implications* about him," SAC ¶ 58 (emphasis added); that the "Defendants' published statements concerning Plaintiff *juxtaposed a series of facts that implied a defamatory connection* between them," *id.* ¶ 59 (emphasis added); and that the "Defendants further *created a defamatory implication* by omitting certain facts," *id.* ¶ 60 (emphasis added).

Finally, the Defendants ask us to dismiss the Plaintiff's defamation-by-implication claim because the "SAC is premised on his allegations that the Letter was 'laced with falsities' and drafted 'without any regard for whether its contents were true (they were not).'" MTD at 10 (citing SAC ¶¶ 3, 5, 6, 33, 38, 42, 44). But "pleading in the alternative is permissible in federal court." *DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1308 n.7 (11th Cir. 2020) (citing *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009) ("Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims.")). At some point, the Plaintiff will have to decide whether the letter's statements were true or false—but not today.

We therefore **DENY** the Defendants' MTD as it relates to the defamation-by-implication claim.

### III. Conspiracy to Defame

A claim for civil conspiracy requires "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Mazer*, 556 F.3d at 1271 (citing *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)). Our Plaintiff has adequately pled this claim against all three Defendants.

The SAC alleges that *all three* Defendants "colluded to defame Plaintiff by agreeing to draft, and then actually drafting, [the letter]." SAC ¶ 30. Specifically, the Plaintiff claims that "Matesic and Abbatt first sent Gerstin a draft of a proposed letter response. Gerstin subsequently re-drafted and

9

revised significant portions of the letter. The final draft of the letter was co-authored in its entirety and in all respects by Defendants and approved by them for publication to the Tower One unit owners." *Id.* ¶ 31. Finally, the SAC says, "[o]n December 18, 2020, Matesic and Abbatt published the letter, sending an email blast to Tower One's unit owners." *Id.* ¶ 33. So, we have all three elements: (1) an agreement between three people; (2) to write a defamatory letter; and (3) several over acts in furtherance of the agreement (drafting, revising, publishing).[3] The Plaintiff has thus pled the elements of this claim.[4]

Pointing to Florida's "single publication" rule, the Defendants contend that the "Plaintiff cannot sustain a cause of action for conspiracy to defame arising from the same publication upon which his defamation claim is based." MTD at 11 (first citing *Ovadia*, 756 So. 2d at 140–41; and then citing *Thomas v. Patton*, 2005 WL 3048033, at *4 (Fla. 4th Cir. Ct. 2005), *aff'd and remanded only as to attorneys' fees*, 939 So. 2d 139 (Fla. 1st DCA 2006)). "In Florida, a single publication gives rise to a single cause of action, [and t]he various injuries resulting from it are merely items of damage resulting from the same wrong." *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002). This rule prohibits defamation claims from being "re-characterized in additional, separate counts for, e.g., libel, slander, or the intentional infliction of emotional distress if the claim

---

[3] The MTD never suggests that the Plaintiff failed to plead damages for this conspiracy claim. *See generally* MTD. The Defendants have thus forfeited any such argument (for now). *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").
[4] The Defendants are right, of course, that a conspiracy-to-defame claim "cannot stand where . . . the defamation action fails." MTD at 11 (quoting *Ovadia v. Bloom*, 756 So. 2d 137, 140 (Fla. 3d DCA 2000)). But, as we've seen, the Plaintiff's defamation claim *hasn't* failed here.

arises from the same publication." *Kamau v. Slate*, 2012 WL 5390001, at *7 (N.D. Fla. Oct. 1, 2012) (Stampelos, Mag. J.), *report and recommendation adopted*, 2012 WL 5389836, at *1 (N.D. Fla. Nov. 5, 2012) (Hinkle, J.). In other words, "[w]hen claims are based on analogous underlying facts and the causes of action are intended to compensate for the same harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (Altonaga, J.). For two reasons, though, this rule doesn't bar the Plaintiff's conspiracy claim here.

*One*, the single-publication rule only prohibits "multiple actions when they arise from the same publication upon which a *failed* defamation claim is based." *Callaway*, 831 So. 2d at 208 (emphasis added) (first citing *Ovadia*, 756 So. 2d at 141 ("The Fourth District properly concluded that the single publication/single action rule does *not* permit multiple actions to be maintained when they arise from the same publication upon which a *failed* defamation claim is based." (second emphasis added); and then citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (dismissing the plaintiff's tort claim after the plaintiff's libel claim had *failed* because of a missed notice deadline and explaining that "[a] contrary result might very well enable plaintiffs in libel to circumvent the notice requirements of Fla. Stat. 770.01 by the simple expedient of redescribing the libel action to fit a different category of intentional wrong")). Here, of course, the defamation claim *hasn't* failed, so the single-publication rule hasn't been triggered.[5]

---

[5] Some of our colleagues (it's true) have construed the single-publication rule as imposing a blanket prohibition on multiple causes of action arising from one publication—regardless of whether the underlying libel or defamation claim has failed. *See, e.g.*, *Kinsman v. Winston*, 2015 WL 12839267, at *6 (M.D. Fla. Sept. 15, 2015) (Conway, J.) (collecting cases and concluding that "the fact that the Court has ruled that Mr. Winston's defamation claims may proceed does not insulate his tortious interference claim from dismissal under the single action rule"). But Florida's appellate courts have *only* applied the single-publication rule in situations where the underlying defamation claim has failed. *See, e.g.*, *Calloway*, 831 So. 2d at 208 ("The single publication/single action rule . . . does not permit multiple actions when they arise from the same publication upon which a *failed* defamation claim is based." (emphasis added)); *Ovadia*, 756 So. 2d at 141 ("[T]he single publication/single action rule does not permit

*Two*, the Plaintiff's conspiracy-to-defame claim isn't duplicative of his defamation claim in any event. It is, instead, an entirely separate cause of action whose viability turns on different facts, additional elements, and (eventually) separate proof. And, in Florida, the law is well-settled that recovery for separate causes of action—even if they're related to one another—is proper when the causes of action "are properly pled upon the existence of independent facts." *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) ("[T]he successful invocation of a defamation privilege *will* preclude a cause of action for intentional infliction of emotional distress if the sole basis for the latter cause of action is the defamatory publication. However, that privilege will not prevent recovery upon separate causes of action which are properly pled upon the existence of independent facts." (emphasis in original)). As the Plaintiff rightly notes, "additional facts are required to prove the conspiracy claim." Response at 18. To establish a conspiracy under Florida law, after all, the Plaintiff must show "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Mazer*, 556 F.3d at 1271 (citing *Charles*, 988 So. 2d at 1159–60). To prove up his conspiracy claim, in other words, our Plaintiff must adduce evidence of an *agreement* between two or more people—something he *doesn't* need to show for his defamation claim. For this additional reason, then, we're not persuaded that the single-publication rule bars the Plaintiff's conspiracy claim here. *Cf. Fridovich*, 598 So. 2d at 70 ("[T]he successful invocation of a defamation privilege *will* preclude a cause of action for intentional infliction of emotional distress if the sole basis

---

multiple actions to be maintained when they arise from the same publication upon which a *failed* defamation claim is based." (emphasis added)); *see also*, *Grayson v. No Labels, Inc.*, 2022 WL 1222597, at *5 (M.D. Fla. Apr. 21, 2022) (similarly concluding that "the rule only prevents a plaintiff from recasting defamation as other actions, thereby potentially extending the statute of limitations or blocking defenses inherent in defamation actions. The rule does not prevent one from pleading defamation and civil conspiracy to commit defamation, as both actions have the same defenses and the same statute of limitations.").

for the latter cause of action is the defamatory publication. However, that privilege will not prevent recovery upon separate causes of action *which are properly pled upon the existence of independent facts*." (second emphasis added)); *Klayman*, 22 F. Supp. 3d at 1256–57 (acknowledging that "recovery for separate causes of action is proper when they are properly pled upon the existence of independent facts," but dismissing claims for tortious interference and intentional infliction of emotional distress because "Klayman has not shown the existence of any independent facts, distinct from the subject of his defamation claim, on which he bases these additional claims").

Because the Plaintiff has pled a plausible conspiracy claim, we **DENY** this part of the MTD.

### IV. Gerstin as Lawyer

The Defendants next ask us to dismiss the conspiracy claim against Gerstin because, "absent any allegations that an attorney was acting under independent motivation, or that an attorney had a 'personal stake in the illegal activities separate and distinct from that of the corporation,' an attorney cannot be found to have conspired with its client." MTD at 12–13 (quoting *Am. Credit Card Tel. Co. v. Nat'l Pay Tel. Corp.*, 504 So. 2d 486, 488 (Fla. 1st DCA 1987)). Again, we disagree.

"As long as an attorney's conduct falls within the scope of his representation, the attorney is immune from allegations of . . . conspiratorial conduct. . . . [H]owever, . . . 'it is axiomatic that if the challenged conduct occurs outside the scope of representation, no reason for immunity exists and the attorney and the client, as individuals, could form a conspiracy.'" *Farese v. Scherer*, 342 F.3d 1223, 1231 (11th Cir. 2003) (quoting *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999)).

In our case, the Defendants are right that Gerstin is a lawyer and that, sometimes, he acts as the Association's lawyer. *See* MTD at 13 ("In fact, Plaintiff concedes that Gerstin was an attorney for the Association."); SAC ¶ 32 ("Gerstin, for his part, is an attorney at a law firm that sometimes advises the Association."). But those general propositions aren't enough to insulate Gerstin from the

13

Plaintiff's defamation charge because the SAC alleges that, in crafting the letter, Gerstin was operating *outside* the bounds of that attorney-client relationship. In Block's words:

> Gerstin, for his part, is an attorney at a law firm that sometimes advises the Association. Gerstin, however, is not an employee of the Association and was not (and could not have been) acting in his capacity as the Association's attorney in drafting and approving the letter—knowing that it would be sent to all the Tower One unit owners—because the entire process was unauthorized by the Board.

SAC ¶ 32. Now, all of this may be untrue. But it's not our job, at the pleading stage, to separate truth from fiction. It's our job only to determine, from the face of the SAC, whether the Plaintiff has pled a viable claim. As we've said, at least for now, he has.[6]

For this reason, also, we reject the Defendants' intracorporate-conspiracy contentions. Under the intracorporate-conspiracy doctrine, "'a corporation cannot agree, combine, or conspire with its officers, employees, or agents.' . . . This principle has been extended to apply to both in-house and outside counsel employed by a corporation." MTD at 12–13 (quoting *Am. Credit Card*, 504 So. 2d at 488). "In other words," the Defendants say, "so long as an attorney's actions were motivated not by personal concerns but by concerns for their clients, attorneys do not form conspiracies with their clients." *Id.* at 12 (cleaned up).[7] But (again) that's only true if we assume that Gerstin *was* acting as an

---

[6] The Defendants insist that, "regardless of whether Gerstin was acting as the attorney for the Association, as an attorney for the entire Board, as an attorney for some of the Board's members, or even as an attorney for Defendants Matesic and Abbatt, individually, Gerstin was at all times material hereto acting in his capacity as counsel for his client(s) and in line with the interests of his client(s)." MTD at 13–14. They may be right about that. And, at summary judgment or trial, they may be able to show that they were right all along. But that's not what the SAC says. And, at this stage of the case, what the SAC says is all that matters.

[7] Every case the Defendants cite for their intracorporate-conspiracy argument involved an attorney who, in the context of the wrongdoing at issue in those cases, was indisputably working *as an attorney*. *See, e.g.*, *Am. Credit Card*, 504 So. 2d at 488 ("[C]ourts have long held that a corporation cannot agree, combine, or conspire with its officers, employees, or agents. . . . [W]e hold the same to be true for outside counsel as well. . . . [F]or all intents and purposes, N[ational] P[ay] T[elephone]'s act of employing W[illkie] F[arr &] G[allagher] as its advocate caused NPT and WFG to merge and become a single entity."); *Richard Bertram, Inc. v. Sterling Bank & Tr.*, 820 So. 2d 963, 964–65 (Fla. 4th DCA 2002) ("Wald was Sterling's attorney. . . . With respect to the conspiracy count, it is well settled that neither an agent nor an employee can conspire with his or her corporate principal or employer. . . .

14

attorney. And, as we've made clear, the SAC alleges that Gerstin *wasn't* acting as the Association's lawyer when he worked on the allegedly defamatory letter. *See* SAC ¶ 32 ("Gerstin . . . was not (and could not have been) acting in his capacity as the Association's attorney in drafting and approving the letter[.]"). Nor does the complaint suggest that Gerstin was *ever* Matesic and Abbatt's personal lawyer or that he was acting as their (or anyone else's) attorney when he helped them draft this letter. And we won't, at least at this phase of the case, draw inferences *against* the Plaintiff. *Cf. Dusek*, 832 F.3d at 1246 (admonishing us, at the pleading stage, to "accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff").

We therefore **DENY** this aspect of the MTD.

V.     **Publication as to Gerstin**

Finally, the Defendants ask us to dismiss the claims against Gerstin because the "Plaintiff fails to allege that Gerstin 'published' the Letter." MTD at 5.[8] In support, they point to an apparent discrepancy between the Plaintiff's general allegation that the "Defendants defamed Plaintiff by

---

An exception is made where the agent has a personal stake in the activities separate from the principal's interest. . . . However, a personal stake by Wald was neither pled nor suggested in this record."); *O'Boyle v. Sweetapple*, 2015 WL 13574304, at *7 (S.D. Fla. June 4, 2015) (Marra, J.) ("The Amended Complaint alleges that the Town entered into an attorney-client relationship with Defendant Sweetapple to take a firm stance against Plaintiff's multiple lawsuits. . . . Although Defendant Sweetapple's alleged actions may be unethical, they are nonetheless part of his attorney-client relationship with the Town if motivated by concern for his client's interest in the on-going court battle with Plaintiff. . . . Accordingly, the Amended Complaint fails to allege facts that indicate that Defendant Sweetapple [was a] member[ ] of an actionable conspiracy." (cleaned up)). Since the Plaintiff has alleged that Gerstin *wasn't* acting as an attorney in the context of our case, the Defendants' cases are all inapposite here.

[8] Although we've incorporated into this Order all our comments and conclusions from the First MTD Hearing, we'll address this last argument directly because, at that hearing, we expressly invited the Defendants to reraise it. *See* First MTD Hr'g Tr. at 49:17–20. We note, though, that we invited the Defendants to "reraise this argument in a subsequent motion to dismiss or motion for summary judgment *if they can find any support for the proposition*" that "a defendant who drafts and approves of a defamatory letter—knowing that it will be published and sent to third parties—has not published the letter for purposes of defamation law." *Id.* at 49:17–20 (emphasis added), 48:25–49:2. And, unfortunately, the Defendants have simply regurgitated the same baseless argument they pushed on this issue the first time around—again, without *any* support.

15

publishing false statements concerning Plaintiff in [the letter]," *ibid.* (quoting SAC ¶ 50), and his more specific claim that "Matesic and Abbatt published the letter by email," SAC ¶ 6. As the Defendants explain: "While the Plaintiff avers that Gerstin had a part in drafting the Letter, the SAC repeatedly makes clear that Defendants Matesic and Abbatt were the ones who published the Letter." MTD at 5.

Three problems with this. *One*, the Defendants cite *no law* for their view that a defendant who conspires to compose a defamatory letter—who then drafts that letter and edits it with his co-conspirators—is somehow not liable for its publication because he didn't click the mouse and send it. *See generally* MTD. The Defendants have, therefore, forfeited any such argument. *See Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). *Two*, the argument is illogical in any event. Only one person, after all, can click to "send" a defamatory email—just as only one person can mail a defamatory letter. But that doesn't absolve everyone else from liability for having participated in the defamation. *Three*, although the Defendants are right that the SAC (on three occasions) blames only Matesic and Abbatt for *publishing* the letter, *see, e.g.*, SAC ¶ 5 ("Most egregiously, Defendants drafted the letter, which Matesic and Abbatt subsequently published, without any regard for whether its contents were true (they were not)."); *id.* ¶ 6 ("On December 18, 2020, Matesic and Abbatt published the letter by email to the entire Tower One community."); *id.* ¶ 33 ("On December 18, 2020, Matesic and Abbatt published the letter, sending an email blast to Tower One's unit owners."), the Plaintiff *does* elsewhere allege that *all three* Defendants published the letter, *see, e.g., id.* ¶ 50 ("Defendants defamed Plaintiff by publishing false statements

16

concerning Plaintiff in the December 18 Letter."); *id.* ¶ 52 (referring to the "Defendants' published false statements concerning Plaintiff"); *id.* ¶¶ 58, 59 (both referring to the "Defendants' published statements concerning Plaintiff"). And, at this stage of the case, we must resolve all reasonable inferences in the Plaintiff's favor. *See Dusek*, 832 F.3d at 1246 ("In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff[.]"). We thus **DENY** this final part of the MTD.

\*\*\*

Accordingly, we hereby **ORDER AND ADJUDGE** as follows:

1. The Motion to Dismiss [ECF No. 110] is **DENIED**.
2. The Defendant shall answer the Plaintiff's Second Amended Complaint [ECF No. 62] by **June 19, 2023**.

**DONE AND ORDERED** in the Southern District of Florida on June 5, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record