UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------X
FREDERIC BLOCK,                     :
                                    :
         Plaintiff–Counterclaim Defendant,  :   Civil Case No.: 21–cv–61032
                                    :
    v.                              :
                                    :
DAVID MATESIC, et al.,              :
                                    :
         Defendant–Counterclaim Plaintiff.  :
                                    :
------------------------------------X

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Plaintiff-Counterclaim Defendant Frederic Block, by and through his attorneys, Wigdor LLP, submits this statement of undisputed facts pursuant to Local Rule 56.1(c).

**I.     Block's December 11, 2020 Letter and Matesic's Responsive Defamation**

1.     In the midst of a long career, Block decided to buy a unit at the Tower One condominium ("Tower One"), in May 2015.  Declaration of Valdi Licul, dated January 31, 2024 ("Licul Decl.") Exhibit ("Ex.") A, First Block Deposition ("Block 1") at 9:9-19.[1]

2.     Tower One is part of a larger community along with Tower Two, and both are governed by a Master Board.  Declaration of Frederic Block, dated January 30, 2024 ("Block Decl.") ¶ 3.

3.     Each of Tower One, Tower Two and the Master have Boards made up of community members, periodically elected by their peer community-members.  Block Decl. ¶3.

---

[1]     Transcripts of the depositions in this matter are attached to the Declaration of Valdi Licul and referred to by the name of the deponent followed by the page and line numbers of the transcript.

1

4. After Block had lived in Tower One for a few years, several of his neighbors approached him and asked him to look into a construction project on the Tower One grounds. Licul Decl. Ex. A, Block 1 at 10:17-25.

5. The construction project had been going on for three years, and appeared to them to have gone on longer than it should have. Id.

6. Basically everyone in the community was concerned about the cost and scope of the project. Licul Decl. Ex. B, First Matesic Deposition ("Matesic 1") at 75:2-77:8.

7. Matesic admitted at his deposition that the project has in general taken "an inordinate period of time." Licul Decl. Ex. B, Matesic 1 at 95:15-18.

8. The Tower One tennis court has been rendered inoperable by equipment. Block Decl. ¶ 24; Licul Decl. Ex. P.

9. Scaffolding, equipment and debris are strewn everywhere. Block Decl. ¶ 25; Licul Decl. Ex. Q.

10. The garage has been heavily damaged, was in disarray and significantly unusable. Block Decl. ¶26; Licul Decl. Ex. R.

11. Many other unit owners agree that the property was left devastated by Matesic's leadership. Licul Decl. Ex. C; Licul Decl. Ex. B, Matesic 1 at 209:4-21 (admitting that various unit owners agreed with Block about construction project).

12. Block began research into the construction project and the "change orders" that had altered its scope since 2015. Licul Decl. Ex. E; Block Decl. ¶5.

13. A "change order" is an extra-contractual agreement within a prior contractor-contracting relationship to add new work or adjust the nature of prior work. Block Decl. ¶ 6

14. A change order is problematic because it will not result in a new contract, and therefore will skirt the scrutiny and legal formalities required for Tower One to enter into a new contract. Block Decl. ¶ 7

15. For instance, it would never be ethical to represent the cost of a project knowing that change orders would increase the ultimate cost. Licul Decl. Ex. B, Matesic 1 at 74:21-75:1.

16. While Block made some headway in his research, he was stymied by the failure of the Board to post the change orders and related documents to the Tower One Association's website. Licul Decl. Ex. E at DM000009; Block Decl. ¶ 8.

17. Continuing into the fall of 2020, Block corresponded with the Board and the community's Master Board as well as the community's property manager, Janine Colonello, to gain access to the full documentation of the change orders that had been issued for the construction project and contracts with the main contractor, C&S Paint and Wallpaper ("C&S"), and the Project Engineer, Thornton Thomasetti ("TT"). Licul Decl. Ex. F.

18. Block's concerns expressed in this correspondence were "legitimate," Licul Decl. Ex. B, Matesic 1 at 79:12-16, and "reasonable," id. at 92:22-25.

19. Block's concerns were not "inaccurate." Id. at 141:5-9.

20. Early in December, Block attended a Zoom meeting with a spokesperson for the property management company, Bruce Masia, where Masia presented about "C&S and the status of the condo." Second Block Deposition ("Block 2"), Licul Decl. Ex. O at 81:6-21.

21. At that meeting, Block told Masia that he had too many questions to ask in person[2], and Masia invited Block to submit a letter with those questions. Id.

---

[2] Participates had only "a few minutes" to pose questions. Licul Decl. Ex. B, Matesic 1 at 205:7-19.

22. Block submitted a letter by email to Masia, copying some Tower One unit owners, on December 11, 2020 (the "December 11 Letter"). Block Decl. ¶ 9; Licul Decl. Ex. G.

23. Block divided the December 11 Letter into four parts and asked a series of questions, focused on two main themes. Licul Decl. Ex. G.

24. His letter recounted how the project carried out by C&S had gone over budget and had taken longer than originally projected. Licul Decl. Ex. G.

25. His letter recounted how the project had gone from an original contract price of $3,975,590 for Tower One and the Master, to $12,347,300. Id. at GERSTIN000089.

26. His letter recounted how the project had gone from an originally scheduled 15 months, to three-and-a-half years by 2020 (with more time left to go). Id.

27. His letter recounted how the project had exploded in scope, with C&S originally "hired to basically do a paint job, but . . . thereafter tasked with a multi-million-dollar restoration project." Id. at GERSTIN000093.

28. His letter recounted how there was reason to believe that the Board had improperly expanded the project beyond the original "paint job." Id.

29. Block observed, based on documents he reviewed, that contractors acting on behalf of the Board approved numerous "change orders" that altered the fundamental nature of the project and expanded it far beyond its original scope, without going through proper channels such as a Board or resident vote. Id.

30. Block observed this new project was not put out for bid. Id. at GERSTIN000093.

31. Block opined that new bids should have been solicited under the "Cardinal Change Rule," which applies where there has been "(1) A significant increase in the amount of work that needs to be completed; (2) A significant alteration to the type of work that needs to be

completed; (3) [or] A significant change in project costs." Id. at GERSTIN000093 (internal quotations omitted).

32. The Cardinal Change Rule is a well-known principle of construction law. Licul Decl. Ex. B, Matesic 1 at 233:17-20.

33. C&S was indeed paid substantially more than originally contracted for. Licul Decl. Ex. H, Second Matesic Deposition ("Matesic 2") at 29:14-21.

34. The project had lasted six years, even though it was originally supposed to last only 15 months, which Matesic admits in his Amended Complaint. Matesic's Amended Complaint ("Matesic's AC"), Dkt. 189 at ¶¶ 13(b), 56.

35. During the time C&S had been performing this work, Matesic had been Board President, giving him a "prominent role" in the project. Licul Decl. Ex. H, Matesic 2 at 18:11.

36. Matesic supported C&S throughout his tenure. Licul Decl. Ex. H, Matesic 2 at 20:11-25; Licul Decl. Ex. B, Matesic 1 at 68:14-69:2.

37. Matesic and Candyce Abbatt ("Abbatt"), a fellow Board member, did not send Block's letter to the unit owners. Licul Decl. Ex. H, Matesic 2 at 21:25-22:3.

38. Matesic and Abbatt, joined by the Board lawyer, Joshua Gerstin, wrote a defamatory letter accusing Block, *inter alia*, of a crime, and distributed it to all the Tower One unit owners. Licul Decl. Ex. I.

39. The letter, attached to an email, dated December 18, 2020 (the "December 18 Email"), stated:

> Recently Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the

> Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computer's security and privacy settings.

Id. at GERSTIN000001.

40. A reasonable reading of this email (as the Court has since held) was that it accused Block of computer hacking or doing some other illicit act to wrongfully obtain personal contact information that he should not have had. Block v. Matesic, No. 21 Civ. 61032, 2023 WL 3816693, at *2 (S.D. Fla. June 5, 2023).

41. After these events, Block resolved to run for the Tower One Board, to try to fix some of the problems he had identified. Block Decl. ¶ 11.

42. Block won the election and served a term of two years. Id.

## II. The April 18, 2023 Letter

43. During his tenure, Block and other Board members committed to holding accountable the parties responsible C&S's failures. Block Decl. ¶ 12.

44. Notably, Block and the Board on which he served settled claims predicated on C&S's failures. Block Decl. ¶ 12; Licul Decl. Ex. J at 1.

45. In a letter to unit owners, the Board president described the recent progress to fix the damage previously done:

> Clearly, after many fits and starts, substantial progress has been made over the past few months on bringing the nearly never-ending Palms' construction projects (saga) to a close. The netting and scaffolds are gone, the staging area on the tennis court has been removed, louvers and PT cables are being installed, the boardwalk is being completed, the marble in the lobbies has been polished, and one by one parking spots are being returned to their rightful users.

Licul Decl. Ex. J at 6.

46. In 2023, Matesic ran for the Board again. Block Decl. ¶ 13.

47. In an election communication to the Tower One community, Matesic claimed that Block and the Board on which he served had run up significant, unnecessary legal expenses. Block Decl. ¶ 14.

48. On April 4, 2023, the Board issued a rebuttal letter to unit owners (the "April 4 Letter"), explaining recent legal expenses. Licul Decl. Ex. K at 1-2; Block Decl. ¶ 15; see also Licul Decl. Ex. L (following up on prior communications).

49. The April 4 Letter sets forth these expenses, including how litigation by Block, Matesic, outside contractors, and certain unit owners had all contributed to necessary defense costs. Licul Decl. Ex. K at 1-2; Block Decl. ¶ 15.

50. On April 18, 2023, Block circulated another letter to Tower One unit owners (the "April 18 Letter"). Licul Decl. Ex. M.

51. This time, he mailed it to their unit addresses (which were common knowledge). Licul Decl. Ex. O, Block 2 at 26:1-11.

52. The April 18 Letter was mailed only to unit owners who could vote in the upcoming Board election. Block Decl. ¶ 16.

53. The April 18 Letter expressed Block's opinion that unit owners ought not to vote for Matesic and Abbatt. Block Decl. ¶ 16; Licul Decl. Ex. O, Block 2 at 22:18-22.

54. Block stated in his letter, "I have a deep-seated interest – as I am sure you do as well – to ensure that the best qualified person will be the new directors." Licul Decl. Ex. M at DM000001.

55. Block ended his letter by stating, "I leave it to your sound judgment to decide if Mr. Matesic and Ms. Abbatt are worthy of your vote." Id. at DM000003.

56. In the April 18 Letter, Block once more pointed out that the C&S project had ballooned in cost, from $2.3 million to $6 million for Tower One, and in completion time, from 15 months to six years (and counting) as of April 18, 2023.  Id. at DM000001.

57. In this letter, Block characterized the leadership of Matesic and Abbatt as "the old, failed way[] of managing our building."  Id. at DM000002.

58. Matesic had a different opinion about his own leadership.  Licul Decl. Ex. H, Matesic 2 at 17:5-11.

59. Matesic suffered no damage to his business as a result of anything Block has said. Licul Decl. Ex. H, Matesic 2 at 60:13-61:11.

60. Matesic filed a Counterclaim Complaint ("Matesic's Counterclaim") countersuing Block for defamation.  Matesic's Counterclaim, Dkt. 153.

### III. The Instant Litigation

61. On October 19, 2023, Matesic disclosed, under oath, the seven defamatory statements that he alleges are defamatory.  Licul Decl. Ex. N.

62. He identified these statements in response to an Interrogatory Request, which sought "the *exact* statements by Block alleged to be defamatory towards Matesic."  Licul Decl. Ex. N at ¶ 1 (emphasis added).

63. Only three statements in these Interrogatory Responses come from Block's April 18 Letter:

> 1) Mr. Matesic, as President of Tower 1 for many years, had been in charge of the shop while C&S destroyed our property, and he continues to support C&S to this day." ("Statement 1")
>
> 2) Now Mr. Matesic and Ms. Abbatt want to return as directors and presumably go back to the old, failed ways of managing our building." ("Statement 2")

8

> 3) Nonetheless, instead of sending my letter to all owners, Mr. Matesic and Ms. Abbatt sent you an email defaming me in my profession by accusing me of making false statements and, incredibly, of hacking into your private emails. ("Statement 3" and, together with statements 1 and 2, the "Original Statements.")

Licul Decl. Ex. N at ¶ 1.

64. The other four statements came from older letters, which have since been held by the Court to fall outside of the statute of limitations. Block v. Matesic, No. 21 Civ. 61032, 2023 WL 8527670, at *3-5 (S.D. Fla. Dec. 8, 2023).

65. Matesic testified, "anywhere [Block] mentions [Matesic's] name and draws conclusions of [Matesic's] actions . . . are defamatory." Licul Decl. Ex. H, Matesic 2 at 53:17-22

66. Matesic claimed the entirety of each of the 11 exhibits attached to his counterclaim was defamatory. Licul Decl. Ex. H, Matesic 2 at 15:3.

67. On December 8, 2023, this Court issued an Order dismissing Matesic's claims in part and granting him leave to amend to repair deficiencies in the remaining claims. Block v. Matesic, No. 21 Civ. 61032, 2023 WL 8527670 (S.D. Fla. Dec. 8, 2023).

68. However, Matesic did not merely clarify his claims, he added numerous new statements he alleges are defamatory:

| | |
|---|---|
| ¶ 13(b) | Block state[s] that C&S was hired by the Board to principally paint and do stucco repairs . . . . Further, Block claims that the contract with C&S called for substantial completion in 15 months. |
| ¶ 13(c) | Block states to readers that the property Matesic has been in charge of for the prior 2 years as a horror show. |
| ¶ 13(d) | Block states to readers that Matesic published mistruths and false accusations. |
| ¶ 13(e) | Block's explanation of inflated legal costs were significantly increased as Matesic claims [sic], however he blames those increases on Matesic and nowhere mentions the expenses created by actions the Board initiated against Matesic when Block was a member. |

9

| | |
|---|---|
| ¶ 13(j) | Block states to readers that the management company requested he put his questions in writing and they would be disseminated to all owners. |
| ¶ 13(k) | Block states to readers "all I asked from Mr. Matesic ... was an apology" and he "refused." |
| ¶¶ 14, 61-63, Ex. C | Matesic cites certain text messages Block sent to other unit owners, where he asks them to send an article to "Matesic and Ruehlman." |
| ¶ 56 | The 2023 Letter cites true facts that the Tower One construction project is in its sixth year and the cost at the time was approximately six million dollars. However, Block uses these facts to create the false impression that Matesic allowed for the construction project to spiral out of control. |

Matesic's AC (relevant citation set forth next to each statement).

Dated: February 23, 2024  
    Fort Lauderdale, Florida

Respectfully submitted,

By:  /s/ Joseph R. Fazio, III
          Joseph R. Fazio, III

**THE LAW OFFICES OF**
**JOSEPH R. FAZIO, P.A.**

633 South Andrews Avenue
Fort Lauderdale, FL 33301
Telephone: (954) 463-0585
Facsimile:  (954) 767-9461
jfazio@jfaziolaw.com

**WIGDOR LLP**

Valdi Licul
(admitted *pro hac vice*)
John S. Crain
(admitted *pro hac vice*)
85 Fifth Avenue
New York, NY 10003

Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
jcrain@wigdorlaw.com

*Counsel for Plaintiff-Counterclaim Defendant*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing was filed through CM/ECF this 23rd day of February 2024, and thereby was served upon counsel of record.

                                                        */s/ Joseph R. Fazio, III*
                                                        Joseph R. Fazio, III