### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-cv-61032-ALTMAN/Hunt

**FREDERIC BLOCK**,

    *Plaintiff,*

*v.*

**DAVID MATESIC**, *et al.*,

    *Defendants.*

_____/

### <u>OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

This is a case about condominium residents and condominium-association board members who have feuded over renovations for more than five years. On May 17, 2021, Frederic Block—a resident of 2100 The Palms ("The Palms") in Fort Lauderdale and a vocal critic of the Board's renovation efforts—sued various individuals who were either on or connected to the Board, alleging that those Defendants had defamed him. A lot has happened since—both on the docket and at The Palms—and we're now dealing with Block's Second Amended Complaint (the "SAC") [ECF No. 62] *and* an Amended Counterclaim [ECF No. 189].

In the SAC, Block asserted claims of defamation *per se*, defamation by implication, and conspiracy to defame against former Board President David Matesic, former Board Member Candyce Abbatt, and former Board lawyer Joshua Gerstin (the "SAC Defendants"). *See generally* SAC. Matesic, Abbatt, and Gerstin have since filed a Consolidated Motion for Summary Judgment on Counts I, II, and III (*i.e.*, all the claims) of Block's Second Amended Complaint (the "Defendants' SAC MSJ") [ECF No. 224].

In his Amended Counterclaim, Matesic has asserted his own claims of defamation *per se*, defamation *per quod*, and defamation by implication against Block. *See generally* Amended Counterclaim.

Block and Matesic have now filed cross-motions for summary judgment as to that Amended Counterclaim. *See* Matesic's Partial Motion for Summary Judgment as to Amended Counterclaim ("Matesic's Amended Counterclaim MSJ") [ECF No. 215]; Block's Motion for Summary Judgment ("Block's Amended Counterclaim MSJ") [ECF No. 218]. All three of these MSJs have been fully briefed and are ripe for adjudication.[1]

For the following reasons, we (1) **GRANT** the Defendants' SAC MSJ; (2) **GRANT** Block's Amended Counterclaim MSJ; and (3) **DENY as moot** Matesic's Amended Counterclaim MSJ.

THE FACTS[2]

## I.      The Facts Underlying Block's Second Amended Complaint

Frederic Block "b[ought] a unit at the Tower One condominium . . . in May 2015." Block's Additional Material Facts [ECF No. 233] ¶ 55; Defendants' Reply Statement of Material Facts ("Defendants' Reply SOMF") [ECF No. 253] ¶ 55 ("Undisputed."). "Tower One is part of a larger community along with Tower Two, and both are governed by a Master Board." Block's Additional Material Facts ¶ 56; Defendant's Reply SOMF ¶ 56 ("Undisputed."). "Each of Tower One, Tower

---

[1] The SAC MSJ is fully briefed. *See* Block's Response to the Defendants' SAC MSJ [ECF No. 224]; SAC MSJ Reply [ECF No. 252]. So is Block's motion for summary judgment on the Amended Counterclaim. *See* Matesic's Response to Block's MSJ [ECF No. 235]; Block's MSJ Reply [ECF No. 251]. Block opposed Matesic's motion for summary judgment on the Amended Counterclaim, *see* Block's Response to Matesic's MSJ [ECF No. 230], but Matesic didn't file a reply, *see generally* Docket.
[2] In ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). Where, as here, there are competing cross-motions for summary judgment, "the facts are viewed in the light most favorable to the non-moving party on each motion[.]" *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up).

Two and the Master have Boards made up of community members, periodically elected by their peer community-members." Block's Additional Material Facts ¶ 57; Defendants' Reply SOMF ¶ 57 ("Undisputed.").

"After Block had lived in Tower One for a few years, several of his neighbors approached him and asked him to look into a construction project on the Tower One grounds." Block's Additional Material Facts ¶ 58; Defendants' Reply SOMF ¶ 58 ("Undisputed.").[3] "The construction project had been going on for three years, and appeared to them to have gone longer than it should have." Block's Additional Material Facts ¶ 59; Defendants' Reply SOMF ¶ 59 ("Undisputed."). "Basically everyone in the community was concerned about the cost and scope of the project." Block's Additional Material Facts ¶ 60; Defendants' Reply SOMF ¶ 60 ("Undisputed."). Accordingly, "Block began research into the construction project and the 'change orders' that had altered its scope since 2015." Block's Additional Material Facts ¶ 66; Defendants' Reply SOMF ¶ 66 ("Undisputed."). "Continuing into the fall of 2020, Block corresponded with the Board and the community's Master Board as well as the community's property manager, Janine Colonello[.]" Block's Additional Material Facts ¶ 71; Defendants' Reply SOMF ¶ 71 ("It is undisputed that Plaintiff continued to correspond with the Board, the Master Board, and the property manager in 2020[.]").

Early in December 2020, Block "attended a Zoom meeting with a spokesperson for the property management company, Bruce Masia, where Masia presented about 'C&S [the contractor] and the status of the condo.'" Block's Additional Material Facts ¶ 74; Defendants' Reply SOMF ¶ 74

---

[3] On April 9, 2018—several months after Hurricane Irma struck South Florida—The Palms properties entered into a contract with C&S Paint and Wallpaper, Inc. *See* Contract between The Palms and C&S (the "Contract") [ECF No. 216-3]. Section 2.3 of the Contract provided that "[t]he Contractor shall achieve Substantial Completion of the entire Work not later than fifteen (15) months from the date that Contractor procures both the permits and the bonds with the possibility of extensions beyond the said 15 months due to delays by weather and subject to adjustments of this Contract Time as provided in the Contract Documents." *Id.* § 2.3.

("Undisputed."). At that meeting, "Block told Masia that he had too many questions to ask in person, and Masia invited Block to submit a letter with those questions." Block's Additional Material Facts ¶ 75; Defendants' Reply SOMF ¶ 75 ("Undisputed.").

On December 11, 2020, Block "sent an email to approximately ninety (90) individuals, comprising of residents and owners at the Palms (including Tower One, Tower Two, and the Master Association), individuals associated with the Palms (*i.e.*, the property manager and Tower One and Master Association's counsel, Gerstin), and other individuals unaffiliated with the Palms (*i.e.*, non-owners)." Defendants' Statement of Material Facts in Support of their Motion for Summary Judgment ("Defendants' SOMF") [ECF No. 225] ¶ 20; Block's Response ("Block's Response SOMF") [ECF No. 233] ¶ 20 ("Undisputed."); *see also* December 11, 2020 Email [ECF No. 226-13]. Block sent the email "to provide the Palms unit owners with information, including addressing the major issues that were complained of." Defendants' SOMF ¶ 21; Block's Resp. SOMF ¶ 21 ("Undisputed."). Block "did not blind copy any of the recipients, but instead, each recipient's email address was displayed and could be seen by the other recipients." Defendants' SOMF ¶ 22; Block's Resp. SOMF ¶ 22 ("Undisputed.").

The various Board members' reactions to this email form a hotly disputed question in this case. According to the Defendants, "[t]he Board had concerns relating to [the] December 11, 2020 email—particularly, security and privacy concerns about the unit owners' private email addresses displayed on the email, as well as other concerns about certain inaccuracies contained in the email." Defendants' SOMF ¶ 25. Block, however, insists that "[n]one of the Board members had bona fide 'security and privacy concerns'" because "[n]o one ever asked [him] how he had obtained the email addresses," "Matesic testified he had no idea 'what the security concerns [were],'" and "neither Abbatt nor Matesic" updated their own security settings after receiving the email. Block's Resp. SOMF ¶ 25. Either way, "Gerstin inquired with the property manager and legal liaison (Matesic) to investigate

whether the residents' email address[es] were given out by the Association or a Board member." Defendants' SOMF ¶ 29; Block's Resp. SOMF ¶ 29 ("Undisputed.").

On December 14, 2020, "the Association posted and distributed a Board of Directors Meeting Notice for December 17, 2020 at 3:00 PM via Zoom." Defendants' SOMF ¶ 33; Block's Resp. SOMF ¶ 33 ("Undisputed."). The agenda on the Meeting Notice "included, *inter alia*, '[d]iscussion on Judge Frederic Block Letter to Association.'" Defendants' SOMF ¶ 34 (quoting Meeting Notice [ECF No. 226-19]); Block's Resp. SOMF ¶ 34 ("Undisputed."). That same day, "Gerstin, at the direction of the legal liaison (Matesic), prepared a proposed response to [Block's] December 11, 2020 email, which was directed solely to [Block], and which the Board was going to consider[.]" Defendants' SOMF ¶ 35; Block's Resp. SOMF ¶ 35 ("Undisputed.").

"The Board Meeting was held on December 17, 2020 as scheduled," with all five members— Matesic, Abbatt, Mel Kramer, Patricia Heessels, and Guilio Monaco—in attendance. Defendants' SOMF ¶¶ 38–39; Block's Resp. SOMF ¶¶ 38–39 (undisputed). "[T]he Board authorized and instructed Gerstin, as counsel for the Association (with the assistance of the Board President and legal liaison, Matesic, and Board member Abbatt) to prepare a response letter to be distributed to the Tower One unit owners." Defendants' SOMF ¶ 40; Block's Resp. SOMF ¶ 40 ("Undisputed."). According to the minutes of the meeting, the Board summarized its "Discussion of Judge Frederic Block Letter to Association" as follows:

> David Matesic stated that the [renovation] project has grown in scale not in scope. The feedback that was received from the residents is that the upkeep of the property has been horrible during construction. David Matesic made a proposition to allow Candyce Abbatt to put a letter together with the help of the association attorney Joshua Gerstin that would go out to the residents of the Tower One. Joshua Gerstin made a proposition to have the Association respond to the mass email with materials from [the contractor] along with updating the information on the website for the residents. The board was in agreement with this proposition 4/1 with Mel Kramer abstaining.

December 17, 2020 Meeting Minutes [ECF No. 226-4] at 2. The next morning, "Gerstin circulated a draft of the proposed letter to Matesic and Abbatt for 'review, edit, and comment.'" Defendants' SOMF ¶ 43 (quoting December 18, 2020 Email Exchange [ECF No. 226-21]); Block's Resp. SOMF ¶ 43 ("Undisputed."). "Gerstin left the final editing of the Letter to Matesic's discretion," and Matesic "sent the draft letter to the property manager with instructions for finalizing." Defendants' ¶¶ 45–46; Block's Resp. SOMF ¶¶ 45–46 (undisputed). Abbatt approved "the draft letter by stating '[l]ooks good to me.'" Defendants' SOMF ¶ 47; Block's Resp. SOMF ¶ 47 ("Undisputed."). On December 18, 2020, "at 5:31 PM, the property manager circulated the final letter to the Tower One residents." Defendants' SOMF ¶ 49; Block's Resp. SOMF ¶ 49 ("Undisputed.").

Here's the December 18, 2020 Email in relevant part:

> Important Privacy and Construction Alert
>
> Dear Members:
>
> We hope this letter finds you and your loved ones safe, healthy, and enjoying the holiday season. Following is an important privacy and construction alert. Recently, Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computers' security and privacy settings. Please contact the property manager if you would like to change your email address for obtaining official Association notices in the future.
>
> *IN REGARDS TO THE CONTENTS OF THE UNSOLICITED EMAILS*
>
> The Association and the professionals working on the construction project to repair Hurricane Irma damage have spent many hours responding to this owner. The Association also expended time and money to gather documents demanded by the owner. The Owner never reviewed this information, and invitations to meetings with

construction professionals were rebuffed. Instead, the owner continues to regurgitate the same questions and in most cases inaccurate, misleading and or out of context conclusions acting as if the Association did not expend its limited time and resources to provide all of the documents requested and answers all of the questions posed, more than once.

[ . . . ]

If you have any questions or concerns after you review the attached documents or website, please write them down and present them to the construction professionals at the next monthly town hall meeting. Your participation and voice are necessary and important. We hope you take the time and stay involved so you are continually aware of all the facts and positive developments regarding the construction project.

Construction projects of this magnitude are always an enormous burden, expense, and inconvenience for those living among its orderly chaos. The Association wants you to know it is continuing to do all it can to make this process as least intrusive as it can. Please contact management for day to day issues with operations and [the Contractor] with questions, concerns, or comments regarding day-to-day issues with the construction.

2020 has been an unusually tough year for all of us. Sending unsolicited blast emails with incorrect statements and facts regarding one of our most precious investments, our homes, unnecessarily adds to everyone's level of stress and discord. As we move forward to a better and brighter 2021, we hope everyone considers contributing to the Association and our residents in a meaningful and positive way.

Best wishes for a happy and safe holiday season to you and all of your loved ones.

Sincerely,

Board of Directors

The Palms 2100 Tower One Condominium Association, Inc.

December 18, 2020 Email [ECF No. 226-1].

Several months later, Block filed this lawsuit against Matesic, Abbatt, and Gerstin, asserting

claims of defamation *per se*, defamation *per quod*, defamation by implication, and conspiracy to defame.

*See generally* Block's Initial Complaint [ECF No. 1]. Unsurprisingly, the pending litigation didn't soothe the acrimony between the parties.

## II.      The Facts Underlying Matesic's Amended Counterclaim

After the publication of the Board's December 18 Email, Block "resolved to run for the Tower One Board, to try to fix some of the problems he had identified." Block's SOMF [ECF No. 219] ¶ 41; Matesic's Response to Block's SOMF [ECF No. 236] ¶ 41 ("Undisputed."). "Block won the election and served a term of two years." Block's SOMF ¶ 42; Matesic's Resp. to Block's SOMF ¶ 42 ("Undisputed."). But, in 2023, Matesic "ran for the Board again." Block's SOMF ¶ 46; Matesic's Resp. to Block's SOMF ¶ 46 ("Undisputed.").

"In an election communication to the Tower One community," Matesic claimed that Block and the Board on which he served "had run up significant, unnecessary legal expenses." Block's SOMF ¶ 47; Matesic's Resp. to Block's SOMF ¶ 47 ("Undisputed."). On April 4, 2023, the Block-aligned Board "issued a rebuttal letter to unit owners . . . explaining recent legal expenses." Block's SOMF ¶ 48; Matesic's Resp. to Block's SOMF ¶ 48 ("Undisputed."). And then, "[o]n April 18, 2023, Block circulated another letter to Tower One unit owners" by "mail[ing] it to their unit addresses[.]" Block's SOMF ¶¶ 50–51; Matesic's Resp. to Block's SOMF ¶¶ 50–51 (undisputed). This letter—which is appended to the Amended Counterclaim as Exhibit A [ECF No. 189] at 23–25, and which we will refer to as the "2023 Letter"—"was mailed only to unit owners who could vote in the upcoming Board election." Block's SOMF ¶ 52; Matesic's Resp. to Block's SOMF ¶ 52 ("Undisputed."). Here are Block's relevant statements from the 2023 Letter:

- "[L]et me take this opportunity to thank all those who have supported the current Board and have read the letters that have been sent to you by its excellent president, Dr. Zucker, explaining in exhausting detail all the positive steps it has taken to right our sinking ship. I say 'sinking ship' because we are now in the sixth year since our construction contractor, C&S Paint & Wallpaper Company, was hired principally to paint our building and to do stucco repairs. Its contract, signed on

April 7, 2018, called for completion in 15 months and a cost of about $2.3 million. The current cost is approximately $6 million and has resulted in enormous special assessments we now had to pay." 2023 Letter at 1.

- "Mr. Matesic, as President of Tower 1 for many years, had been in charge of the shop while C&S destroyed our property, and he continues to support C&S to this day." *Ibid.*

- "Now Mr. Matesic and Ms. Abbatt want to return as directors and presumably go back to the old, failed ways of managing our building." *Id.* at 2.

- "[I]nstead of sending my [December 11, 2020 Letter] to all owners, Mr. Matesic and Ms. Abbatt sent you an email defaming me in my profession and accusing me of making false statements and, incredibly, of hacking into your private emails." *Id.* at 2–3.

So, naturally, on June 26, 2023, Matesic filed his Initial Counterclaim [ECF No. 153] against Block, claiming that this 2023 Letter defamed him. Block filed a Motion to Dismiss [ECF No. 169] that Initial Counterclaim on August 21, 2023. But, before we could adjudicate that motion to dismiss, "Block sent several text messages [on November 8, 2023] to three unit owners at Tower One regarding a news article describing a case he was assigned pertaining to the prosecution of ten members of the Gambino family, an organized crime syndicate, on charges that include racketeering, conspiracy, extortion, and witness retaliation." Matesic's SOMF ¶ 36; *see generally* Docket (nowhere disputed by Block). In this series of text messages, Block wrote: "Send it [presumably, the link to the article] to Matesic and Rhuelman and Melvin." Matesic's SOMF ¶ 36; *see generally* Docket (nowhere disputed by Block). We'll refer to this text-message exchange, which has been appended to the Amended Counterclaim as Exhibit C [ECF No. 189] at 28, as the "2023 Text Messages," and they, too, form the basis of Matesic's Amended Counterclaim.

## III.   The Procedural History: Block's SAC

As we mentioned, this case came to us on May 17, 2021, when Block filed his Initial Complaint against Matesic, Abbatt, and Gerstin. After the Defendants filed their Motion to Dismiss [ECF

No. 23], Block submitted his First Amended Complaint [ECF No. 24] as a matter of right. The Defendants then filed a Motion to Dismiss that First Amended Complaint [ECF No. 29], which we granted in part after concluding that the First Amended Complaint was a shotgun pleading, *see* October 27, 2021 Order [ECF No. 56].

On November 16, 2021, Block filed his now-operative Second Amended Complaint. In Count I, he asserted a claim of defamation *per se* against all three Defendants for "publishing false statements concerning [Block] in the December 18 Letter"—that is, statements that (1) "are reasonably understood to implicate [Block's] moral character and professional code of ethics"; (2) would cause a "reasonable reader . . . [to] conclude that [Block] committed felonies under Florida and federal law"; and (3) "injured [Block] in his office, occupation, business and/or employment." SAC ¶¶ 50–54. According to Block, the "defamatory statements were so obviously defamatory and damaging to [his] reputation that they give rise to an absolute presumption of both malice and damages." *Id.* ¶ 56. In Count II, he asserted a claim of defamation by implication against all three Defendants because (1) the "published statements concerning [Block] created false suggestions, impressions and/or implications about him"; (2) the Defendants "juxtaposed a series of facts that implied a defamatory connection between them"; and (3) the Defendants "further created a defamatory implication by omitting certain facts." *Id.* ¶¶ 58–60. And, in Count III, Block advanced a claim of conspiracy to defame against all three Defendants on the basis that they allegedly (1) "shared a common purpose and agreed to defame [Block]" and (2) "took action against [Block] for the purpose of accomplishing the underlying tort of defamation with the desire and intention that the information be published to third parties." *Id.* ¶¶ 62–63.

The Defendants filed a Joint Motion to Dismiss (the "SAC MTD") [ECF No. 110], which we denied, *see* SAC MTD Order [ECF No. 128]. In that order, we found (1) that Block had "adequately pled a claim of defamation *per se* by alleging that the Defendants' letter 'tends to subject [him] to hatred,

distrust, ridicule, contempt, or disgrace,'" *id.* at 4 (quoting *Alfalo v. Weiner*, 2018 WL 3235529, at *2 (S.D. Fla. July 2, 2018) (Moreno, J.)); (2) that Block had stated a claim for defamation by implication because he had averred that the three true facts from the December 18 Email "impl[ied] a defamatory connection between them,'" *id.* at 8 (quoting *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1124 (S.D. Fla. 2021) (Ruiz, J.)); and (3) that Block could proceed on his "conspiracy-to-defame claim" because it "[wa]sn't duplicative of his defamation claim" and because Block had sufficiently alleged that "Gerstin was operating *outside* the bounds of [the] attorney-client relationship," *id.* at 12, 14. The Defendants then filed separate Answers to the SAC. *See* Answers and Affirmative Defenses [ECF Nos. 137–39].[4]

After some protracted discovery, on February 23, 2024, the Defendants filed their SAC MSJ. In that motion, they say that they have

> amassed a mountain of evidence demonstrating beyond dispute that: (1) Matesic and Abbatt's actions were taken within the scope of their roles as Board members in furtherance of their duties as Directors; (2) Gerstin's actions were taken exclusively within the course and scope of his professional engagement and he had no personal stake or interest but instead was solely charged with carrying out the Board's instructions; (3) the Defendants' actions were not primarily motivated (or motivated at all) by express malice or actual malice; (4) the Defendants were acting in furtherance of the statutory duties of the Association to disclose a potential data breach; and (5) there is no evidence to be had to substantiate the Plaintiff's fanciful claims to the contrary.

SAC MSJ at 2–3.

## IV. The Procedural History: Matesic's Amended Counterclaim

Back on June 20, 2023—roughly one month after he'd filed his Answer to Block's SAC— Matesic submitted his Initial Counterclaim [ECF No. 153]. In it, Matesic identified several

---

[4] In his Answer to the SAC [ECF No. 137], Gerstin included a Third-Party Complaint for indemnification against The Palms 2100 Condominium Association, Inc. Given our rulings in this Order, that third-party claim is now moot.

communications (all sent by Block) that (he believed) were defamatory. But he only identified specific language from three communications that could even possibly qualify as defamatory: Block's December 11 Email (*i.e.*, the email that precipitated the Board's own December 18 Email about security concerns); Block's January 28, 2021 Board Candidacy Letter (the "2021 Candidacy Letter") [ECF No. 153-10]; and Block's April 18, 2023 letter ("the 2023 Letter") [ECF No. 153-1]. Based on these three communications, Matesic advanced claims of defamation *per se*, defamation *per quod*, and defamation by implication against Block. *See generally* Initial Counterclaim.

Block responded with his own Motion to Dismiss the Initial Counterclaim (the "Initial Counterclaim MTD") [ECF No. 169], which we granted in part and denied in part in a December 8, 2023 Amended Order (the "Initial Counterclaim MTD Order") [ECF No. 183]. We granted the Initial Counterclaim MTD to the extent that (1) we dismissed *with prejudice* "on timeliness grounds" any defamation claims pertaining to the 2020 Email and the 2021 Candidacy Letter, *see* Initial Counterclaim MTD Order at 11–12; (2) we dismissed *with leave to amend* Matesic's defamation-*per-quod* claim because he hadn't "alleged *any* special damages," *id.* at 13–16; and (3) we dismissed *with leave to amend* Matesic's defamation-by-implication claim because he failed to identify any "*true* facts Block ha[d] manipulated in an effort to defame [Matesic] *by implication*," *id.* at 18 (emphasis added).

On December 22, 2023, Matesic filed the now-operative Amended Counterclaim. In that pleading, he again advanced claims of defamation *per se*, defamation *per quod*, and defamation by implication. *See generally* Amended Counterclaim. He grounded these claims in Block's 2023 Letter *and* the 2023 Text Messages, which (again) Block sent *after* Matesic had filed his Initial Counterclaim. On February 22, 2024, Matesic filed his Amended Counterclaim MSJ. He contends there that "summary judgment is warranted in Matesic's favor on the issue of Block's liability for (1) defamation *per se* as it pertains to Block's false statements published in his 2023 Letter; (2) defamation *per quod* as it pertains to all of Block's false statements; and (3) defamation by implication as it pertains to the truthful

statements about the cost and length of the construction project as of the date of publication of the 2023 Letter." Matesic's Amended Counterclaim MSJ at 2. He also attacks the validity of several of Block's affirmative defenses. *See id.* at 13–19.

Block likewise filed an Amended Counterclaim MSJ, in which he argues that the Amended Counterclaim is a "retaliatory strike suit." Block's Amended Counterclaim MSJ at 7. He insists that, while he "opined on Matesic's leadership, . . . he was entitled to do so [because] these statements were all protected by the qualified privilege under Florida law, which shields communications made during a political process." *Ibid.* "Because of the qualified privilege," Block continues, "Matesic is constrained to adduce evidence of express malice, which he fails to do." *Ibid.* Plus, Block says, Matesic "has adduced no evidence of special damages for his claim of defamation *per quod*; . . . Block's statements were either pure opinions, substantially true, or simply not defamatory[.]" *Ibid.* The parties' motions are fully briefed.

It's against this background that we adjudicate the Defendants' SAC MSJ, Matesic's Amended Counterclaim MSJ, and Block's Amended Counterclaim MSJ.

### STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (cleaned up) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In ruling on a motion for summary judgment, we "need consider only the cited materials, but [we] may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, we must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, we must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, we must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fam.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

ANALYSIS OF THE SAC MOTION FOR SUMMARY JUDGMENT

We grant summary judgment for the Defendants as to each of Block's three claims. *First*, Block's defamation-*per-se* claim fails because the defamatory statements weren't false. *Second*, his defamation-by-implication claim fails because he fails to adduce sufficient evidence of actual malice. *Third*, his conspiracy-to-defame claim fails because neither of his defamation claims survive to sustain it.

## I.      The Defamatory Statements Weren't Literally False

On the issue of falsity, we grant summary judgment for the Defendants as to Block's defamation-*per-se* claim, but deny it as to his defamation-by-implication claim. Block's two claims are mutually exclusive: The former turns on whether the Defendants' statements were *false*; the latter on whether the statements were *true* (and then juxtaposed to create a false implication). When we denied the SAC MTD as to both claims, we observed that, "[a]t some point, [Block] will have to decide whether the letter's statements were true or false[.]" SAC MTD Order at 9. Discovery has plucked that decision from Block's hands, leaving no material dispute that the Defendants' statements were true and, thus, that his *per se* claim fails as a matter of law.

### a.      The Law of Defamation

Defamation is "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973). "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). The "substantial truth doctrine" also applies in Florida, meaning that "a statement does not have to be perfectly accurate" to avoid being defamatory "if the 'gist' or the 'sting' of the statement is true." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234 (Fla. 3d DCA 2021). Under Florida law, then, "[d]efamation has the following five elements: (1) publication; (2) falsity; (3) actor

must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). "Defamation claims can be proven in either of the following ways: (1) defamation *per quod*, which 'requires an additional explanation of, or an interpretation of innuendo suggested by the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement[,]' or (2) defamation *per se*, which 'does not require any additional explanation in order to prove the defamatory nature of the statement.'" *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. Aug. 30, 2021) (Bloom, J.) (quoting *Scobie v. Taylor*, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2015) (Scola, J.)).

We'll start with defamation *per se*. "[A] publication is libellous [sic] *per se*, or actionable *per se*, if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). "When determining whether a published statement constitutes libel *per se*, an arbiter of fact may consider only the four corners of the publication." *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998) (King, J.) (citing *Barry College v. Hull*, 353 So. 2d 575, 578 (Fla. 3d DCA 1977) (cleaned up)). "[T]he language of the document should not be interpreted in the extreme, but construed as the 'common mind' would naturally understand it." *Ibid.* (citing *McCormick v. Mia. Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962)). In cases of defamation *per se*, "liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages." *Lawnwood Med. Ctr. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010).

"In *per quod* actions," by contrast, "the words used, given their natural and common meaning, are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts, such as

innuendo." *Scobie*, 2013 WL 3776270, at *2. In other words, if a statement "requires explanation of context" for it to be defamatory, it may qualify as defamation *per quod*, even if it isn't defamation *per se. Daniels v. HSN, Inc.*, 2020 WL 533927, at *4 (M.D. Fla. Feb. 3, 2020) (Bucklew, J.) (cleaned up). Because "defamation *per quod* 'requires additional explanation of the words used to show that they have a defamatory meaning, . . . the plaintiff must allege and prove special damages.'" *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999); *see also Frey v. Minter*, 829 F. App'x 432, 434 (11th Cir. 2020) (noting that Florida law "require[s] proof of special damages for a plaintiff to sustain a claim of defamation *per quod*"). Special damages are "actual, out of pocket losses which must be proven by specific evidence as to the time, cause[,] and amount," and their "chief characteristic . . . is a realized or liquidated loss." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004) (Ryskamp, J.).

And then there's "defamation by implication," which "is a well-recognized species of defamation that is subsumed within the tort of defamation." *Jews For Jesus*, 997 So. 2d at 1108. Defamation by implication "applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Ibid.* Defamation by implication, in other words, "arises not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts." *Corsi*, 519 F. Supp. 3d at 1123–24. Defamation by implication is thus "premised not on direct statements but on false suggestions, impressions[,] and implications arising from otherwise *truthful* statements." *Id.* at 1124 (emphasis added). "Simply put, if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Jews For Jesus*, 997 So. 2d at 1108 (cleaned up). "All of the protections of defamation law that are afforded to the media and private defendants are

extended to the tort of defamation by implication." *Ibid.* "[S]pecial damages are not required to be pled in an action for defamation by implication." *Anderson v. Smith*, 2020 WL 10058207, at *5 (M.D. Fla. Mar. 24, 2020) (Schlesinger, J.).

It is well settled in Florida that "'[c]ommentary or opinion based on facts that are set forth in the [allegedly defamatory communication] or which are otherwise known or available to the reader or listener are not the stuff of libel.'" *Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. July 29, 2016) (Gayles, J.) (quoting *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006)). In assessing whether a statement is "pure opinion," we "must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication," and we must "consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement." *Id.* at 1367 (quoting *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984)). "Pure opinion is sometimes characterized as rhetorical hyperbole." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. June 5, 2006) (Seltzer, Mag. J.) (cleaned up); *see also Readon*, 317 So. 3d at 1235 ("Florida law recognizes a difference between statements presented as fact and statements presented as an opinion or rhetorical hyperbole.").

### b.  Analysis

#### i.  *Because the Statements Were True, Summary Judgment Is Appropriate on Block's Defamation-Per-Se Claim*

Block's *per-se* claim fails because Block hasn't shown that anything in the December 18 Email was untrue. The SAC precisely identifies the "operative" portion of the December 18 Email:

> Recently Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the Association nor its management was the source of our owners' email

> addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computer's security and privacy settings.

SAC ¶ 37. This portion of the email, Block alleged,

> accused [him] of having unlawfully and/or wrongfully obtained unit owners' email addresses because, according to the Defendants, "[n]either the Association nor its management was the sources of [the] owners' email addresses and the method of obtainment . . . remains unknown. . . ." Defendants then warned the unit owners to "consider updating their computer[s'] privacy and security settings," falsely suggesting that Plaintiff had unlawfully or wrongfully accessed—and would continue to unlawfully or wrongfully access—the unit owners' electronic devices.

*Id.* ¶ 38.

A year of discovery showed that none of these statements were false. Block *did* send out at least two email "blasts," including the December 11 Email. Block *was* a "disgruntled" owner.[5] He *did* criticize the Association, the Board, and so on.[6] The December 11 Email *did* list unit owners' email addresses. *See* December 11 Email.[7] And the parties agree that the email addresses came from "neither the association nor its management." Block testified that he obtained the email addresses not from the Board or any of the Defendants, but "through his personal network[.]" Block's Resp. SOMF ¶ 105. The Defendants attack Block's testimony as "self-serving," SAC MSJ at 17—bizarre, given that this testimony helps *them*—but mercifully avoid further self-defeating arguments. So, there's no dispute of fact on the provenance of the emails either. Plus, the Defendants say that they didn't

---

[5] Disgruntled means "unhappy and annoyed." *Disgruntled*, MERRIAM-WEBSTER.COM, merriam-webster.com/dictionary/disgruntled (last visited June 26, 2025). If Block's extensive litigation history against the Defendants shows anything, it's that he's unhappy and annoyed.

[6] The record doesn't contain sufficient evidence for us to determine whether Block did so with "incorrect statements and facts," but the factual accuracy of the December 11 Email isn't material to the SAC MSJ.

[7] All of the recipients of the email are listed on the exhibit, but their actual email addresses are redacted. The parties don't tell us exactly which of the recipients were unit owners, but neither party disputes that the recipients included unit owners.

contemporaneously know how Block obtained those email addresses,[8] and Block adduces no evidence that they did. *See generally* Block's Resp. SOMF ¶ 105.

Block fares no better on whether his "list[ing] each member's email address" in fact "caus[ed] serious privacy and security concerns for everyone": It unquestionably did. Block argues that this sub-statement is false because all Defendant have admitted "that they did not really suspect a breach of security or privacy." Block's Resp. at 13. That's not in fact what they admitted. Gerstin testified that he had discrete privacy and security concerns about the December 11 Email. He was "very concerned that somebody had requested email addresses and they were mistakenly given out [by the Association]" or that, "if nobody gave [ ] out the email addresses[,] then whether . . . there might have been a breach of some sort." Deposition of Joshua Gerstin [ECF No. 226-9] at 63:23–64:13. The breach, he explained, could have been caused by "a hacker or something like that," *id.* at 64:10–12, but also "maybe by accident [the email addresses] [we]re [on] the website," *id.* at 70:4–5.

To get to the bottom of how Block acquired the email addresses, Gerstin asked The Palms' property manager and Matesic to determine "whether . . . the association was either compromised as far as email addresses are concerned or if anyone [at the Association] had given out email addresses of members," *id.* at 63:11–16, and he himself "looked through the headers of the [December 11 Email] to see if there [were] any sort of clues there or anything else like that," *id.* at 68:4–8. Asked directly what he determined after his "security look-through," he explained that "the people whose email addresses were exposed have a problem" because "having their personal email addresses leaked . . . [was] the first step to somebody taking [their] identity or hacking or [some]thing like that." *Id.* at 68:9–69:5. He came away thinking that "it was important, crucially important, for the association

---

[8] According to the Defendants, "it was unclear," "[b]ased on Gerstin's [contemporaneous] investigation," "how Plaintiff obtained the residents' private email addresses contained in his December 11, 2020 [E]mail." Defendants' SOMF ¶ 30.

to give notice at the very least to the people whose personal email addresses were exposed." *Id.* at 70:6–8.

Matesic and Abbatt, for their parts, testified that they agreed with Gerstin's security and privacy concerns. Matesic testified that he "understood that not everybody [at] The Palms was aware that their e-mail was shared with other people outside of the community. Not everybody probably recognized that there were people outside of the community and they should [have been] made aware." Deposition Transcript of David Matesic ("Matesic Dep. Tr.") [ECF No. 226-14] at 269:4–8.[9]

Abbatt echoed Matesic's testimony on privacy, explaining that it was a problem that "the email blasts [ ] contained in open view [ ] all of the email addresses of the residents." Deposition Transcript of Candyce Abbatt ("Abbatt Dep. Tr.") [ECF No. 226-17] at 73:17–22.[10] She also added that "it's important to protect, you know, private emails of individuals, particularly if they are homeowners" because failing to do so could expose them to security hazards. *Id.* at 77:11–16. As an example, she noted that an exposed email address could attract "spam emails that contain malware." *Id.* at 76:20–23. And, in Abbatt's experience, it's possible for property owners "in the process of closing [ ] on the sale of a property" to "get an email from someone"—a scammer—"at [the owner's] private email address instructing them, for example, to wire their money to such and such an address." *Id.* at 77:2–11. The owner, expecting such a closing email, could unwittingly send his money to the scammer.

---

[9] Matesic also testified that he understood Gerstin's security concerns to be *real* security concerns. *See* Matesic Dep. Tr. at 269:1–3 ("Q: What did you say about [Gerstin's] security concerns? A: I understood them to be security concerns.").

[10] Abbatt's deposition testimony was consistent with her contemporaneous reaction to the December 11 Email. *See, e.g.*, Abbatt's Internal Board Email dated December 14, 2020 [ECF No. 226-15] at 2 ("I want to know how [Block] obtained these emails. If a board member or employee gave them to him that's also inappropriate. He didn't even bother to blind cc thereby giving out private emails.").

*See ibid.*[11] Like Gerstin, Abbatt concluded that it was "part of our duty as a board . . . to try to let [the residents] know if there has been a breach of [their] security[.]" *Id.* at 77:11–16.

Block's response to all this testimony is bizarre. As to Gerstin, Block argues that "Gerstin actually investigated security concerns and found that there were none"—and, therefore, that he couldn't have had privacy or security concerns when he sent the December 18 Email. Block's Resp. at 13. This argument makes no sense. If the email prompted Gerstin to investigate *the possibility* that a hack had occurred, then it necessarily follows that Block's email caused Gerstin *some* privacy and security concerns. As to the others, Block argues that "neither [Matesic] nor Abbatt actually changed their [own] security settings, though they purported to believe they ran security risks if they did not[.]" Block's Resp. at 2; *see also id.* at 13 (same). But Matesic and Abbatt's unrebutted testimony was that they were concerned about *the residents*' privacy and security, not their own.[12] Their failure to update their own privacy and security settings doesn't bear on their concern for the residents at all—let alone create a dispute of fact.

It moreover seems to us that the parties are quibbling over a statement that's fundamentally an opinion. The Defendants' statement that "visibly list[ing] each member's email address caus[ed] serious privacy and security concerns for everyone" boils down to a statement that the December 11 Email was "concerning." The key "difference between statements of opinion and statements of fact" is that "statements of fact are readily capable of being proven true or false." *Turner*, 879 F.3d at 1264

---

[11] Matesic's testimony on this point was similar to Abbatt's: "Hacking goes on everywhere. I am not a technical wizard but I do know that if your email address goes out and somebody else gets your e-mail address and forwards it off to somebody else, obviously that's an entry port for problems." Matesic Dep. Tr. at 285:7–11. Block attached this page of Matesic's deposition transcript as an exhibit in support of a different motion. [ECF No. 223-3] at 7.

[12] Even Heessels, who otherwise thought the December 18 Email went too far, testified that "there *were* concerns about privacy, no question." Deposition of Patricia Heessels [ECF No. 234-2] at 64:2–21 (emphasis added).

(citing *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 697 (11th Cir. 2016)).[13] Whether the December 11 Email was "concerning" isn't something that can be verified or falsified. *See, e.g.*, *id.* at 1264–66 (holding that statements that the plaintiff had engaged in "homophobic taunting," behaved "inappropriately," and exercised "poor judgment" were all pure opinion). Even if the parties had, say, surveyed all the residents to ask them whether Block's email alarmed them in some way, each resident's alarm (or lack thereof) would simply have been an expression of *that* resident's opinion. For this additional reason, the "concerns" statement can't sustain Block's defamation-*per-se* claim.

Block contends that our order denying the Defendants' motion to dismiss his defamation-*per-se* claim "is the law of the case," and he insists that, because a defamation-*per-se* analysis is "limited to the four corners of the letter," the SAC MSJ "may be denied on this basis alone." Block's Resp. at 18–19. He's wrong for at least two reasons. *First*, "every order short of a final decree is subject to reopening at the discretion of the district judge," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983), and there's never been a final decree in this case.[14] *Second*, and more importantly, our decision now comes on a motion for summary judgment. We're thus no longer bound to accept Block's allegations as true, as we were when we decided his motion to dismiss. Now, Block must produce *evidence* that the Defendants' statements in their December 18 Email were false. *See Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1295 (S.D. Fla. 2023) (Smith, J.) (granting summary judgment for the defendant where "[p]laintiffs have not proven that the [allegedly

---

[13] *Turner* involved Florida law, while *Michel* dealt with New York law. Nevertheless, the Eleventh Circuit in *Turner* relied on *Michel* for the difference between statements of opinion and statements of fact under Florida law.

[14] *See also Dietz v. Bouldin*, 579 U.S. 40, 46 (2016) ("[T]he Court has recognized that a district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case."); *Great Lakes Ins. SE v. Crabtree*, 673 F. Supp. 3d 1301, 1311 & n.20 (S.D. Fla. 2023) (Altman, J.) ("We . . . don't have the luxury of disregarding a clearly erroneous ruling—whether to save judicial resources or for some other noble purpose. . . . Because we think the prior order was wrong, we're well within our discretion to correct it.").

*per se* defamatory] statement in the Open Letter is false or that its substance is defamatory in nature"). Since he hasn't done that, his *per-se* claim fails—irrespective of what we might have said at the motion-to-dismiss phase of this case.

      ii.  *Summary Judgment on Truth Is Inappropriate on Block's Defamation-by-Implication Claim*

Of course, under our reasoning, Block's defamation-by-implication claim survives perfectly intact. "[I]f the defendant juxtaposes a series of facts so as to imply a defamatory connection between them . . . he may be held responsible for the defamatory implication[.]" *Jews For Jesus*, 997 So. 2d at 1108 (cleaned up). "Whether the defendant's statements constitute defamation by implication is a question [of] law for the court to determine." *Turner*, 879 F.3d at 1269. "The inquiry turns on whether the 'gist' of the publication is false." *Ibid.* And "[w]hether the publication is defamatory becomes an issue of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which is defamatory." *Ibid.* Having held that the statements in the December 18 Email weren't false, we have no trouble concluding as a matter of law that, when read together, they *could* defame Block by falsely implying that he's a hacker. To be sure, we think the statements could also be read innocuously. But that means there are "two reasonable interpretations, one of which is defamatory," *ibid*, so the claim clears this preliminary hurdle. And the Defendants seem to agree: They, after all, don't seek summary judgment on any of the elements of Block's defamation-by-implication claim.

**II.    Block Fails to Carry His Burden on Actual Malice**

The Defendants' next argument is that they're entitled to summary judgment on Block's defamation-by-implication claim because, although he's a public figure, he hasn't demonstrated the requisite actual malice. They're right that Block must demonstrate actual malice, but it's because he's a public *official*—not a public *figure*. And they're also right that he hasn't sufficiently demonstrated actual malice. So, while there may be other, common-law bases for us to grant summary judgment for the Defendants on Block's claims (damages, for example), we "choose[ ] a more targeted route that

addresses the underlying problem"—Block's "insufficient evidence of actual malice." *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1310 n.9 (S.D. Fla. 2015) (Rosenberg, J.), *aff'd*, 848 F.3d 935 (11th Cir. 2017).

### a. Block Must Show Actual Malice

"A plaintiff who is a 'public official' must overcome the First Amendment by proving that a false statement relating to his official conduct was made with 'actual malice[.]'" *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 845–46 (11th Cir. 2020) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (cleaned up)). In other words, to decide whether Block bears the actual-malice burden, we must make two threshold determinations: *first*, that Block is a public official (or was at the time he was defamed), *see Rosenblatt v. Baer*, 383 U.S. 75, 87 n.14 (1966) ("It is not seriously contended, and could not be, that the fact [the public-official plaintiff] no longer supervised the [County Recreation] Area when the [defamatory] column appeared has decisional significance here.");[15] *second*, that the false statement he's suing about relates to his official conduct. Whether Block qualifies as a public official is a question of federal law. *See id.* at 84 ("Turning [ ] to the question whether respondent was a 'public official' within [*Sullivan*], we reject at the outset [the] suggestion that it should be answered by reference to state-law standards."). Why not state law? Because "[t]he standards that set the scope of [*Sullivan*'s] principles cannot [ ] be such that 'the constitutional limits of free expression in the Nation would vary with state lines.'" *Ibid.* (cleaned up).

---

[15] *See also Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069 (5th Cir. 1987) ("This Court sees no persuasive reason why [the public-official plaintiffs'] involuntary departure from their public positions [six years before suing] should exempt them from meeting the [*Sullivan*] standard when they sue for a news story on that departure."); *Pierce v. Cap. Cities Commc'ns, Inc.*, 576 F.2d 495, 510 n.67 (3d Cir. 1978) (holding, where defamatory statements were "in large part about decisions made at the time that [the public-official plaintiff] was in office," that "[t]he passage of some three years between the time of [the plaintiff's] departure from [public office] . . . did not, by itself, strip [the plaintiff] of his status as a 'public official'" for actual-malice purposes).

### i. *Block is a Public Official*

"The [Supreme] Court has not provided precise boundaries for the category of 'public official,'" but "it cannot be thought to include all public employees[.]" *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979); *Wilkinson v. Fla. Adult Care Ass'n, Inc.*, 450 So. 2d 1168, 1171 (Fla. 2d DCA 1984) ("[A] public official designation does not attach simply because one is in government employment[.]"). "The thrust of [*Sullivan*] is that . . . [w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees[,] . . . the [*Sullivan*] malice standard[ ] applies." *Rosenblatt*, 383 U.S. at 86. And so, the category of *Sullivan* "public officials" encompasses "elected officials and candidates for those positions," *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978);[16] "appointed officials," *ibid*.; and, "*at the very least*[,] those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs," *Lovingood*, 800 F. App'x at 846 (quoting *Rosenblatt*, 383 U.S. at 85 (emphasis added)). We determine whether an employee exercises "substantial" responsibility by looking to the employee's "control over operations, involvement in formulation of policy or other decision-making, administrative functions, handling of public funds, supervisory responsibility, [and] independent authority," *Johnston v. Borders*, 2018 WL 8244336, at *6–7 (M.D. Fla. June 19, 2018) (Byron, J.), although there's no binding test or formula.[17]

---

[16] "All decisions of the former Fifth Circuit announced before October 1, 1981, are binding precedent in the Eleventh Circuit." *Roman v. United States*, 789 F. App'x 211, 212 (11th Cir. 2019) (citing *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

[17] Since the cases don't tell us whether a federal judge—nominated by the President and confirmed by the Senate—constitutes an "appointed official" within the ambit of *Sullivan*, *see Plante*, 575 F.2d at 1135, we'll analyze Block's status under the substantial-responsibility test. Obviously, though, if federal judges are "appointed officials," then Block is plainly a public official under the law.

Paradoxically, the substantial-responsibility test isn't especially demanding. Many everyday government functionaries will qualify. *See* LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 866 (2d ed. 1988) ("[T]he term 'public official' now embraces virtually all persons affiliated with the government, such as most ordinary civil servants, including public school teachers and policemen."). The "NASA deputy manager" plaintiff in *Lovingood*, for example, was a public official simply because his "responsibility for [a] [space] shuttle's propulsion systems amounted to [substantial] control over the conduct of governmental affairs." 800 F. App'x at 846. So too was a county animal-control director empowered to "impound people's pets[ ] and issue citations carrying civil penalties"—a rather modest official remit. *Demby v. English*, 667 So. 2d 350, 354 (Fla. 1st DCA 1995) ("Although [the director] is not an elected public official, she most certainly is a public officer wielding a portion of the sovereign power of this state . . . and is therefore subject to the actual malice standard."). Even regular police officers and prison guards have been held to be public officials. *See, e.g.*, *Smith v. Russell*, 456 So. 2d 462, 463 (Fla. 1984) (holding that a police officer was a public official because he was "a highly visible representative of government authority who has power over citizens and broad discretion in the exercise of that power"), *cert. denied*, 470 U.S. 1027 (1985); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 361 (Fla. 4th DCA 1997) (holding that corrections officers were public officials).[18]

Block, a sitting senior judge on the United States District Court for the Eastern District of New York, is obviously a public official. The public has a marked independent interest in the qualifications and performance of federal judges. *See, e.g.*, David F. Levi, Raymond J. Lohier Jr., Diane P. Wood & Jeffrey S. Sutton, *Losing Faith: Why Public Trust in the Judiciary Matters*, 106 JUDICATURE 70, 72 (2022) ("[W]e really have nothing other than public confidence to protect the branch. . . . Any loss

---

[18] *See also Stewart v. Town of Zolfo Springs*, 1997 WL 689448, at *3 (M.D. Fla. Aug. 27, 1997) (Adams, J.) (holding that a police officer was a public official); *Horne v. WTVR, LLC*, 893 F.3d 201, 207 (4th Cir. 2018) (collecting public-official cases).

in confidence in what we do, or what the Supreme Court does, makes the rule of law somewhat more vulnerable and detracts from the legitimacy of what we do."). And we can say firsthand that federal district-court judges—like all federal judges—both *appear to* and *actually* exercise at least the same amount of "responsibility for or control over" government affairs as an agency's deputy program manager or a police officer. How could it be otherwise, when it's "emphatically [our] province and duty . . . to say what the law is?" *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). In discharging that duty, we oversee or sometimes outright dispose of cases raising questions acutely relevant to the public: from which party will recover (or pay) millions of dollars in damages[19] to why an executive act respects (or offends) the Constitution[20] to whether a criminal defendant's rehabilitation is sufficient to restore his liberty.[21]

We're not aware of any federal defamation action in which a federal court has determined that federal judges are public officials. But many courts, applying *Sullivan*, have found *state* judges to be "public officials" who are required to demonstrate "actual malice." *See, e.g.*, *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1056 (9th Cir. 1998) (holding that a California superior court judge was a public official).[22] In our assessment, it makes no difference that state judges are often elected, rather than

---

[19] *Cohen v. G & M Realty L.P.*, 320 F. Supp. 3d 421, 428 (E.D.N.Y. 2018) (Block, J.) (awarding, after a bench trial, $6.75 million to aerosol artists who sued a building owner because he'd willfully destroyed their artwork), *aff'd*, 950 F.3d 155 (2d Cir. 2020).

[20] *Scott v. Goodman*, 961 F. Supp. 424, 427 (E.D.N.Y. 1997) (Block, J.) (holding that a New York City Transit Authority regulation banning employees from wearing any button, badge, or other insignia violated the First Amendment), *aff'd*, 191 F.3d 82 (2d Cir. 1999).

[21] *See, e.g.*, *United States v. Russo*, 643 F. Supp. 3d 325, 339 (E.D.N.Y. 2022) (Block, J.) (explaining why former Colombo Family captain Anthony Russo was entitled to compassionate release); FREDERIC BLOCK, A SECOND CHANCE: A FEDERAL JUDGE DECIDES WHO DESERVES IT, ch. 11 (2024) (ebook) (same).

[22] *See also Milgroom v. News Grp. Bos., Inc.*, 586 N.E.2d 985, 986–87 (Mass. 1992) ("A sitting judge is a public official for the purposes of applying the principles of [*Sullivan*].."); *Aisenson v. Am. Broad. Co.*, 269 Cal. Rptr. 379, 383 (App. 2d Dist. 1990) (same holding as to Los Angeles Superior Court judge); *Times Publ'g Co. v. Huffstetler*, 409 So. 2d 112, 114 (Fla. 5th DCA 1982) (same holding as to Florida circuit-court judge); *Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 481 (7th Cir. 1981) (affirming

nominated and confirmed. *Accord Sullivan*, 376 U.S. at 273 (explaining that judges and elected officials alike "are to be treated as 'men of fortitude, able to thrive in a hardy climate'" (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947))). Irrespective of how they obtain their offices, judges in our federalist system—state or federal—exercise sufficient power and responsibility (and engender sufficient public interest) to qualify as public officials.[23] That goes for Block too.

### ii.   *The December 18 Email Pertains to Block's Official Conduct*

A little counterintuitively, the Defendants' "false statements" in this condo dispute indeed relate to Block's official conduct. "[A]nything which might touch on an official's fitness for office is relevant" to the actual-malice analysis, *Garrison*, 379 U.S. at 77, because society's interest in a public official "is not strictly limited to the formal discharge of official duties," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–45 (1974). Indeed, "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." *Garrison*, 379 U.S. at 77. It's for this reason that the Supreme Court has "h[e]ld as a matter of constitutional law that *a charge of criminal conduct*, no matter how remote in time or place, *can never be irrelevant* to an official's or a candidate's fitness for office for purposes of application" of the actual-malice analysis. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971) (emphasis added) (rejecting argument that a public-official plaintiff bears the burden of proving actual malice

---

(without discussion) same holding as to Wisconsin county-court judge); *Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382–83 (N.Y. 1981) (same holding as to New York Supreme Court Justice); *Garrison v. State of La.*, 379 U.S. 64, 66–67, 76–77 (1964) ("find[ing] no difficulty in bringing the [plaintiff's] statement within the purview of criticism of the official conduct of public officials" where the plaintiff had criticized the "excessive vacations" of Louisiana parish district-court judges); *see also Wilkinson v. Fla. Adult Care Ass'n, Inc.*, 450 So. 2d 1168, 1171 (Fla. 2d DCA 1984) (collecting cases on whether various officials qualify as public officials).

[23] And, of course, because of the substantial-responsibility test, the public-official designation isn't *limited* to solely judicial-branch judges. At least one case has held that, for example, a Florida "compensation claims judge"—a state-agency judge similar to a federal administrative-law judge—is a "public official" under *Sullivan. Hoch*, 742 So. 2d at 454, 460.

"only as to libels relating to official conduct" (cleaned up)); *see also Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 300 (1971) (same).

Block alleges that the December 18 Email charged him with criminal conduct. *See* SAC ¶ 39 ("The letter [ ] implicitly accused Plaintiff of committing state and federal computer criminal hacking offenses, including under Fla. Stat. Ann. § 815.06 *et seq.* and the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*"). Whether Block is indeed a hacker—although, let's be clear, there's not an iota of evidence that he is—obviously bears on his fitness to serve as a federal judge. *Cf. Dodds*, 145 F.3d at 1068 ("[S]tatements of opinion concerning whether a person who holds high public office is fit for that office or is competent to serve in that position are protected under the First Amendment[.] . . . [This] rule clearly applies equally to all state and federal judges, elected, appointed, or otherwise.").

*     *     *

Because Block is a public official and the defamation bears on his official conduct, he must show actual malice.[24]

### b. Block Fails to Show Sufficient Evidence of Actual Malice

To prevail at summary judgment, then, Block must present evidence that each of the Defendants sent the December 18 Email with actual malice. *See Lovingood*, 800 F. App'x at 845–46 (citing *Sullivan*, 376 U.S. at 279–80). Although we "apply Florida's substantive law" to Block's

---

[24] For reasons we can't begin to fathom, the Defendants didn't bother arguing that Block was a public *official*. They instead contended that Block was a general public *figure*, like an athlete or a celebrity, or alternatively a limited-purpose public figure who'd thrust himself into the forefront of the roof-repair controversy. Block, for his part, didn't admit that he was a public official who was required to show actual malice until we directed the parties to file supplemental briefing on that issue. *See* Order Directing Supplemental Briefing [ECF No. 275] at 3–4 (citing Rule 56(f)); Plaintiff's Supplemental Brief [ECF No. 277] at 1–2 ("Plaintiff agrees that he is a 'public official' under *Sullivan* and its progeny. . . . Plaintiff [also] agrees that as a public official he must show that Defendants acted with actual malice."). But since the parties eventually agreed that Block is a public official, we won't address their public-figure arguments at all.

defamation claims, we look to First Amendment law to determine whether Block's evidentiary showing is sufficient. *Phelps v. Ramsay*, 2024 WL 3289612, at *7 (11th Cir. July 3, 2024) (first citing *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018); and then citing *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020)). It isn't, as we'll explain.

### i.   The Standard

*Sullivan* defines actual malice as "knowledge that [a false statement] was false" or "reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. "The mere existence of a false statement does not, on its own, demonstrate [a defendant's] knowledge of its falsity." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 946 (11th Cir. 2017). Actual malice "is a subjective test, which asks whether the publisher 'in fact entertained serious doubts as to the truth of his publication,'" but published anyway. *Berisha*, 973 F.3d at 1312 (quoting *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988)). The test is "not an objective one," in the sense that "the beliefs or actions of a reasonable person"—whether, for instance, a reasonable person would have investigated the truth of his statement before publishing it—"are irrelevant." *Michel*, 816 F.3d at 703 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). All that matters is the speaker's state of mind—*i.e.*, whether, *at the time he spoke*, he knew (or didn't care) that he was speaking falsely. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("[W]e have made clear that the defendant must have made the false publication with a 'high degree of awareness of . . . probable falsity.'"); *see also* 1 ROBERT D. SACK, LYRISSA B. LIDSKY, SACK ON DEFAMATION § 5:5.1 at 5-87 (5th ed. 2024) ("It is crucial that the state of mind of the defendant be measured at the time of publication." (collecting cases)).

A public-official plaintiff may adduce different kinds of evidence to create a fact issue on actual malice. Direct documentary or testimonial evidence—for example, a contemporaneous email exchange in which the defendants admit that they knew a statement was false, but resolved to publish it anyway—would probably always justify denying summary judgment. *See* RODNEY A. SMOLLA, 1 LAW

OF DEFAMATION § 3:45.50 (2d ed. May 2025 Update) ("The clearest showing of fault under the [*Sullivan*] standard would be proof that the publisher knew that a defamatory statement was false but published it despite such knowledge and without qualification." (quoting Lackland H. Bloom, *Proof of Fault in Media Defamation Litigation*, 38 VAND. L. REV. 247, 256 (1985))). But it's "rare for a defendant to admit actual malice" outright. *Reid v. Viacom Int'l Inc.*, 2017 WL 11634619, at *3 (N.D. Ga. Sept. 22, 2017). For that reason, we also allow plaintiffs to carry their burden with "circumstantial evidence," including "evidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant[.]" *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (collecting cases); *Connaughton*, 491 U.S. at 668 ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence[.]"); *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence."). After all, "a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Hunt*, 720 F.2d at 644 (cleaned up).

There's no fixed list of pertinent types of circumstantial evidence, and no one type of circumstantial evidence is automatically sufficient by itself. So, for example, "[e]ven [a defendant's] 'extreme departure from professional [publishing] standards' does not necessarily rise to the level of actual malice." *Berisha*, 973 F.3d at 1312 (quoting *Connaughton*, 491 U.S. at 665–66). That said, we view the evidence cumulatively. As in any case, multiple pieces of circumstantial evidence generally weigh more than one piece of circumstantial evidence. *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("The plaintiff can 'prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence.'" (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987))); *Eastwood*, 123 F.3d at 1256 ("We look to *the totality* of the [defendant]'s

presentation . . . and find that [it] falsely suggested [the gist of the defamation]." (emphasis added));
*Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 411 (6th Cir. 1991) (stating that a plaintiff "can present proof
of malice in the form of cumulative circumstantial evidence, which is often the only way to prove
malice in libel cases").[25]

We think there's also no explicit bar against *post*-publication evidence. It's true that the
Eleventh Circuit hasn't expressly endorsed our view. In fact, it seemed to suggest the opposite in a
recent binding decision, holding that a defendant's "communications with certain third-parties *after*
the first article had been published [ ] d[id] not speak to [the defendant]'s knowledge of the accuracy
of the statements [he] made" and ultimately concluding that the plaintiffs had failed to "demonstrate[ ]
a probability of success on the actual malice issue." *Novella*, 848 F.3d at 947. But *Novella* didn't
announce a blanket proposition that post-publication evidence is irrelevant to actual malice, or even
articulate a legal rationale for its assessment that we could generalize to other cases. We're also not
aware of any decision (including any other Eleventh Circuit decision) citing *Novella* to categorically
exclude post-publication evidence—and at least one decision has rejected that reading. *See Coomer v.
The Am. Project, Inc.*, 2025 WL 1222527, at *3 (M.D. Fla. Apr. 28, 2025) (Flynn, Mag. J.) ("Moreover,
the Court is not persuaded that the *Novella* case stands for the broad proposition suggested by
Defendants, namely, that post-publication information is never relevant in defamation cases.").

*Novella* notwithstanding, we see no reason to categorically preclude defamation plaintiffs from
relying on post-publication evidence. Suppose a defendant happened to memorialize in a post-
publication email that he knew he had lied about the plaintiff. Such an email would *obviously* be evidence

---

[25] *See also Coomer v. Byrne*, 2025 WL 90097, at *6 (M.D. Fla. Jan. 14, 2025) (Barber, J.) ("[Actual malice]
evidence may include a combination of factors such as the inherent improbability of the defamatory
claim, reason to doubt the veracity or reliability of the source, the lack of any attempt to corroborate
or refute a questionable claim by consulting the most obvious sources, and the defendan's awareness
of other credible information contradicting the claim." (cleaned up)).

of actual malice. That defendants are rarely so obliging doesn't affect the principle; a plaintiff will usually have evidence less direct than an "I-know-I-lied" email, but he should still be allowed to adduce it. In the criminal context, for example, a defendant's "knowledge and intent" may "be proven through [his] false exculpatory statements"—statements that, it goes without saying, post-date the commission of the crime. *United States v. Childers*, 254 F. App'x 772, 785 (11th Cir. 2007) (citing *United States v. McDowell*, 250 F.3d 1354, 1367 (11th Cir. 2001)). Similarly, in employment-discrimination cases, inconsistent "[p]ost-hoc justifications for termination [can] constitute evidence of pretext" because shifting justifications might show that an employer fired an employee for an improper reason. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) (collecting cases).

Since actual malice is a state of mind much like any other, a plaintiff should be entitled to try to prove it with whatever evidence he can find. Much as "a brick is not a wall[,]" a single "item of evidence . . . need not prove conclusively the proposition for which it is offered." 1 MCCORMICK ON EVID. § 185.2 (9th ed. 2025). In that vein, the Supreme Court has suggested that "[t]he existence of actual malice may be shown [through] any competent evidence, either direct or circumstantial . . . including . . . subsequent statements of the defendant." *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (quoting 50 AM. JURIS. 2D. LIBEL AND SLANDER § 455 (1970)); 50 AM. JURIS. 2D. LIBEL AND SLANDER § 458 (2025) (same). Several courts have held the same. *See, e.g.*, *Gilmore v. Jones*, 2021 WL 68684, at *6 (W.D. Va. Jan. 8, 2021) ("While evidence that the publisher had not yet obtained at the time of publication could not be relevant to his state of mind, materials that post-date the publication (including, for example, the publisher's own statements) may be probative of actual malice.").[26] We'll follow their lead here.

---

[26] *See also Eramo v. Rolling Stone*, 209 F. Supp. 3d 862, 874 (W.D. Va. 2016) (concluding, on summary judgment, that evidence of a publisher's "internal conversations and discussions with outside sources" after publication of an allegedly defamatory article was relevant to the actual-malice inquiry),

Regardless of the *type* of actual-malice evidence the plaintiff adduces, the plaintiff only carries its burden if that evidence shows that the defendant *knew* (or was recklessly indifferent to whether) it was speaking falsely. The Supreme Court's decision in *Masson* is instructive. There, the Court identified a jury question on actual malice where there were material differences between how a defendant reporter quoted the plaintiff in writing and what the plaintiff had actually said on the defendant's tape recording. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 521–25 (1991). Similarly, in *Connaughton*, the Supreme Court held that "the conclusion that the [defendant newspaper] acted with actual malice inexorably follow[ed]" from evidence that the defendant relied solely on a source who was "hesitant," "sometimes unresponsive," and "improbable," disregarding statements from five other witnesses denying the story the defendant wanted to report and declining to interview a "key witness" with direct knowledge of the facts. *Connaughton*, 491 U.S. at 690–93. The defendants in each of those cases knew that there were strong reasons to doubt the truth of their statements. In *Masson*, the reporter attributed statements to the defendant that the reporter's own recordings showed the defendant never said. In *Connaughton*, the newspaper recklessly relied on a suspect source, willfully closing its eyes to overwhelming contrary witnesses.[27] That's the standard here.

---

*reconsideration granted on unrelated grounds*, 2016 WL 5942328 (W.D. Va. Oct. 11, 2016); *Stern v. Cosby*, 645 F. Supp. 2d 258, 280 (S.D.N.Y. 2009) (noting, on summary judgment, that the defendant's trip to the Bahamas, taken after the plaintiff filed his defamation suit, where she met her sources and offered to pay them to sign affidavits supporting the allegations in her book, was probative of actual malice (citing *Sharon v. Time, Inc.*, 599 F. Supp. 538, 581 (S.D.N.Y. 1984))); *Davis v. Schuchat*, 510 F.2d 731, 736 (D.C. Cir. 1975) (noting that the witness's testimony regarding the defendant's knowledge "shortly after the slanderous utterances" was relevant to the defendant's state of mind at the time of publication); SMOLLA § 3:79 (collecting cases).

[27] *See also Drummond Co., Inc. v. Collingsworth*, 2024 WL 5056619, at *7 (N.D. Ala. Dec. 10, 2024) (denying summary judgment on actual malice where there was evidence that the defendant had paid certain sources to support his story by "contradict[ing] their prior sworn testimony" and accusing the plaintiff of wrongdoing); *Amin v. NBCUniversal Media, LLC*, 2024 WL 3188768, at *26 (S.D. Ga. June 26, 2024) (denying summary judgment on actual malice where there was evidence that the defendant reported that the plaintiff, an ICE doctor, had performed "mass hysterectomies" and called him the "uterus collector," even though it knew from various sources that he had performed (at most) only two

Remember, too, that Block's surviving defamation claim is one of defamation by *implication*—meaning that the statement is susceptible of *both* defamatory *and* nondefamatory meanings. So, to show actual malice, Block must adduce evidence *not only* that the Defendants knew the defamatory meaning was false, but *also* "that the [D]efendant[s] either intended to communicate the defamatory meaning or knew of the defamatory meaning and w[ere] reckless in regard to it." *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 90 (3d Cir. 2013). As the Third Circuit has explained, it suffices in "ordinary" defamation cases to show merely that the defendant published a statement that it *knew* to be false. And that makes sense. If a defendant makes a statement capable of only a defamatory meaning (*e.g.*, that the plaintiff is an arsonist), and the defendant *knows* that the statement is false, then it's entirely reasonable to surmise that the defendant intended the defamatory meaning. But, in "defamation-by-implication cases, showing known falsity [or recklessness] alone is inadequate . . . because the statement has defamatory and nondefamatory meanings," and the defendant might have meant only the nondefamatory meaning. *Ibid.* To hold that falsity alone is sufficient to show actual malice in an implication case would be to hold, perversely, that *Sullivan*'s protections are more easily lost when a defendant's statement has *at least one* nondefamatory meaning than when it has *no* nondefamatory meanings at all. That's not what the cases contemplate. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (holding that, where "adoption of the language chosen [i]s 'one of a number of possible rational interpretations' of an event," even language "reflecting a misconception[ ] does not place the speech beyond . . . the First Amendment's broad protective umbrella," and observing that to hold otherwise would be to say that "any individual using a malapropism might be liable"); SACK ON DEFAMATION § 5:5.1 at 5-95 & n.497 ("[I]mplications perceived in a statement but not

---

hysterectomies); *100PlusAnimal Rescue, Inc. v. Butkus*, 2020 WL 13517903, at *9 (S.D. Fla. Sept. 30, 2020) (Cooke, J.) (denying summary judgment on actual malice where there was evidence that the defendant had viewed a report exonerating the plaintiff of criminal misconduct, but nevertheless subsequently stated that the plaintiff had engaged in that misconduct).

intended by the speaker ordinarily are not actionable in public official or public figure cases." (collecting cases)).

It's for this reason that several circuit courts have concluded, as we do, that an actual-malice plaintiff asserting a defamation-by-implication claim "must show something that establishes defendants' intent to communicate the defamatory meaning." *Kendall*, 716 F.3d at 90; *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (affirming summary judgment against a plaintiff who "utterly fail[ed] to demonstrate that [the defendant] intended or knew of [certain defamatory] implied messages").[28] The Eleventh Circuit hasn't expressly joined these other circuits, but it approvingly cited *Kendall* in affirming summary judgment for a defendant where the plaintiff's evidence was "immaterial as to whether [the defendant] actually had doubts about . . . the alleged [defamatory] implications." *Klayman v. City Pages*, 650 F. App'x 744, 749–50 (11th Cir. 2016).[29]

Finally, Block "must present clear and convincing evidence that the defendants acted with actual malice to defeat defendants' summary judgment motion." *Silvester*, 839 F.2d at 1498 (citing *Anderson*, 477 U.S. at 248); *Phelps*, 2024 WL 3289612, at *7 (affirming summary judgment for the defendants and holding that a public-figure plaintiff was required to "show by clear and convincing

---

[28] *See also Dodds*, 145 F.3d at 1064 ("It is not enough, however, to show that this [defamatory] implication was reasonable. [The plaintiff] must further establish that [the defendant] intended to convey the defamatory implication." (quoting *Newton v. Nat'l Broad. Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990))); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) ("It follows that where the plaintiff is claiming defamation by innuendo, he also must show . . . that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material."); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) ("[W]here the plaintiff is claiming injury from an allegedly harmful implication arising from the defendant's article, 'he must show with clear and convincing evidence that the defendant[ ] intended or knew of the implications that the plaintiff is attempting to draw[.]'" (quoting *Saenz*, 841 F.2d at 1318)).
[29] At least one other Circuit has interpreted *City Pages* as "holding that a plaintiff must prove actual malice as to defamatory meaning" in defamation-by-implication cases. *Palin v. New York Times Co.*, 113 F.4th 245, 276 (2d Cir. 2024) (discussing the holdings of its "sister circuits," but declining to "join these courts" solely because the case before it was "not a defamation-by-implication case").

evidence that the [defendants] acted with actual malice toward her").[30] That is, he must adduce evidence "sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice on the part of the defendant." *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 294 (Fla. 2d DCA 2001). "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254.[31]

    The clear-and-convincing-evidence standard is undoubtedly difficult to satisfy. *See, e.g.*, *Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024) (collecting cases describing the burden as "heavy," "daunting," and requiring a "high standard of proof"); *Kahl*, 856 F.3d at 116 ("[A] public-figure plaintiff faces a 'daunting' summary judgment standard. The standard is 'significantly

---

[30] *See also Anderson*, 477 U.S. at 255–56 ("[W]here the factual dispute concerns actual malice, . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."); *Rebozo v. Washington Post Co.*, 637 F.2d 375, 381 (5th Cir. Feb. 1981) ("[A]s in all summary judgment cases, [the question] is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, the evidence and all the inferences which can reasonably be drawn from it must meet that higher standard." (internal citation omitted)). Florida's courts have held the same. *See, e.g.*, *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43 (Fla. 4th DCA 2010) ("[S]ummary judgment was proper because there is no record evidence sufficient to satisfy this court that a jury could find, by clear and convincing evidence, that [the Defendant] acted with actual malice in publishing the five statements in question.").
[31] *See also Phelps*, 2024 WL 3289612, at *9 (affirming summary judgment for the defendants because "the district court properly found insufficient evidence to create a jury issue as to actual malice"); *Klayman*, 650 F. App'x at 751 (same where actual-malice evidence was "insufficient" and "[fell] short"); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 766–69 (4th Cir. 2023) (same where actual-malice evidence "fail[ed] to tip the scales," and was "not enough," "insufficient," and "d[id] not come close to the quantum of evidence needed to create a jury question"); *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 117 (D.C. Cir. 2017) (Kavanaugh, J.) (same where actual-malice evidence was "insufficient"); *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (same as to certain defendants, concluding that the plaintiff's actual-malice "evidence here falls short").

more onerous than the usual preponderance of the evidence standard.' . . . Summary proceedings 'are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.'" (internal citations omitted)); *accord Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *24 (S.D. Fla. Sept. 20, 2023) (Goodman, Mag. J.). ("This standard is so high that this Court last found a triable issue on actual malice in cases against media defendants brought by public figures in 1983."). "[A]lthough [the standard is] not 'insatiable,' [it's] still 'demanding,'" *Raulerson v. Warden*, 928 F.3d 987, 1007 (11th Cir. 2019) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)), requiring "proof that a claim is highly probable," *ibid.* (cleaned up); *accord Friedman v. Schiano*, 777 F. App'x 324, 331 (11th Cir. 2019) ("Clear and convincing evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." (cleaned up)); *Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1268 (S.D. Fla. 2020) (Singhal, J.) ("Clear and convincing evidence is an 'intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.'" (quoting *B.F. v. Fla. Dep't of Child. & Fams.*, 237 So. 3d 390, 392 (Fla. 4th DCA 2018))).

### ii. *Block Fails to Demonstrate the Existence of a Jury Issue on Actual Malice*

Block hasn't adduced enough evidence to survive summary judgment as to any of the Defendants. Block's argument on actual malice is cursory and weak, consisting of just one paragraph with no case citations. It really only contains two assertions: *first*, he says that, "[a]s argued above, *supra* § II.A., Defendants published full-well [sic] knowing the falsehood of what they said"; *second*, he claims that the Email was "inherently improbable" because "[n]o reasonable person could have concluded that Block hacked or did something else untoward to obtain his neighbors' email addresses." Block's

Resp. at 10. Even filling in Block's arguments for him, we can't conclude that he's surmounted the clear-and-convincing-evidence standard.

In section II.A of Block's brief, Block tries to explain why the Defendants lost any state-law privilege they might have had by speaking with *express* malice. But express and actual malice are different standards, and we're thoroughly unimpressed by Block's vague gesture (without argument or case citations) towards evidence of the former to try and carry his different—and higher—burden on the latter. Nevertheless, we'll do our best to try to flesh out what we think Block is saying here. Charitably construed, Section II.A identifies five possible pieces of evidence: *first*, Block argues that "the [Email] itself evinces ill-will" by using the words "disgruntled" and "regurgitating," Block's Resp. at 5–6; *second*, he reiterates that Matesic and Abbatt didn't change their security settings, *ibid.*; *third* and *fourth*, he obliquely references the "[t]he ongoing Tower One controversy," including the fact that Abbatt and Matesic led a recall campaign against him and that, from March 26, 2021, to December 8, 2021, Matesic "[a]trociously [ ] fil[ed] judicial ethics complaints against Block" after Block sued Matesic, *id.* at 6–7; *fifth*, he discerns malice in the Defendants' refusal "to issue a retraction and an apology, even after Block made them aware of the defamatory import of their [Email]," *id.* at 7.[32]

### A. The Words, the Recall, and the Ethics Complaints

The first, third, and fourth pieces of evidence all have something in common: They're, at best, (weak) evidence of express or "ordinary" common-law malice—not *actual* malice. "'[A]ctual malice' is a term of art, created to provide a convenient shorthand expression for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers." *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 251–52 (1974). "As

---

[32] Block also suggests that "[t]he ongoing Tower One controversy" *itself* "furnishes proof of malice" because a "jury [could] conclude . . . that Block's detailed critique had embarrassed the[ ] [Defendants], and that they wished to strike back at him." Block's Resp. at 6. In other words, Block is offering *his own email* as "evidence" of the state of mind with which the *Defendants* sent the December 18 Email. This "argument" is frivolous on its face, and we won't deign to address it further.

such, it is quite different from the common-law standard of 'malice' generally required under state tort law[.]" *Ibid.*[33] We'll thoroughly explain express malice later in this Order, when we discuss Block's own motion for summary judgment. For now, suffice it to say that express malice means "ill will, hostility, [and] evil intention to defame and injure." *Nodar*, 462 So. 2d at 811.

Unfortunately for Block, the Eleventh Circuit has bluntly reaffirmed, in recent binding precedent, that "[i]ll-will, improper motive or personal animosity plays *no role* in determining whether a defendant acted with actual malice." *Veritas*, 121 F.4th at 1283 (quoting *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) (emphasis added)); *see also Phelps*, 2024 WL 3289612, at *8 (holding that, even if the defendants had devised a plan "to harm [the plaintiff], the existence of such a plan fails to establish that the [defendants] 'entertained serious doubts as to the truth of [their] publications'" (citing *Berisha*, 973 F.3d at 1312)).[34] For that reason alone, there's a strong argument that we needn't consider *any* evidence of express malice as evidence of actual malice.

That said, we think *Veritas* and *Dunn* may be in tension with *Connaughton*, in which the Supreme Court explained that "it *cannot* be said that [circumstantial] evidence concerning motive . . . *never* bears any relation to the actual malice inquiry." *Connaughton*, 491 U.S. at 666 (emphasis added). That's not to

---

[33] *See also Lovingood*, 800 F. App'x at 846 n.5 ("Actual malice under the [*Sullivan*] standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." (quoting *Masson*, 501 U.S. at 510)); *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984) ("[T]he 'actual malice' necessary to overcome the 'constitutional privilege' of [*Sullivan*] is different from the express malice necessary to avoid the common-law qualified privilege. The elements of 'actual malice,' and the standard of proof, differ from those of express malice.").

[34] *Veritas* arose on a motion to dismiss, but *Dunn* and *Phelps* both affirmed grants of summary judgment for the defendants. Also, although *Dunn* concerned a labor dispute in which the plaintiffs weren't public officials or figures, the actual-malice standard nevertheless applied. "[T]he Supreme Court has instructed that federal labor law partially preempts state libel law because national labor policy favors free speech, open communication, and robust debate in labor disputes," and so, a defamatory statement "published in the context of a labor dispute . . . is actionable only if a plaintiff shows the statement was made with actual malice." *Dunn*, 193 F.3d at 1191 (first citing *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 272–73 (1974); and then citing *Linn v. United Plant Guard Workers of Am., Loc. 114*, 383 U.S. 53, 64–65 (1966)).

say that the Supreme Court has suggested that a plaintiff can carry his actual-malice burden solely with circumstantial motive evidence—quite the opposite: It has explained that the "actual malice standard is not satisfied *merely* through a showing of ill will or 'malice' in the ordinary sense of the term" and cautioned that "courts must be careful not to place too much reliance on such factors." *Ibid.* After all, "actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith." *Tavoulareas*, 817 F.2d at 789.[35] "Such an approach would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence." *Ibid.* But, in the spirit of *Connaughton*, several other circuits have permitted evidence of ill motive to bear on the existence of actual malice. *See, e.g., Sindi v. El-Moslimany*, 896 F.3d 1, 17 (1st Cir. 2018) ("[The defendant] had an obvious motive to besmirch [the plaintiff's] reputation: she believed that [the plaintiff] had engaged in an extramarital affair with her husband. . . . [The defendant]'s vengeful motive, while insufficient on its own to establish actual malice, furnishes cogent evidence supporting such a finding.").[36] That's logical: A defendant who is particularly motivated to hurt the plaintiff might well be motivated to lie to do so.

---

[35] *See also Bohler v. City of Fairview*, 830 F. App'x 465, 473 (6th Cir. 2020) ("Nor is any improper motive on the part of [the defendants] a decisive factor in proving 'actual malice.'").

[36] *See also Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice."); *Duffy v. Leading Edge Prods. Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("Although we recognize that proof of ill will or animosity is not required to show actual malice, evidence of ulterior motive can often bolster an inference of actual malice."); *Tavoulareas*, 817 F.2d at 795 ("It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice. . . . Nevertheless, reason and the weight of precedent suggest that, under some circumstances, the probative value of ill-will evidence in establishing 'intent to inflict harm through falsehood' outweighs the risk that admitting such evidence will chill honestly believed speech."). Florida's courts have reached the same conclusion. *See, e.g., Don King Prods., Inc.*, 40 So. 3d at 44 ("A showing of ill will, alone, cannot establish actual malice. However, ill will or motive, when combined with other evidence, may amount to actual malice.").

It's therefore worth explaining why Block's proffer of the word choice, the recall campaign, and the ethics complaints isn't enough to surmount his actual-malice burden *even under* a more lenient evidentiary regime. Our task in this case is to assess whether there's a "clearly convincing" genuine dispute of material fact on the existence of *actual* malice.

**The Word Choice.** We can immediately dispose of Block's argument that certain ostensibly disparaging words in the Email show actual malice. The words, of course, aren't themselves probative of falsity or recklessness—they're evidence of actual malice only insofar as they're evidence of express malice. "[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs" whether facts are material for summary-judgment purposes. *Anderson*, 477 U.S. at 248. Because there's no First-Amendment substantive law of express malice, we use "Florida's substantive law," *Phelps*, 2024 WL 3289612, at *7 (citing *Turner*, 879 F.3d at 1262), to determine whether the words of the December 18 Email are competent evidence of express malice.[37] As it happens, they aren't.

Block says that the "letter itself evinces ill-will" because the Defendants referred to him as "disgruntled" and said that he was "regurgitating" certain information. Block's Resp. at 12–13 (quoting December 18 Email). This "utterly gratuitous" language, Block says, reveals that "the publication's true, primary intent was to discredit [Block's] analysis and defame him by way of retribution." *Id.* at 13. Filling in the gaps for Block, the reasoning seems to be that the Defendants' words show their ill intent towards him, and that ill intent (he seems to be saying) evinces their actual malice. Block doesn't

---

[37] So that it's clear, though, Florida law doesn't govern or supplement Block's actual-malice *burden.* As we'll explain later, to survive summary judgment on the element of express malice under Florida's qualified-privilege law, a plaintiff must adduce evidence of express malice that's sufficient for a jury to conclude that a defendant's "*primary* motive" was to injure the plaintiff. *See infra* at 61–63. But that doesn't mean that Block's express-malice evidence must satisfy the "primary motive" standard for us to accept it as evidence of actual malice. Rather, Block is entitled to try to carry his burden with *any* competent evidence he may adduce of express malice—*even if* that evidence wouldn't be enough to show that the Defendants' "primary motive" was to defame him.

argue—nor could he—that the words "disgruntled" and "regurgitate" in any way demonstrate the Defendants' knowledge of the falsity of their statement. We therefore take him to be arguing that the Defendants' word choice shows that the Defendants intended the defamatory implication of the December 18 Email.

Unfortunately for Block, his argument is absurd. As we noted, "disgruntled" means "unhappy and annoyed." *Disgruntled*, MERRIAM-WEBSTER.COM, merriam-webster.com/dictionary/disgruntled (last visited June 26, 2025). Was Block disgruntled? Yes—obviously. And to "regurgitate" means "to throw or pour back or out from or as if from a cavity." *Regurgitate*, MERRIAM-WEBSTER.COM, merriam-webster.com/dictionary/regurgitate (last visited June 26, 2025). "Typically," it refers to something— say, information—that has "been taken in, at least partially digested, and then spit back out." *Ibid*. We don't think that "regurgitate" connotes something strictly negative,[38] but Block's argument isn't more persuasive even when we infer (as we must) that the Defendants meant it disparagingly. "Strong, angry, or intemperate words do not alone show express malice." *Nodar*, 462 So. 2d at 812. Under Florida law, "words themselves" inherently "demonstrate express malice" only when they are "*so extreme*." *Ibid*. (emphasis added).

Obviously, to satisfy a standard that regards mere garden-variety "extreme" words as insufficient, the words must be genuinely incendiary. In *Loeb*, for instance, the "intrinsically" malicious words were statements that the plaintiff "was a disgrace to a Jewish organization," that he was of "low moral character," and that he had engaged in conduct so "scandalous" and "evil" that "no respectable person [would] have anything to do with him." *Loeb v. Geronemus*, 66 So. 2d 241, 244 (Fla. 1953). In *Brown v. Fawcett*, the intrinsically malicious words made up a (false) sensationalized magazine article

---

[38] Roger Newman's adoring biography of Justice Black, for example, observes that Black "had digested [the framers'] debates and could practically *regurgitate* them whole." ROGER K. NEWMAN, HUGO BLACK: A BIOGRAPHY 405 (1994) (emphasis added).

stating that the plaintiff "ravish[ed] and murder[ed] [a] young twenty year old . . . housewife." 196 So.

2d 465, 465 (Fla. 2d DCA 1967). "To illustrate the tenor of [these] thoroughly disreputable"

statements, the court quoted the most salacious portions at length:

> He had to have her. He had to have her if he had to kill to have
> her. . . . The man struck [the housewife] again, the pine board breaking
> at last, blood clotted, smeared. He threw it behind him, part of it falling
> into the baby's crib. His quivering fists reached out, caught the
> insensible blonde's gown, ripped it away so nothing would be between
> that beautiful body and him again. In the darkness then, he lifted her
> again, panting, and ran across a weedgrown field with her to the deeper
> shadows of a moss-choked fallen tree. And there he had everything he
> wanted from her, every way he wanted it, his perverted mind driven to
> wild excesses by his own violence and by her clean and radiant-looking
> young beauty. . . . Then sated, like an animal wearied and exhausted,
> there was nothing for him to do but slink away in the dark, return softly
> and silently into the black night from which he had come.

*Id.* at 467. These statements, in the court's summary, depicted the plaintiff as "a murderer, a sodomist

[sic], a rapist, a lecher, and a degenerate brute." *Id.* at 473. Accordingly, it held that "[t]he article was

so defamatory"—*so* extreme—"on its face that the jury had ample reason to find that it was the

consequence of . . . express malice[.]" *Ibid.*

"Disgruntled" and "regurgitated" pale in comparison. And Block doesn't cite a single case in

which any court treated such anodyne words as evidence of express (let alone actual) malice. In fact,

faced with much nastier statements, the cases do the opposite. *See, e.g., Gunder's Auto Ctr. v. State Farm

Ins.*, 699 F. Supp. 2d 1339, 1342 (M.D. Fla. 2010) (Merryday, J.) (finding no express malice at summary

judgment in statements that the plaintiff-repairman's workmanship was "substandard," and that he

"overcharge[d]" customers, prescribed "[repair] procedures that [we]re not needed and not actually

done," and wasn't as "efficient" as his competitors), *aff'd*, 422 F. App'x 819 (11th Cir. 2011); *Bush v.

Raytheon Co.*, 2009 WL 10669904, at *1, *10 (M.D. Fla. Sept. 8, 2009) (Bucklew, J.) (finding no express

malice at summary judgment in statements that a plaintiff-employee performed poorly, was difficult

to work with, and "[fought] his own personal rebellion" against his managers), *aff'd*, 373 F. App'x 936 (11th Cir. 2010).[39]

This all decisively dispenses with any argument Block might have meant to make that the "words themselves" are evidence of ill motive—or that they otherwise tend to show that the Defendants spoke with actual malice. Because Florida law forbids us from using the "words themselves" as evidence of express malice unless they're especially extreme—and since "disgruntled" and "regurgitated" *aren't* extreme—they don't show *either* express *or* actual malice.

**The Recall.** Block argues next that Abbatt and Matesic "pursued a recall against Block's membership on the Board." Block's Resp. at 7; Resp. SOMF ¶ 104 ("Abbatt and Matesic later launched a recall petition against Block, while he was serving as a Director of the Board. That litigation ended and was mooted when Block's term ended."). Block didn't attach the amended complaint he filed in state court challenging the recall, but the Defendants did append it to their reply. *See* Block's Amended Recall Complaint ("Recall Complaint") [ECF No. 255-3]. The thrust of the Recall Complaint, which Block filed on November 8, 2022, was that Abbatt and Matesic (as "friends and supporters" of the defendant named in that case) lied to other residents about Block's performance and conduct on the Board—not merely because they disliked him, but also to cover up their own misdeeds. *See* Am. Recall Compl. ¶¶ 6, 21, 24, 27, 35. For example, Abbatt and Matesic and their cohorts allegedly told other residents that Block had been "running up enormous legal bills" and not paying vendor invoices. *Id.* ¶¶ 33, 35. Block alleged that most of the signatures on the recall petition

---

[39] *See also Nodar*, 462 So. 2d at 812 ("The words themselves . . . [we]re not so extreme as to [intrinsically] demonstrate express malice" because they "merely" accused the plaintiff-teacher of "harass[ing]," "verbally abus[ing]," and "victimizing" her student and charged that "she was unqualified to teach the course."); *Demby*, 667 So. 2d at 353 (finding that there was "clearly" no express malice inherent in statements that the plaintiff, the director of a county animal-control division, had proposed "asinine" and "inhumane polic[ies]," that she "refused to allow [an innocent dog] access to veterinary care," that she wished that same dog "to die (a long[,] slow, agonizing death) of [a] heartworm infestation," and that, as "[the] County's own Cruella DeVille," she was neither "caring" nor "compassionate").

"were not facially valid" and had been "fraudulently induce[d]" by parties, including Matesic and Abbatt, acting as "friends and supporters" of the defendant named in the Recall Complaint. *Id.* ¶¶ 6, 21, 27. We don't know why Block didn't attach the Recall Complaint himself or why his declaration is silent on the details. Drawing all inferences in his favor, though, we'll assume that he could and would testify that the allegations in the Recall Complaint are true.

Unfortunately for Block, the recall (and its concomitant details) is poor evidence of actual malice. It's not evidence at all as to Gerstin, whose name doesn't even appear in the Recall Complaint. As to Abbatt and Matesic, however, we think the recall is probative—though weakly—of the state of mind with which they sent the December 18 Email. *See Sindi*, 896 F.3d at 17 (treating statements reflecting the defendant's "vengeful motive" as "cogent evidence" of actual malice). Now, it's true that Abbatt and Matesic pursued the recall almost *two years after* they sent the December 18 Email, and that Florida law contemplates that "any member of the board of administration [of a condo] may be recalled and removed from office *with or without cause* by the vote or agreement in writing by a majority of all the voting interests." FLA. STAT. § 718.112(2)(l) (emphasis added). It's also true that the Recall Complaint doesn't *at all* show whether Abbatt and Matesic knew that Block wasn't a hacker, or that they acted recklessly when they sent the email. Nevertheless, a jury could surmise that, if Abbatt and Matesic were willing to lie about Block to the other residents and obtain invalid signatures on the recall petition, then maybe they hated Block so much that they *intended* to imply in the Email (from two years before) that Block is a hacker. But let's be clear—this evidence is attenuated even as far as motive evidence goes. We're certainly not announcing a bright-line temporal cutoff for motive evidence of actual malice. But Block must show actual malice by *clear and convincing* evidence, and it seems obvious to us that the strength of motive evidence generally diminishes the further away it is from the allegedly defamatory speech, *see, e.g.*, *Blankenship*, 60 F.4th at 763 ("[E]vidence of possible animus carries little weight in the actual malice analysis. That is particularly true here, where the hostile comments came

*two years before* the allegedly defamatory statements." (citation omitted & emphasis added))—especially

if it *long* postdates that speech. So, with the recall, Block just barely moves the needle.

      **The Ethics Complaints.** What about the ethics complaints? *See* Block's Resp. at 13 (insisting

that the December 18 Email "was part of a pattern" that included Matesic's filing of "judicial ethics

complaints against Block"). As evidence of actual malice, they're a little better than the words and the

recall—but just a little. Like the recall, the ethics complaints aren't evidence against all the Defendants.

The record before us doesn't show that Abbatt or Gerstin had anything to do with them, so they're

only evidence as to Matesic. On top of that, some of Matesic's ethics complaints seem not to have

been totally unjustified. For example, Matesic complained that Block was using his judicial letterhead

for personal matters. Acknowledging that Block *had* used his letterhead for personal matters, Judge

Debra Livingston[40] found that "[t]he record does not establish that the Judge intended to use his

official letterhead to advance his private interests but, regardless of his intent, the use of judicial

letterhead may have violated Canon 2(B) by lending the prestige of the judicial office to the Judge's

personal matters." Opinion, *In re Charge of Judicial Conduct*, No. 21-90017-jm (Jud. Council 2d. Cir.

2022) (the "Ethics Opinion") [ECF No. 220-19] at 16. She deemed the matter concluded, though,

because Block unilaterally "corrected any potential violation by acknowledging the impropriety and

pledging to refrain from similar conduct in the future." *Ibid.* Matesic also complained that Block

misused his judicial email account for personal matters. *Ibid.* Judge Livingston explained that

occasional use of a judicial email account for non-judicial matters, "without more, is not misconduct."

*Id.* at 17. But she conceded that "[i]t may have been preferable for the Judge to use a personal email

account" and noted that, after the ethics complaint was filed, Block indeed switched to a personal

email account for condo-related matters. *Ibid.* Matesic next complained that Block violated the

---

[40] Judge Livingston wrote for the Judicial Council of the Second Circuit, to which the ethics complaints
were directed.

confidentiality of the judicial-ethics proceedings by "contact[ing] a lawyer whom [Matesic] had identified as a potential corroborating witness." *Id.* at 19–20. Judge Livingston found that Block's actions didn't rise to the level of misconduct, though she noted that Block "admit[ted] that he may have inadvertently violated [the confidentiality rule]." *Id.* at 20.

That said, we can't ignore that Judge Livingston concluded, "based on the [overall] record here[,] [that] *no reasonable person* could view [Block's] conduct" as a violation of Canon 2(B). *Id.* at 11 (emphasis added). For the same reason, she dismissed Matesic's specific allegations that Block retaliated against him for filing ethics complaints and that Block "practiced law" when he served as a Board member, because "no reasonable observer" could have found this conduct inappropriate. *Id.* at 18, 24.

We'll therefore treat the ethics complaints like the recall—weakly probative of the state of mind with which Matesic sent the December 18 Email. It's significant to us that Judge Livingston concluded that "no reasonable person" would have made them. Again resolving all reasonable inferences for Block, we think a jury could conceivably conclude from the unreasonableness of the complaints that Matesic was so eager to harm Block that he *intended* to imply in the December 18 Email that Block was a hacker. But, again, this evidence is limited and weak. The ethics complaints are temporally closer to the email than the recall—and correspondingly more convincing—but they still postdate the email by at least three months (and up to twelve months). And, of course, they don't show that Matesic knew that Block wasn't a hacker or that he acted recklessly when he sent the email. So, between the recall and the ethics complaints, Block has adduced evidence that Matesic (and Abbatt, to a lesser extent) had some animus towards him, but absolutely no evidence that they had the requisite knowledge of (or indifference to) the falsity of the implication of the email. Even considered together, these two pieces of evidence fall far short of "clear and convincing."

## B.  The Security Settings

According to Block, the Defendants sent the December 18 Email knowing that the "privacy and security concerns" language was false. As evidence for this, Block argues that the Defendants never changed their own security settings. We've already explained why Block's argument fails, *supra* § I(b)(i)—*viz.*, because there *were* privacy and security "concerns." And, since there were "concerns," the fact that the Defendants didn't change their own settings has no bearing on whether the Defendants sent the December 18 Email with knowledge of (or reckless indifference to) its falsity. For the same reason, the Defendants' failure to change their own security settings doesn't tend to show that they intended to imply that Block is a hacker.

## C.  The Defendants' Refusal to Retract

It takes Block until the fifth piece of evidence before he manages to identify anything directly pertinent to actual malice—although it's evidence against Matesic and Abbatt only, not Gerstin. Specifically, Block argues that there's evidence of actual malice because the "Defendants refused to issue a retraction and apology, even after Block made them aware of the defamatory import of their letter" by sending them his own letter threatening litigation. Block's Resp. at 7; Block's January 7, 2021 Letter [ECF No. 220-4] at 2. But Block admitted that he never requested an apology or retraction from Gerstin. The January 7, 2021 Letter was addressed to Matesic, Abbatt, and Heessels only. And, asked during his deposition whether it was true that "at no time before he was sued was Mr. Gerstin asked to apologize," Block admitted that he overlooked Gerstin:

> Yeah, the letter that my law firm wrote was addressed to the board. I don't think it was addressed to Gerstin as well. I don't remember whether they asked him to apologize also. But I don't remember specifically anything that I know of that was written to Gerstin asking for an apology, if that's the [answer] you want.

Deposition Transcript of Frederic Block ("Block Dep. Tr.") [ECF No. 226-3] at 71:19–25.

Setting Gerstin aside, Block makes a little headway with this refusal-to-retract evidence. He cites Professor Rodney Smolla's well-known defamation treatise "for cases where a failure to retract was proof of malice." Block's Resp. at 7 (citing SMOLLA § 3:80). Smolla makes what we think is a reasonable point: Because *actual* malice depends on the speaker's knowledge of (or indifference to) the statement's falsity, the speaker's failure to retract the statement *after learning that it is false* "*may* be probative of the existence of actual malice." SMOLLA § 3:80 (emphasis added & collecting cases); *accord* 1 SACK ON DEFAMATION § 5:5.2 at 5-133 (a failure to retract "may *support* 'actual malice,' but it does not necessarily *prove* 'actual malice,' because it does not prove a wrongful state of knowledge *at the time of initial publication*" (cleaned up & emphasis added)); *Kahl*, 856 F.3d at 118 (same).[41]

Curiously, several courts have disagreed with Smolla and Sack, holding that, because a publisher's refusal to retract a statement it learns to be false necessarily takes place "*after* publication," it can't help establish actual malice "at the time of publication." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (Easterbrook, J.); *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) ("CBS's alleged post-publication [refusal to correct or retract] here is not probative of its state of mind at the time of publication[.]").[42] But all these decisions are based on *Sullivan*'s holding that

---

[41] *See also Zerangue*, 814 F.2d at 1071 ("Refusal to retract an exposed error tends to support a finding of actual malice."); *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) (same observation); *cf. Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020) (citing *Zerangue* for the proposition that "readiness to print a retraction weighs against malice[,]" but "once the publisher knows that the story is erroneous . . . the argument for weighting the scales on the side of [its] first amendment interests becomes less compelling" (cleaned up)). For what it's worth, Smolla also observes that the speaker's refusal to retract could be "circumstantial evidence that *no* actual malice existed, because the [speaker] continued to believe the story not libelous." SMOLLA § 3:80 (emphasis added & collecting cases). On summary judgment, though, we'd draw the inference most favorable to Block, the non-movant—that a reasonable jury *could* find that the non-retraction shows actual malice.

[42] *See also Blankenship*, 60 F.4th at 763 ("[T]he lack of a retraction has little to no relevance in the actual malice inquiry[.]"); *Reed v. Chamblee*, 2023 WL 6292578, at *24 (M.D. Fla. Sept. 27, 2023) (Corrigan, J.) ("A publisher's refusal to retract a statement also does not qualify as actual malice."); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 321 (D.D.C. 2011) (holding that a plaintiff's demand letter informing the

"[t]he Times' failure to retract upon respondent's demand . . . [was] not *adequate* evidence of malice for constitutional purposes." *Pippen*, 734 F.3d at 614 (citing *Sullivan*, 376 U.S. at 286 (emphasis added)); *Fairfax*, 2 F.4th at 295 (same). Whether evidence is *adequate* to demonstrate actual malice is different from whether it categorically can be used at all—and *Sullivan* expressly left open the categorical question. *Sullivan*, 376 U.S. at 286 ("*Whether or not* a failure to retract may *ever* constitute such evidence, there are two reasons why it does not *here*." (emphasis added)).

The Eleventh Circuit, for its part, has said only that "a mere refusal to correct a publication *falls short*." *Klayman*, 650 F. App'x at 751 (emphasis added). True enough, *Klayman* affirmed a district court decision that had announced a categorical bar against using non-retractions as evidence of actual malice. *See Klayman v. City Pages*, 2015 WL 1546173, at *15 (M.D. Fla. Apr. 3, 2015) (Conway, J.), *aff'd*, 650 F. App'x. 744 (11th Cir. 2016) (holding "the fact that Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction *does not* help Plaintiff to establish actual malice" (emphasis added)). But, instead of adopting that logic, the Eleventh Circuit said that the non-retraction evidence "f[e]ll[ ] short"—hardly language of categorical prohibition. Plus, *Klayman* cites (albeit without quoting) *Sullivan*'s "adequacy" language, lending further credence to the position we share with Smolla and Sack.

We'll therefore treat Matesic and Abbatt's refusal to retract as further evidence of actual malice—though, once again, we see it as rather weak. We see no reason to *categorically* bar plaintiffs from using a defendant's failure to retract as evidence of actual malice. But we can't deny that the

---

defendant that one of its books was defamatory didn't put the defendant on notice of the book's falsity, because "post-publication/post-distribution correspondence cannot establish a dispute as to actual malice"); *Dockery*, 799 So. 2d at 296 ("As a matter of law, [the defendant's] failure to print [the plaintiff]'s denials that he owed the taxes does not constitute actual malice."); *cf. McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("[The plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication.").

"probative value" of a refusal to retract "as to a defendant's state of mind at the time of publication is dubious at best." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013) (Oetken, J.) (explaining that a defendant's refusal to retract didn't "in and of itself" clearly and convincingly establish actual malice), *aff'd*, 807 F.3d 541 (2d Cir. 2015).[43]

### D. Inherent Implausibility

Finally, Block claims that the Defendants must have spoken with actual malice because it's implausible to believe that he's actually a hacker. "[E]vidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant is relevant to establishing actual malice." *Hunt*, 720 F.2d at 643. That's because a statement might be "so inherently improbable that only a reckless man would have put [it] in circulation." *St. Amant*, 390 U.S. at 732.

As a threshold matter, though, it seems somewhat counterintuitive to ask whether a statement that's defamatory *by implication* is "inherently implausible." When an ordinary statement is "inherently implausible," but the defendant publishes it anyway, the implausibility of the statement might tend to show that the defendant was recklessly indifferent to whether the statement was true. That's not the case when a defendant publishes a *true* statement from which some implausible *implication* might be drawn. In that scenario, the defendant would have already ensured that his statement was literally true. So, we think that, to hold a defendant accountable for some unlikely implication of his true statement, we'd first need some evidence that he *intended* that implication. The improbability of the implication *by itself* can't show that the defendant acted with actual malice.

And that's a problem for Block because he hasn't adduced *any* evidence that the Defendants intended to imply that he's a hacker. Remember, the ethics complaints and the recall show only that

---

[43] Of course, the Eleventh Circuit might adopt the reasoning of the Fourth and Seventh Circuits and announce that we should give no weight to a defendant's refusal to retract—in which case Block's retraction evidence (which weighs only a little now) would count for *nothing at all*.

the Defendants *may* have been *motivated* to defame Block. They don't show that the Defendants meant to create the defamatory implication (or that they were recklessly indifferent to whether they were creating that implication). So too for the refusal to retract. If there were evidence that the Defendants intended the defamatory implication, their refusal to retract *might* support a finding that they knew (or didn't care) that the implication was false. But there isn't any such evidence—and that evidentiary lacuna dooms Block's claim.

We agree, of course, that it's ridiculous to think that Block is a hacker. We said as much to the parties when we disposed of the Defendants' first motion to dismiss:

> Block has plausibly alleged that the defendants either knew their accusations were false or else that they acted with reckless disregard of whether they were false or not—all in a purposeful and intentional effort to discredit and embarrass Block as he alleges. Indeed, on its face, let's face it, *it seems rather implausible to believe that an 80-something-year-old federal judge hacked into his neighbors' email addresses* for the purpose of complaining about a construction project.

Transcript of November 4, 2021 Hearing [ECF No. 59] at 36:9–14 (emphasis added). But Block doesn't offer any argument (or cite a single case) to substantiate his position that the mere implausibility of an *implication*—divorced from any evidence that the Defendant intended that implication—tends to show actual malice. We won't allow a party to survive summary judgment based on arguments he really doesn't develop—especially when he offers no cases to support his view. *See, e.g.*, *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

For our part, we're not aware of any case in which the implausibility of a defamatory implication by itself was treated *at all* as evidence of actual malice. Nor are we aware of any case in which inherent implausibility alone (or even coupled with weak circumstantial evidence) justified

denying summary judgment. In fact, when the claim is one of defamation by implication, courts seem to require much more than what Block has adduced here.

Take, for instance, *Amin v. NBCUniversal Media, LLC*, in which NBC reported that the plaintiff, a government gynecologist, was a "uterus collector" who conducted "mass hysterectomies" on "all or nearly all his patients"—"as many as 15 immigrant women"—even though "no medical indication existed" to justify his doing so. 2024 WL 3188768, at *25 (S.D. Ga. June 26, 2024). The district court reasonably found these allegations "so implausible that a jury could infer actual malice." *Ibid.* But there was also a great deal of evidence directly probative of actual malice: NBC's internal pre-publication investigation of the story had "found evidence of only two hysterectomies," *ibid.*; NBC was told by one "attorney source" that "her team was not finding evidence of mass hysterectomies," by a second that "one client had had a hysterectomy that medical records revealed was medically necessary," and by a third that he could confirm only one hysterectomy, *id.* at *26; and "NBC's own reporter" even incredulously texted her colleague: "But only two hysterectomies?" *Ibid.* All this evidence made it quite clear that NBC published the story even though it had had ample reason to believe that the claims were bogus. With evidence so starkly at odds with the reported story, the story's "inherent improbability" seems not to have mattered *at all.*

Because Block has adduced no evidence of the Defendants' intended meaning, we won't let him use the "inherent implausibility" of the implication that he's a hacker to reduce or satisfy his actual-malice burden. Without some evidence that the Defendants *meant* to imply that Block is a hacker, in short, the implausibility of that implication is of little relevance here.

### E. The Evidence Cumulatively

Here's the final evidentiary tally: As to Matesic, Block has adduced the recall, the ethics complaints, and the refusal to retract; as to Abbatt, he's adduced only the recall and the refusal to retract; as to Gerstin, he's adduced *nothing at all.* But do the recall, the ethics complaints, and the refusal

to retract, considered cumulatively, show that Block could prove by clear and convincing evidence that Matesic acted with actual malice? We don't think this one is even close. The recall (almost two years post-publication) *might* tend to show that Matesic and Abbatt were *inclined* to tell lies to injure Block. Matesic's ethics complaints (between three to twelve months post-publication) *might* tend to show the same thing, albeit as to Matesic only. The (post-publication) refusal to retract shows, at a stretch, that Matesic and Abbatt *might* have intended the defamatory implication that Block was a hacker.

What's missing, though, is any evidence that the Defendants *knew* that Block *wasn't* a hacker (or that they were recklessly indifferent to the reality that he wasn't), or any pre-publication evidence that the Defendants intended to imply that Block was a hacker—in other words, any evidence at all which, in the aggregate, clearly and convincingly establishes the Defendants' knowledge or intent at the time they sent the December 18 Email.

In the end, Block's evidence simply doesn't clearly and convincingly show that *Matesic*—let alone the others, against whom there's *less* evidence—acted with actual malice. *Accord Klayman*, 650 F. App'x at 750–52 (affirming summary judgment for the defendant in a circumstantial-evidence case where the plaintiff coupled the defendant's refusal to retract with weak evidence of ill will).[44] To hold otherwise—to hold that a refusal to retract coupled with *post hoc* evidence of animosity, but practically

---

[44] *See also Phelps*, 2024 WL 3289612, at *8 (affirming summary judgment for the defendant and holding that circumstantial evidence that the defendants implemented a plan to harm the plaintiff didn't establish actual malice); *Novella*, 848 F.3d at 946 ("Here, even all of the [plaintiff]'s circumstantial evidence taken as true is insufficient to show that [the defendant] had serious doubts as to the truth of the content contained in his two articles."); *Blankenship*, 60 F.4th at 760 (affirming summary judgment for the defendants in a circumstantial-evidence case where the plaintiff coupled a refusal to retract with emails from which it "[wa]s safe to conclude that [the defendants] wished to damage [the plaintiff]'s Senate candidacy"); *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 656 (7th Cir. 2006) (affirming summary judgment for the defendant because the defendant's "deviation from its previous practice and ill will toward [the plaintiff] [we]re just more pieces of circumstantial evidence, insufficient without something more concrete, to show actual malice").

no evidence of knowledge or recklessness or intended meaning, is clear and convincing—would render the standard (and *Sullivan* itself) meaningless.

We reach this conclusion with some small discomfiture. We generally disfavor summary judgment on questions of motive and intent. *See, e.g.*, *United States v. Taneja*, 2023 WL 3563602, at *5 (M.D. Fla. Apr. 25, 2023) (Bucklew, J.) ("Ordinarily, summary judgment should not be granted in cases where motive, intent, subjective feelings, and reactions are to be searched." (quoting *Rogers v. Evans*, 792 F.2d 1052, 1059 (11th Cir. 1986)). That we must, on this record, grant summary judgment seems to lay bare one of *Sullivan*'s lesser-appreciated infirmities:[45] that *Sullivan* engrafts the clear-and-convincing-evidence standard—a *weight* standard—onto cases that'll inevitably depend on evidence we're loathe to weigh ourselves. *Cf. Torres v. Wal-Mart Stores E., L.P.*, 555 F. Supp. 3d 1276, 1278 (S.D. Fla. 2021) (Altman, J.) ("Who should decide whether, in weighing its important interest in reducing

---

[45] *Sullivan* is more frequently criticized for constitutionalizing state defamation law on non-constitutional (and increasingly impractical) grounds. *See, e.g.*, *Berisha v. Lawson*, 141 S. Ct. 2424, 2429 (2021) (Gorsuch, J., dissenting from the denial of certiorari) ("Departures from the Constitution's original public meaning are usually the product of good intentions. But less clear is how well *Sullivan* and all its various extensions serve its intended goals in today's changed world." (collecting cases)); *McKee v. Cosby*, 586 U.S. 1172, 1181 (2019) (Thomas, J., concurring in denial of certiorari) ("[T]here appears to be little historical evidence suggesting that the [*Sullivan*] actual-malice rule flows from the original understanding of the First or Fourteenth Amendment. . . . We did not begin meddling in this area until 1964, nearly 175 years after the First Amendment was ratified."); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 767 (1985) (White, J., concurring) (arguing that *Sullivan* "struck an improvident balance" that "escalat[ed] the plaintiff's burden of proof to an almost impossible level"); *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting in part) ("The holding [of *Sullivan*] has no relation to the text, history, or structure of the Constitution, and it baldly constitutionalized an area of law refined over centuries of common law adjudication. . . . [T]he actual malice requirement was simply cut from whole cloth."); *cf.* Elena Kagan, *A Libel Story:* Sullivan *Then and Now*, 18 LAW & SOC. INQUIRY 197, 207 ("Questions [about *Sullivan*'s effect on journalistic standards] in no way prove that the Court decided *Sullivan* incorrectly," but "the legal standard adopted in *Sullivan* may cut against the very values underlying the decision."). Of course, any doubts we might have about the basis and wisdom of *Sullivan* are immaterial because it remains binding precedent. *Accord, e.g.*, *Dershowitz v. Cable News Network, Inc.*, 668 F. Supp. 3d 1278, 1286 (S.D. Fla. 2023) (Singhal, J.) (approvingly citing Judge Silberman's in-part dissent, but granting summary judgment for the defendant anyway where the circumstantial evidence, "while establishing foolishness, apathy, and an inability to string together a series of common legal principles," didn't establish actual malice).

overhead costs against an invitee's right to amble freely through unpuddled aisles, Wal-Mart has struck the right balance? A life-tenured judge no one elected? A jury of both parties' peers? The answer—to us—seems clear."). And, because the existence of actual malice presents a legal question, the Eleventh Circuit will no doubt be asked to do this all over again. This all makes little sense to us. That said, the Supreme Court has decided that we must apply this evidentiary standard at summary judgment to properly balance the First Amendment's protections against an individual's right to be secure in his reputation. That's what we've attempted to do here.

### III.   Because Block Doesn't Show Sufficient Evidence of Actual Malice, His Conspiracy Claim Fails Too

By extension, we likewise grant summary judgment for the Defendants as to Block's conspiracy-to-defame claim. "There being no defamation—the gist of the defamation conspiracy— there can be no conspiracy claim." *Corsi*, 519 F. Supp. 3d at 1120 n.6 (citing *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981)); *see also Grayson v. No Labels, Inc.*, 2022 WL 12144181, at *3 (11th Cir. Oct. 21, 2022) ("Because 'a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim,' and [plaintiff] cannot prove actual malice to support his claims of defamation, his claim of a civil conspiracy fails as a matter of law." (internal citations omitted)), *cert. denied,* 143 S. Ct. 2514 (2023)*; Ovadia v. Bloom*, 756 So. 2d 137, 140 (Fla. 3d DCA 2000) ("The conspiracy to defame claim cannot stand where, as here, the defamation action fails. There being no defamation, the gist of the defamation conspiracy, there can be no conspiracy claim."); *Beck v. Lipkind*, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) ("Additionally, '[s]ince we have determined that a cause of action for defamation, a necessary predicate to a cause of action for conspiracy to defame, has not been alleged or proven, an action for conspiracy to defame must also fail.'" (quoting *Hoon v. Pate Const. Co., Inc.*, 607 So. 2d 423, 430 (Fla. 4th DCA 1992))).

*          *          *

Summary judgment is therefore appropriate on all three of Block's claims, and the SAC MSJ must be granted.

ANALYSIS OF BLOCK'S MOTION FOR SUMMARY JUDGMENT

I.      **Block is Entitled to Summary Judgment on Matesic's Amended Counterclaim**

Finally, we find that Block is entitled to summary judgment on Matesic's Amended Counterclaim because (a) his 2023 Letter is protected by Florida's qualified privilege, and (b) his 2023 Text Messages aren't defamatory.

a.   The Law of Qualified Privilege

Under Florida law, statements that "would otherwise be actionable" are "privileged" if they were communicated "in good faith on any subject matter by one having an interest [or duty] therein . . . to a person having a corresponding interest or duty[.]" *Nodar*, 462 So. 2d at 809 (citing *Abraham v. Baldwin*, 42 So. 591, 592 (Fla. 1906)). The privilege exists "so that parties can honestly express opinions under reasonable circumstances to other people who need to hear those opinions." *Bush*, 2009 WL 10669904, at *8.

Florida courts use a multi-element test to determine whether a statement is privileged. But, because the Florida Supreme Court hasn't adopted any particular recitation of these elements, the District Courts of Appeal have announced at least two different five- and four-element tests. *Compare, e.g.*, *Thomas v. Tampa Bay Downs, Inc.*, 761 So. 2d 401, 404 (Fla. 2d DCA 2000) ("[T]he essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner."), *Am. Ideal Mgmt., Inc. v. Dale Vill., Inc.*, 567 So. 2d 497, 499 (Fla. 4th DCA 1990) (same five-element test), *and Nowik v. Mazda Motors of Am. (E.) Inc.*, 523 So. 2d 769, 770 (Fla. 1st DCA 1988) (same), *with Demby*, 667 So. 2d at 353 ("To be qualifiedly privileged, a publication must be made (1) in good faith (2) by one who has a duty or

59

interest in the subject matter (3) to someone who has a corresponding duty or interest (4) 'even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.'"), *John Hancock Mut. Life Ins. Co. v. Zalay*, 581 So. 2d 178, 179 (Fla. 2d DCA 1991) (same four-element test), *and Magre v. Charles*, 729 So. 2d 440, 442 (Fla. 5th DCA 1999) (same). And at least one federal district court in Florida has announced variations of both the five- and the four-element tests—neither originating in nor later endorsed by *any* state District Court of Appeal. *See Lefrock v. Walgreens Co.*, 77 F. Supp. 3d 1199, 1201 (M.D. Fla. 2015) (Kovachevich, J.) ("In order for a statement to be privileged it must be 1) made in good faith; 2) with an interest to be upheld; 3) published on a proper occasion; and 4) published in a proper manner." (cleaned up)); *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1542 (M.D. Fla. 1993) (Kovachevich, J.) ("The elements of qualified privilege are: good faith, an interest to be upheld, a statement limited in scope to a specific purpose, published on a proper occasion, and published in a proper manner.").[46]

Although we think that all these tests try to accomplish the same thing—and that there's no case-dispositive difference between them—we'll follow the other courts in our District and use the five-element test announced in *Thomas* and *Dale Village. See Monarch Air Grp., LLC v. JPMorgan Chase Bank*, 2023 WL 9106247, at *4 (S.D. Fla. Dec. 19, 2023) (Dimitrouleas, J.) (using the five-element test); *Falic*, 347 F. Supp. 2d at 1264 (same).

One last thing: A long line of older Florida cases holds that, "[i]n a defamation action, the affirmative defense[ ] of . . . qualified privilege present[s] factual questions for resolution by the jury, and if a defendant asserts these defenses, the trial court may not grant summary judgment." *Glickman*

---

[46] *Lefrock* and *Shaw* purport to draw their respective four- and five-element tests from *Abraham v. Baldwin*, 42 So. 591 (Fla. 1906), and *Leonard v. Wilson*, 8 So. 2d 12 (Fla. 1942). But neither *Abraham* nor *Leonard* announced or endorsed any particular test. Regardless, both *Lefrock* and *Shaw* were affirmed without comment. *See LeFrock v. Walgreen Co.*, 644 F. App'x 898 (11th Cir. 2016); *Shaw v. Reynolds Tobacco Co.*, 15 F.3d 1097 (11th Cir. 1994).

*v. Potamkin*, 454 So. 2d 612, 613 (Fla. 3d DCA 1984) (collecting cases); *see also Shafran v. Parrish*, 787

So. 2d 177, 180 (Fla. 2d DCA 2001) ("[W]hether a qualified privilege exists is a mixed question of law

and fact subject to determination by the trier of fact." (citing *Glynn v. City of Kissimmee*, 383 So. 2d 774,

776 (Fla. 5th DCA 1980))). Nevertheless, whether the qualified privilege applies "is a question of law

properly decided by a court if the circumstances surrounding the communication are undisputed or

so clear under the evidence as to be unquestionable." *Thomas*, 761 So. 2d at 404.

### i.   *Good Faith*

With that background in mind, we turn to the first "element": whether the publication was

made in good faith. Paradoxically, good faith is almost always expressed *both* as an *element* and as the

*first step* of the qualified-privilege test,[47] even though it's actually an *inference* the court draws *only after* it

deems the other elements satisfied. *See Nodar*, 462 So. 2d at 810 ("The determination that a defendant's

statements are qualifiedly privileged eliminates the presumption of malice attaching to defamatory

statements by law. The privilege instead *raises a presumption* of good faith[.]" (emphasis added)).[48] We're

---

[47] *See, e.g.*, *Thomas*, 761 So. 2d at 404; *Axelrod v. Califano*, 357 So. 2d 1048, 1051 (Fla. 1st DCA 1978) (same).

[48] *See also Lefrock*, 77 F. Supp. 3d at 1201 ("The Walgreens pharmacists acted in good faith and were upholding a legitimate interest since the statements were made while the pharmacists were filling prescriptions and giving general advice as they have a duty to do."); *Bass v. Rivera*, 826 So. 2d 534, 535 (Fla. 2d DCA 2002) (holding that a defendant's entitlement to a qualified privilege "*provides a presumption* of good faith" (emphasis added)); *Thomas*, 761 So. 2d at 404 ("Once it is determined that Mr. Kibbey's report is qualifiedly privileged, it *becomes cloaked with a legal presumption* of good faith." (emphasis added)). To emphasize that good faith follows from the other elements, some courts explain that they "consider whether a defamatory statement was made in good faith under a totality of the circumstances test," where the "circumstances" are those other elements. *See, e.g.*, *Harris v. Plapp*, 386 So. 3d 185, 189 (Fla. 1st DCA 2022); *Solis v. Okeechobee Shooting Sports, LLC*, 2020 WL 3089094, at *4 (S.D. Fla. Mar. 26, 2020) (Maynard, Mag. J.) ("Once the defamatory statement is determined to be qualifiedly privileged . . . the defendant is presumed to have acted in good faith. The . . . inquiry asks . . . whether the defendant made the statement at a setting in a way that was reasonable and appropriate *under the overall circumstances*." (emphasis added)), *report and recommendation adopted*, 2020 WL 3089091 (S.D. Fla. Apr. 20, 2020) (Rosenberg, J.). It's quite clear to us that all of these cases are saying the same thing.

not the first court to remark on this incongruity,[49] and we probably won't be the last. The upshot is that we can only determine whether good faith attaches at the *end* of our analysis of the other elements.

Nevertheless, we must analyze good faith as a standalone element because Florida law doesn't extend the qualified privilege to statements that are made with express malice. "[T]he gravamen of express malice is the abuse of a privileged occasion by improper motives on the part of the speaker." *Nodar*, 462 So. 2d at 811 n.8. Once we presume (from the satisfaction of the other elements) that a statement was made in good faith, the burden shifts to the plaintiff to show that it was actually made with malice. *Id.* at 810 ("The privilege instead raises a presumption of good faith and places upon the plaintiff the burden of proving express malice.").[50] Treating good faith as an element serves as a kind of failsafe. Even if a canny defendant attacks a plaintiff in a way that incidentally satisfies the other qualified-privilege elements, the plaintiff can still defeat the privilege by pleading, and then adducing evidence of, express malice.

But the plaintiff's burden is heavy because express malice is a "rigorous standard" meant to "deter most frivolous suits." *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992).[51] "[A] plaintiff would have to establish by a preponderance of the evidence that . . . the defendant's *primary motive* in making

---

[49] As another court in our District observed, "[a]lthough good faith is an element of the qualified privilege, Florida courts have provided little guidance on a defendant's burden to show good faith. Apparently, when the other elements of the privilege are established, good faith is presumed." *Falic*, 347 F. Supp. 2d at 1264; *see also DeMartini v. Town of Gulf Stream*, 2017 WL 6366763, at *13 (S.D. Fla. Aug. 9, 2017) (Middlebrooks, J.) ("Once a defamation defendant establishes the last four elements of qualified privilege, he is entitled to 'a presumption of good faith'—the privilege's first element."), *aff'd*, 942 F.3d 1277 (11th Cir. 2019).

[50] *See also Coogler v. Rhodes*, 38 Fla. 240, 249 (1897) ("In cases of qualifiedly privileged publications . . . the burden of proof is changed, and, in order for the plaintiff to recover, he is called upon affirmatively and expressly to show malice in the publisher."); *Brodie v. Bayside Village E. Condo. Ass'n, Inc.*, 389 So. 3d 666, 667 (Fla. 3d DCA 2024) (same); *Zalay*, 581 So. 2d at 180 ("In order to eliminate the presumption of good faith, the plaintiff must show that the defendant's statements were made with the primary motive of injuring the plaintiff." (citing *Nodar*, 462 So. 2d at 810)).

[51] *See also Shaw*, 818 F. Supp. at 1542 (express malice "is a very high standard to meet").

the statements was the intent to injure the reputation of the plaintiff." *Ibid.* (emphasis added).[52] The

defendant's motivations must be "ill will, hostility, [and] evil intention to defame and injure." *Nodar*,

462 So. 2d at 811 (quoting *Montgomery v. Knox*, 23 Fla. 595, 606 (1887)).[53] So, it's not enough for the

plaintiff to show that the defendant used "strong, angry, or intemperate words," *id.* at 812, or merely

"that the statements are untrue," *Sussman v. Damian*, 355 So. 2d 809, 811 (Fla. 3d DCA 1977) (collecting

cases).[54] Nor is "the incidental gratification of personal feelings of indignation . . . sufficient to defeat

the privilege where the primary motivation is within the scope of the privilege." *Nodar*, 462 So. 2d at

812. And proof of knowledge of falsity—the kind of knowledge that would tend to show actual

malice—isn't evidence of express malice, which "focuses on the defendant's feelings toward the

plaintiff." *Hunt*, 720 F.2d at 650 (discussing this distinction in the context of punitive damages); *see

also Coogler*, 21 So. 109 at 112 ("[M]alice . . . is not inferable from the mere fact that the statements are

*untrue*." (emphasis added)); *Crestview Hosp. Corp. v. Coastal Anesthesia, P.A.*, 203 So. 3d 978, 982 (Fla. 1st

DCA 2016) ("The mere fact that a statement is untrue and made with knowledge of its falsity, or made

recklessly without regard to its truth or falsity is not the test."); *Zalay*, 581 So. 2d at 180 (holding, in

---

[52] *See also Nodar*, 462 So. 2d at 811 ("Where a person speaks upon a privileged occasion, but the speaker is motivated *more by a desire to harm the person defamed* than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege destroyed." (emphasis added)).

[53] *Nodar* admitted that *Montgomery* "is not very enlightening about what constitutes express malice." *Nodar*, 462 So. 2d at 811 n.8. Still, it confirmed that the plaintiff's burden is high indeed, reversing the trial court's decision to instruct the jury that express malice is "ill will, hostility, *or* evil intention to defame and injure." *Id.* at 811 & n.8 (emphasis added). That disjunctive instruction, the appellate court explained, "was inadequate to fully apprise the jury of what would show express malice." *Id.* at 811 n.8.

[54] *See also Loeb*, 66 So. 2d at 244 ("[T]he malice which vitiates a qualified privilege must be actual and not merely inferred from falsity[.]"); *Redding v. Nova S.E. Univ., Inc., College of Osteopathic Med.*, 2015 WL 13567452, at *8 (S.D. Fla. Aug. 24, 2015) (Marra, J.) (granting summary judgment for the defendant because "[n]o inference of 'evil intention' arises from the fact that" the defendant made false statements).

the context of jury instructions, that whether the speaker "acted in disregard of whether the statements were false . . . goes to actual malice, not express malice").[55]

On summary judgment, the plaintiff must adduce colorable evidence of express malice, either directly or indirectly. *Direct* evidence of express malice might include, for example, evidence that the reasons for a defamatory announcement of a contract termination "were manufactured at a later time in order to afford false justification[.]" *Dale Vill.*, 567 So. 2d at 500. Establishing malice by *indirect* evidence, in contrast, requires the plaintiff to "prov[e] a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable [defendant] pursuing a lawful objective." *Arko Plumbing Corp. v. Rudd*, 230 So. 3d 520, 528 (Fla. 3d DCA 2017) (Luck, J.) (quoting *McCurdy v. Collis*, 508 So. 2d 380, 382 (Fla. 1st DCA 1987)).

Florida's courts haven't specified the kinds or quantum of indirect evidence that would suffice at summary judgment, but recall that a plaintiff can only defeat the qualified privilege by showing that the defendant's "*primary motive*" was to injure the plaintiff's reputation. *Fridovich*, 598 So. 2d at 69 (emphasis added). In our view, then, the indirect evidence must be compelling enough that a reasonable jury could conclude that it was the "primary motive" for the defamatory statement.[56] The cases bear out our intuition. In *Arko*, for example, there was "circumstantial evidence of express malice" where the defendant insurance agent defamed the plaintiff based on information he received from the plaintiff's dubious former employee. 230 So. 3d at 528–29. That evidence was *circumstantial*, but it wasn't *slight*. The defendant relied on the former employee's information to accuse the plaintiff

---

[55] *See also Monarch Air Grp.*, 2023 WL 4363816, at *5 (granting summary judgment for the defendant where, although "Plaintiffs argue[d] [that the defendant] knew that the statements were false when it made them[,] . . . knowledge of falsity is insufficient to establish express malice"); *Black v. Adv. Neuromodulation Sys., Inc.*, 2014 WL 1303656, at *9 (N.D. Fla. Mar. 27, 2014) (Stafford, J.) (same).

[56] Put another way, if a plaintiff and a defendant reasonably disagree that, say, a certain piece of testimony evinces malice, we'll draw the inference in the plaintiff's favor, as we must on a defendant's motion for summary judgment. But, if we think there isn't enough such evidence for a reasonable jury to conclude that the defendant's *primary* motive was malicious, the plaintiff's claim can't survive.

of fraud at a deposition in front of its clients *even though* he "knew of conflicting information about [the employee's] credibility, including that he left [the plaintiff] on bad terms" and "wanted revenge," "had lied under oath, and had been promised payment for his testimony." *Ibid.* On top of that, the defendant "knew of . . . [but] did not investigate [the employee's] criminal background, including that he was on probation and had abused heroin." *Ibid.* Although the defendant explained that he was just zealously running down leads, the plaintiff argued that the defendant ignored all those warning signs out of malice. *See id.* at 528–29. The choice between those "competing inferences," the court held, fell to a jury. *Id.* at 529.[57]

The evidence of malice was likewise compelling in *Randolph v. Beer*, where the chairman of a credit union falsely told his board about a rumor that the credit union's president had masterminded an insurance-kickback scheme. *See* 695 So. 2d 401, 402 (Fla. 5th DCA 1997). The chairman testified that another employee of the credit union had informed him of these rumors—and he, in turn, felt that he had a fiduciary duty to inform the board. *Id.* at 402–03. But that employee testified in discovery that he'd never informed the chairman of any such thing. *Id.* at 403. Plus, the chairman claimed that he had "no conflicts on a personal level" with the president, but other employees swore that there was

---

[57] *McCurdy* closely resembles *Arko*. The plaintiff there, a subcontractor for defendant Exxon, had previously prevailed against Exxon in a workplace-injury suit. *McCurdy*, 508 So. 2d. at 384. During that case, his treating physician had testified about his injuries and his inability to work. *Id.* at 381. After the trial, Exxon reported the physician's testimony to its contractor, the plaintiff's direct employer, to inform the contractor that the plaintiff couldn't work safely. *Id.* at 381–82. The plaintiff was thereafter fired by the contractor. *Id.* at 382. When the plaintiff sued Exxon for defamation, the evidence showed that (1) the contractor had told Exxon the plaintiff was "doing a good job," and (2) Exxon had never assessed the plaintiff's performance itself before repeating the physician's testimony. *Id.* at 384. Together, these two pieces of evidence created a factual dispute about Exxon's motives. *Id.* at 385. Exxon, to be sure, "had a contractual right to raise safety concerns regarding the manner in which" its subcontractors performed their duties. *Id* at 384. Nevertheless, "[t]he inference of malice as the motivating factor in Exxon's decision ar[o]se[ ] due to the timing of the decision, *i.e.*, five weeks after Exxon paid the judgment award, and due to the basis of the decision, including the fact that no well-founded accusation had been made, and no investigation had been conducted by Exxon before announcing its decision." *Ibid.*

in fact "great animosity" between the two men. *Ibid.* In denying summary judgment, the court noted that it wasn't clear whether the rumor had preexisted the chairman's allegations. *Id.* at 404. If it hadn't, then a jury "could conclude that [the chairman] concocted the story to satisfy his animosity against [the president]," in which case the qualified privilege would be defeated. *Ibid.*; *see also Corp. Fin., Inc. v. Principal Life Ins. Co.*, 461 F. Supp. 2d 1274, 1294 (S.D. Fla. 2006) (Ungaro, J.) (finding circumstantial evidence of express malice where the plaintiff adduced testimony that the defendant's employee altered documents in order to implicate the plaintiff in a fraud).

We can distill this caselaw into two decisional principles. *First*, we decide the question of good faith only at the *end* of our elements analysis. *Second*, the plaintiff must make an evidentiary showing sufficient for a reasonable jury to conclude that *malice* was the speaker's *primary* motivation.

### ii.   The Speaker's Interest

The second element—practically, the first—is the existence of "an interest in the subject by the speaker or a subject in which the speaker has a duty to speak." *Thomas*, 761 So. 2d. at 404; *Dale Vill.*, 567 So. 2d. at 499. "The law of Florida embraces a broad range of the privileged occasions that have come to be recognized under the common law." *Nodar*, 462 So. 2d at 809. The speaker's interest or duty to speak "need not be one having the force of a legal obligation; it may be one of imperfect obligation," or it could be "public, personal or private, either legal, judicial, political, moral, or social," or "arise out of the relationship or status of the parties." *Leonard v. Wilson*, 150 Fla. 503, 509 (1942); *see also Falic*, 347 F. Supp at 1264–65 (same); *Lewis v. Evans*, 406 So. 2d 489, 492 (Fla. 2d DCA 1981) (same). So, for example, courts have found that a security bulletin warning employees (and even "some non-employee members of the public") to "be on the alert" about a vengeful former employee arose out of the speaker's "moral interest, if not [ ] legal duty, to prevent a potentially violent confrontation on its premises." *Miller v. Morris Comm'cn. Co.*, 2005 WL 8159674, at *3, *14 (M.D. Fla. July 22, 2005) (Schlesinger, J.). A speaker could have an "interest" in "social activism," including "advocat[ing] the

66

end" to animal-breeding practices "it considers to be inhumane." *Big Cat Rescue Corp. v. Big Cat Rescue Ent. Grp., Inc.*, 2013 WL 12149263, at *1, *6 (M.D. Fla. Feb. 8, 2013) (Scriven, J.). Even "statements and communications made in connection with the various activities of [a social] organization or group enjoy a qualified privilege." *Loeb*, 66 So. 2d at 244 (resolving "a matter of dissension in a church or social group as to differences of opinion between the plaintiff below and certain members of the Jewish Community Center of Hollywood, Florida").[58] The "members of such bodies may report on the qualifications of applicants, prefer [sic] charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken[.]" *Ibid.* (cleaned up). The late Judge Ryskamp summarized this principle cogently:

> Florida courts have found a wide variety of interests to be [ ]sufficient,[59] including: a parent's interest in his child's welfare;[60] a corporation's interest in monitoring its compliance with statutory requirements;[61] [a] political candidate's interest in defending his candidacy;[62] a corporation's interest in responding to customer inquiries;[63] an employee's interest in serving his or her employer;[64] and an organization member's duty to notify other members of

---

[58] *Loeb* allowed a defamation claim to proceed on the basis of allegedly defamatory statements the defendant made "*after* the [community group's] meeting" had adjourned. *Loeb*, 66 So. 2d at 244–45 (emphasis added). But the appellate court conceded that the statements the defendant made *during* the meeting likely "enjoyed a measure of qualified privilege"—and, as a result, the court didn't disturb the lower court's holding granting summary judgment for the defendant as to those statements. *Ibid.* (emphasis added).

[59] Judge Ryskamp's opinion mistakenly used the word "insufficient" here. It's plainly just a scrivener's error; Florida courts have held that each of these interests exists and is sufficient.

[60] *Nodar*, 462 So. 2d at 809.

[61] *Zalay*, 581 So. 2d at 180 ("An insurance company cannot monitor its own compliance with [statutory] requirements without occasionally discussing the performance of its agents and their employees with the insureds. Therefore, we believe that [the insurer], as a matter of law, had a qualified privilege to speak to its policyholders regarding the policies that [the plaintiff] had sold them.").

[62] *Abram v. Odham*, 89 So. 2d 334, 336 (Fla. 1956) ("The defendant . . . had an interest in defending and a right to defend his candidacy[.]").

[63] *Shaw*, 818 F. Supp. at 1542–43 ("[T]he Defendant had the primary motive of responding adequately to a customer's inquiry.").

[64] *Thomas*, 761 So. 2d at 404 ("As security director at one member racetrack, it was his duty to communicate to the other members of the Bureau conduct by persons involved in racetracks and racing that is detrimental to the interests of Bureau members.").

information that would be detrimental to the organization's
interests.[65]

*Falic*, 347 F. Supp. 2d at 1265 (internal citations omitted). Naturally, Florida law also extends the

qualified privilege when speakers have "interests in property, business[,] and professional dealings,"

including when they are "tenants in common [or] other co-owners of land or chattels." *Ibid.* (citing

RESTATEMENT (FIRST) OF TORTS § 596 (1938)); RESTATEMENT (SECOND) OF TORTS § 596 (1977)

(same).[66]

As relevant here, Florida courts have located interests in the management of "cooperative

homeowners association[s]," *Dale Vill.*, 567 So. 2d at 498, and condominiums, *Brodie v. Bayside Village*

*East Condominium Ass'n, Inc.*, 389 So. 3d 666, 666 (Fla. 3d DCA 2024). In particular, *Brodie* affirmed a

decision by the erstwhile Circuit Court Judge Michael Hanzman applying the qualified privilege to

rancorous communications between the plaintiff condo owners and the defendant condo directors

and managers. *See Brodie v. Bayside Vill. E. Condo. Ass'n, Inc.*, No. 2022-012584-CA-01, slip op. at 15–

16 (Fla. 11th Cir. Ct. Feb. 23, 2023) [D.E. 90].[67] Neither the Third DCA nor Judge Hanzman

questioned whether the parties had an interest in the wellbeing of their condo association. *See generally*

*Brodie*, 389 So. 3d at 666; *Brodie*, slip op. at 15–16. We assume, then, that it was as obvious to them as

---

[65] *Putnal v. Inman*, 76 Fla. 553, 556 (1918) ("In order that merchants may prudently do a credit business, it is expedient for them to know those in the community who meet their obligations promptly and those who do not . . . and a communication made by a member of the association to the other members, is privileged[.]").

[66] *See also* DOBBS' LAW OF TORTS § 547 (2d ed. Apr. 2024 Update) ("Common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor. The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit.").

[67] The Bluebook prescribes that we should cite Florida Circuit Court opinions from the Florida Law Weekly Supplement. The relevant Supplement number is 30 Fla. L. Weekly Supp. 743a, but the Supplement isn't paginated. In our view, then, the easiest and most precise way to cite to Judge Hanzman's opinion is to treat it as a slip opinion.

it is to us that the managers and residents of condos have vested interests in the management, quality, and security of their shared home.[68]

### iii.  The Listener's (or Reader's) Corresponding Interest

The third element of the qualified privilege asks whether the speaker and the listener have "mutual" interests in the subject of the speech. Florida defamation law hasn't articulated with any measure of precision *when* an interest is mutual. From what we can tell, the mutuality test relies on intuition and is somewhat flexible. Financial advisors and their clients, for example, have a mutual interest in protecting "the stability of their investment." *Falic*, 347 F. Supp. 2d at 1267. So too do sales representatives and longtime customers in their business relationship, *Shaw*, 818 F. Supp at 1543, employees and their coworkers in their duties, *Thomas*, So. 2d at 404, a parent and a teacher in a child's "difficulties [in] class," *Nodar*, 462 So. 2d at 809, and so on.[69] Importantly, *mutuality* does not mean *agreement*. Florida courts don't ask whether the speaker and the listener have the same opinion about their mutual interest. In fact, the qualified privilege attaches to many topics that are practically guaranteed to elicit *disagreement*. *See, e.g.*, *Nodar*, 462 So. 2d at 805–06 (discussing public criticism of a schoolteacher); *Loeb*, 66 So. 2d at 244 (resolving "a matter of dissension in a church or social group"); *Abram*, 89 So. 2d at 336 (holding that a gubernatorial candidate had the right to defend his candidacy to prospective voters).

But to say that a certain kind of mutual interest *often* exists when certain speakers and listeners are involved doesn't mean it exists in *every* such situation. For example, in *Mandarin Utilities*, the

---

[68] *Accord Cohen v. Beachside Two-I Homeowners' Ass'n*, 2006 WL 1795140, at *5 (D. Minn. June 29, 2006) ("[Defendant homeowners' association] is entitled to a common interest qualified privilege regarding its communications in the Board meeting minutes. The . . . Board, management company, and homeowners share a common interest in their town home community."), *aff'd*, 272 F. App'x 534 (8th Cir. 2008).

[69] *See also Miller*, 2005 WL 8159674, at *3, *14 (holding that the employer shared a moral interest with both employees and "non-employee members of the public" in "prevent[ing] a potentially violent confrontation on its premises").

defendant (Mandarin), a public water utility, informed a developer-client that the plaintiff-contractor should not be hired "because its work was 'not satisfactory.'" *Water & Sewer Util. Const., Inc. v. Mandarin Utils., Inc.*, 440 So. 2d 428, 430 (Fla. 1st DCA 1983). The First DCA held that Mandarin and the developer had corresponding interests because both wanted to ensure that they only hired approved contractors to avoid creating problems with the utility. *Ibid.* ("This relationship amply supports the trial court's determination that a qualified privilege existed."). But, in *Teare*, the Florida Supreme Court held that there was no mutuality of interest where a defendant, a union plumber, told two prospective clients that the plaintiff, a non-union plumber, shouldn't be hired because "[his] work has been repeatedly found to be unsatisfactory." *Teare v. Loc. Union No. 295*, 98 So. 2d 79, 83 (Fla. 1957). That's practically the same statement that was at issue in *Mandarin Utilities*. But, in the circumstances of *Teare*, the Florida Supreme Court held that the union plumber and the clients didn't share an interest. *Ibid.* True, the union plumber and the clients may have had some nebulous shared interest in good plumbing. *Ibid.* But the union plumber wanted the clients not to hire a non-union plumber, whereas the clients were "not the least bit interested whether the plumber who did the job was a Union or non-Union man." *Ibid.*

Similarly, mutuality of interest can be lost when the defendant doesn't sufficiently tailor its audience to ensure that they *all* share the same particular "property, business, professional, or civic" interest. *Falic*, 347 F. Supp. 2d at 1267. Again, "[a] [mere] shared interest in [some] general subject matter is not sufficient[.]" *Ibid.*; *see also Teare*, 98 So. 2d at 83; *Scholz v. RDV Sports, Inc.*, 710 So. 2d 618, 626 (Fla. 5th DCA 1998) (no mutuality between a basketball team unilaterally criticizing its former assistant coach and the news media, which was merely interested in hearing the criticism).

To understand the outer bounds of this mutuality-of-interest element, we'll use the employment-evaluation interest as an example. Florida law frequently presumes that the qualified privilege applies "where parties have a mutual interest in evaluating a person's work." *Crestview Hosp.*,

203 So. 3d at 981. "Employees evaluate employers and vice versa; customers evaluate salespeople to store managers; parents evaluate teachers to principals; former bosses evaluate former workers to potential new employers; and so on." *Ibid.*;[70] *see also Zalay*, 581 So. 2d at 179 ("Statements made by an employer or to an employer regarding an employee's or former employee's performance have long been recognized as a privileged occasion.").

Not infrequently, though, employers will communicate an evaluative statement to parties who *don't* have any real mutual interest in the evaluation, such as other employees. In *Healy*, for example, a defendant bank terminated the plaintiff, its employee, after she failed to comply with its money-transfer procedures. *See Healy v. Suntrust Serv. Corp.*, 569 So. 2d 458, 461 (Fla. 5th DCA 1990). Although the employee's failure was not a theft, the bank's manager convened "approximately twenty to thirty-five bank employees and told them that [the plaintiff] had been discharged for 'misappropriation of funds.'" *Id.* at 459. The bank later tried to justify its decision to inform that group of employees as "standard procedure"—done to "avoid rumor and speculation" and to "deter future [similar] acts." *Ibid.* But the court didn't buy that explanation. It wasn't clear from the record that the other employees in fact had any interest in knowing why the plaintiff was terminated, and ultimately the court doubted that "publication to that particular audience (considering its size and nature) [was] necessary to address a legitimate interest of the bank." *Id.* at 461. As a result, it left the mutuality question "[to] be resolved by the fact finder below." *Ibid.*[71]

---

[70] Note, however, that the parties in *Crestview Hospital* "[didn't] dispute that a conditional privilege attached" to the evaluative conversation at issue there. *Crestview Hosp.*, 203 So. 3d at 982.

[71] *See also Falic*, 347 F. Supp. 2d at 1267 (no mutuality between a financial advisor and *non*-clients); *Drennen v. Westinghouse Elec. Corp.*, 328 So. 2d 52, 55 (Fla. 1st DCA 1976) (no mutuality of interest where the defendant management told the plaintiff's 300 "fellow employees in . . . identical work" that the plaintiff had been fired for "taking company property," and where at least one manager admitted that informing the other employees "tended to serve [the defendant's] own particular interest"); *Arison Shipping Co. v. Smith*, 311 So. 2d 739, 741 (Fla. 3d DCA 1975) (no mutuality of interest where evaluative communications were "made to lower echelon employees having no corresponding interest in them").

None of this is to say that every case has a single set of listeners whose interests correspond rigidly to those of the speaker. But mutuality is often found when defendants sensibly tailor their audiences. In *White*, for instance, one of the defendant's employees unilaterally communicated to her fellow employees (and even to a non-employee board member) her "concern" that the plaintiff, a school principal, was "mentally unstable." *White v. Sch. Bd. of Hillsborough Cnty.*, 2008 WL 227990, at *6–7 (M.D. Fla. Jan. 25, 2008) (Whittemore, J.). The court agreed that, notwithstanding the speaker's one-sided announcement and the listeners' roles, the speaker and the listeners "each had an interest in Plaintiff's performance as director of [the school], as well as in the safety and security of [the school]'s staff and students." *Ibid.* Because the defendant employee made her communications "privately to a select group of interested persons" out of her "moral or social duty," the communications were protected by the qualified privilege. *Ibid.* (granting summary judgment for the defendant on a defamation claim), *aff'd*, 2009 WL 174944 (11th Cir. Jan. 27, 2009).[72]

There's relatively little caselaw explaining how to analyze mutuality of interest in the common-tenancy or condo context, but *Dale Village* is instructive. There, the defendant homeowner's association terminated the plaintiff, the "exclusive managing agent" of the mobile-home park they ran. *Dale Vill.*, 567 So. 2d. at 498. After the termination stirred up some "controversy" among residents, the association's board of directors "posted two information bulletins outlining the alleged reasons for the termination," as well as "a[n] [open] letter to [the plaintiff] alleging park rules violations with respect to property owned by him." *Ibid.* The defendant posted these documents on the front door of a recreation hall, which was "frequented not only by owners but also by residents who were not mobile home owners" and "nonresidents" who would visit for weekly bingo. *Ibid.* The court took

---

[72] *See also Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 834 (Fla. 3d DCA 2007) (mutuality of interest existed between the manager, explaining reasons for the plaintiff's suspension, and "other employees . . . who sought an explanation for [that] suspension").

it as a given that "owners and residents of the park . . . would have a corresponding interest" in the association's explanation for its termination of the managing agent. *Id.* at 500–01. In other words, it appeared to accept that all owners and residents—even residents who did not own a mobile home—would reasonably be entitled to know why their "exclusive managing agent" was terminated, even though it didn't appear that all owners and residents objected to (or even cared about) the termination. *See generally ibid.* And that makes sense: The board, the managers, the owners, and the residents all shared a broad property and managerial interest in their association. The court drew the line, though, at the *nonresidents* and the open letter about the managing agent's *personal* rules violations. *Ibid.* The court was skeptical that nonresidents who visited the association property just to play bingo would have a genuine interest in the reasons behind the managing agent's termination. *Ibid.* The court expressed similar doubts about the extent to which *anyone*—resident or nonresident—would have *any* bona fide interest in the managing agent's individual rules violations. *Ibid.*

The thrust of this jurisprudence is that mutuality depends on the relationship between (and the relative postures of) the speaker and the listeners. Florida courts rightly strip the qualified privilege from statements that are made to those with no interest in them—or at least will leave the existence of the privilege in those cases to a factfinder. At the same time, statements that are made to tailored audiences where the mutuality of interest is clear can and do receive the benefit of the privilege.

### iv.  The Occasion and Manner of the Statement

The fourth and fifth elements of the qualified-privilege analysis consider the statement's occasion and manner. Under Florida law, "occasion" refers to "the time, place, and circumstances" of the statement, and "manner" refers to the "character and extent" of the communication. *Abraham*, 52 Fla. at 156–57; *see also, e.g., Thomas*, 761 So. 2d at 404 (holding generally that proper occasion exists for employees when "the [speech] conduct occurs substantially within the time and space limits authorized or required by the job"). In truth, courts often *either* conflate these two elements with some analysis

of interest, mutuality, or good faith, *or* else they ignore them altogether. *See, e.g.*, *Monarch Air Grp.*, 2023 WL 9106247, at *5 ("[C]ourts have held that a statement is made on a proper occasion and in a proper manner where . . . the statement was 'limited in scope' to the subject matter of the parties' corresponding interest, made at the time the interest arose, and was 'not disclosed to additional persons.'" (cleaned up));[73] *DeMartini v. Town of Gulf Stream*, 2017 WL 6366763, at *13 (S.D. Fla. Aug. 9, 2017) (Middlebrooks, J.) (finding proper occasion and manner simply because the statement was made during settlement negotiations, which "have the benefit of the qualified privilege"); *White*, 2008 WL 227990, at *7 (concluding that a communication was subject to the qualified privilege without explicitly addressing proper occasion or, manner).

The only noteworthy feature of the occasion jurisprudence is that a *response* to an inquiry or a challenge is often considered a "proper occasion." *See, e.g.*, *Hager v. Venice Hosp., Inc.*, 944 F. Supp. 1530, 1536 (M.D. Fla. 1996) (Kovachevich, J.), *aff'd*, 132 F.3d 1461 (11th Cir. 1997) ("[T]he statements in question were published by [defendant] in response to legitimate inquiries for information about [plaintiff] in his professional capacity and were made in good faith."); *Shaw*, 818 F. Supp. at 1542 ("The Defendant's statements were made in good faith in response to an inquiry from a customer[.]"); *Boehm v. Am. Bankers Ins. Grp., Inc.*, 557 So. 2d 91, 94 (Fla. 3d DCA 1990) ("In the instant case[,] the executive search agent 'actively sought out Gaston and insistently pressed for information regarding his personal character and behavior.' The trial court was correct in finding the alleged defamations occurred on a privileged occasion and were relevant to the inquiry being made."). In the condo context, Judge Hanzman's opinion in *Brodie* made much of this distinction, noting that one of the defamatory emails over which the plaintiffs were suing "was sent *in response* to the [plaintiffs'] own"—

---

[73] Obviously, if the statement *isn't* "properly limited in scope to the subject matter of the parties' corresponding interest," then there is no mutuality of interest—the third element. So, except for the reference to "the time [at which] the interest arose," it's not clear how *Monarch Air Group* distinguishes mutuality from occasion and manner.

indeed, it was "*necessitated* by Plaintiffs' accusations." *Brodie*, slip op. at 16–17 (emphasis added). Although he didn't use the terms "proper occasion" or "proper manner," Judge Hanzman found it significant that the response email "was limited to the scope of [the] accusations [in the plaintiff's original email], and provided evidence contradicting the[ir] grave representations." *Id.* at 17. Indeed, after noting that the defamatory email was a response, Judge Hanzman concluded that the plaintiffs had failed to "show express malice and overcome the protections of a qualified privilege." *Ibid. Brodie* resolved a motion to dismiss—not a motion for summary judgment—but Judge Hanzman's treatment of responses is still instructive here.

For simplicity, then, we'll treat occasion and manner jointly, relying on the better-developed occasion jurisprudence to inform our analysis.

### b. Block's 2023 Letter is Protected by the Qualified Privilege

#### i. The 2023 Letter Was Sent to Uphold a Mutual Interest

Starting with the "interest to be upheld prong," *Lefrock*, 77 F. Supp. 3d at 1201, Block unambiguously sent his 2023 Letter in connection with the Tower One Board election. He, in fact, said *exactly* that in the first paragraph of his letter—where he described his interest in plain English:

> Dear Fellow Tower 1 Unit Owner:
>
> As you now know the election for two new Board members this past Thursday . . . has been aborted because of numerous ballot concerns and we will all have to revote in the near future. . . . Although I will not be running for reelection *I have a deep-seated interest—as I'm sure you do as well—to ensure the best qualified persons will be the new directors.*

Block's 2023 Letter at 1 (emphasis added); *see also* Matesic's January 31, 2024, Declaration ("Matesic Jan. 31, 2024 Decl.") [ECF No. 216-1] ¶ 20 ("Block's 2023 Letter was meant to keep me from getting elected to the Tower One board of directors."). And, as with the Board's December 18 Email and the defendants' letter in *Brodie*, Block sent his 2023 Letter shortly after *Matesic* circulated a community-wide letter criticizing Block and his fellow Board members. *See* Block's 2023 Letter at 1 ("I assume

you have read Mr. Matesic's letter that he wrote several days ago and the Board's excellent response of April 4th putting his mistruths and false accusations to rest."); *see also* Board's April 4, 2023 Letter [ECF No. 220-11] ("The Board has been made aware of a March 31, 2023, communication circulated by Mr. David Matesic to unit owners. The statements in his communication were presented without context and based upon an incorrect or incomplete understanding of the facts."). It seems clear to us that Block, Matesic, and the rest of the Tower One community had a "mutual" or "corresponding" interest, *Falic*, 347 F. Supp. 2d at 1265–66, in ensuring that the best candidates were elected to the Board. That they differed in their *opinions* about *who* the best candidates might be is (again) totally irrelevant here. *See Brodie* at 15 (observing that the "unit owner and residents . . . had an interest in the safety and cost of maintaining the common areas of the Condominium"). It's also clear that Block tailored the audience for his 2023 Letter to only those residents with a corresponding interest in choosing the best candidate for the Board. He did so by mailing the letter to the addresses of unit owners *who could vote in the election*. *See* Block's October 24, 2023 Deposition [ECF No. 220-15] at 26:1–24 ("A: It was common knowledge what their addresses were. . . . I didn't have their emails. I sent the letter to their addresses. Q: So this was . . . a letter that was mailed to . . . 90 unit owners? A: Yes. We had the addresses of all the unit owners. Those are common knowledge. We know where they live."). We therefore conclude that Block sent the 2023 Letter to the Tower One voting community pursuant to a mutual interest he and his audience shared in the quality of the Board.

*ii.   The 2023 Letter Was Sent on a Proper Occasion and in a Proper Manner*

Matesic doesn't argue that Block's 2023 Letter wasn't published on a proper occasion or in a proper manner, so he's waived any arguments he might have made as to these elements. *See, e.g.*, *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an

argument they chose not to develop for the district court at the time of the summary judgment motions."); *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1343–44 (S.D. Fla. 2021) (Altman, J.) (holding that, "in opposition to [an] MSJ," a non-moving party who addressed only one part of an argument "concede[d], by not suggesting otherwise," that it had waived the other parts of that argument).

In any event, we easily conclude that the 2023 Letter *was* published on a proper occasion and in a proper manner. As we've said, the Letter's "occasion" was the Tower One Board elections. *See* Matesic's Jan. 31, 2024, Decl. ¶¶ 29–30 ("On April 13, 2023, Tower One conducted its annual election to elect members to Tower One's board of directors. The Tower One board of directors at the time then cancelled the April 13, 2023 election and scheduled a 'revote' to be conducted on May 15, 2023."). And Block expressly tied the Letter to that occasion. *See* 2023 Letter at 1 ("Although I will not be running for reelection[,] I have a deep-seated interest—as I am sure you do as well—to ensure that the best qualified persons will be the new directors."). That's precisely the kind of occasion and manner Florida courts have found proper in similar circumstances. *See, e.g.*, *Belcher v. Schilling*, 349 So. 2d 185, 186 (Fla. 3d DCA 1977) (holding that a libelous letter sent in connection with a company election was protected by the qualified privilege).

### iii.   The 2023 Letter Was (Presumptively) Sent in Good Faith

Because the 2023 Letter satisfies the other qualified-privilege elements, we may presume that it was sent in "good faith." *Lefrock*, 77 F. Supp. 3d at 1201.[74] As a result, Matesic "bears the burden of

---

[74] In his only counterargument to Block's assertion of the qualified privilege, Matesic tries to distinguish our case from *Lefrock* on the ground that "Block was not bound by any state law duty to make the defamatory statements in his [2023 Letter] or to publish the Letter at all." Matesic's Resp. to Block's MSJ at 5–6. But Matesic cites no case—and we haven't found one—for his view that Florida's qualified privilege *only* applies where the defendant had a legal duty to speak. As we've explained at length, Florida law says just the opposite. *See, e.g.*, *Nodar*, 462 So. 2d at 809 (noting that "[a] communication made in good faith on any subject matter by one having an interest therein, *or* in reference to which he has a duty, is privileged if made to a person having a corresponding interest *or*

proving the [communication] was made with express malice." *Thomas*, 761 So. 2d at 404. As we've explained, *see ante*, at 63–65, on summary judgment, the party attempting to rebut the presumption of good faith bears the burden of adducing colorable evidence of express malice, either directly or indirectly. At least one case says that *direct* evidence of express malice might include evidence that the reasons for a defamatory announcement of a contract termination were a post-hoc fabrication. *Dale Vill.*, 567 So. 2d at 500. *Indirect* evidence, by contrast, requires the plaintiff to "prov[e] a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable [defendant] pursuing a lawful objective." *Arko*, 230 So. 3d at 528. Either way, the rebuttal burden is "rigorous," requiring a plaintiff to "establish by a preponderance of the evidence that . . . the defendant's *primary motive* in making the statements was the intent to injure the reputation of the plaintiff." *Fridovich,* 598 So. 2d at 69 (emphasis added).

Matesic tries to carry this burden by arguing that the 2023 Letter was not "made with a good motive," and that Block sent it "for the purpose of harming the subject of the defamation." Matesic's Resp. to Block's MSJ at 8 (quoting *Falic*, 347 F. Supp. 2d at 1264). According to Matesic, Block wrote his 2023 Letter with express malice because "Block has admitted to publishing the Letter for the purpose of preventing Matesic from winning a Board election and has admitted that his hope in publishing the Letter was to harm Matesic." *Id.* at 9. In support, he points to three sentences in particular:

- "Mr. Matesic, as President of Tower 1 for many years, has been in charge of the shop while C&S destroyed our property, and he continues to support C&S to this day." *Ibid.* (quoting Block's 2023 Letter at 1).

---

duty, even though it contains matter which would otherwise be actionable, *and though the duty is not a legal one* but only a moral or social obligation," before finding that the qualified privilege applied to the "remarks" of a parent made during a "school board meeting concerning the curriculum and instruction in [a class] in which his son was enrolled" (cleaned up & emphasis added)).

- "Now Mr. Matesic and Ms. Abbatt want to return as directors and presumably go back to the old, failed ways of managing our building." *Ibid.* (quoting Block's 2023 Letter at 2).

- "Nonetheless, instead of sending my letters to all owners, Mr. Matesic and Ms. Abbatt sent you an email defaming me in my profession by accusing me of making false statements and, incredibly, of hacking into your private emails." *Ibid.* (quoting Block's 2023 Letter at 2–3).

None of this even tends to show—let alone by the "rigorous" "preponderance" standard that's required to rebut good faith, *Fridovich*, 598 So. 2d at 69—that Block spoke maliciously. Matesic's first error is on the law. That Block wanted Matesic to lose the Board election isn't evidence of express malice. Remember, the plaintiff must show that "the defendant's primary motive in making the statements was the intent to injure *the reputation of the plaintiff*." *Fridovich*, 598 So. 2d at 69 (emphasis added). The defendant's motivations must be "ill will, hostility, [and] evil intention to *defame* and injure." *Nodar*, 462 So. 2d at 811 (emphasis added). In other words, express malice exists when the speaker is *principally* trying to injure the *reputation* of the subject. Qualified privilege is, after all, a defense to *defamation*.

So, a plaintiff cannot show express malice simply by suggesting that the speech criticizes or may have negative consequences for the plaintiff—such as the loss of an election. Consider the extensive jurisprudence applying the qualified privilege to just such speech. *See, e.g.*, *id.* at 809 (privilege applied to public criticism of a schoolteacher); *Abram*, 89 So. 2d at 336 (privilege applied to a political candidate's remarks to his audience that the plaintiff, his political opponent, was "a phony"); *Loeb*, 66 So. 2d at 244–45 (privilege could apply to a Jewish community group's publication of disciplinary action and expulsion against the plaintiff and to disparaging statements made during the group's meeting); *Miller*, 2005 WL 8159674, at *3, *14 (privilege applied to a security bulletin warning readers to "be on the alert" about the plaintiff); *Big Cat Rescue Corp.*, 2013 WL 12149263, at *1, *6 (privilege applied to public remarks that a defamation plaintiff's animal-exhibition business constituted "animal

abuse"); *Mandarin Utils.*, 440 So. 2d at 430 (privilege applied to Mandarin's statement to a developer

that the plaintiff's work was "not satisfactory"); *cf. Gunder's Auto Ctr.*, 699 F. Supp. 2d at 1343 (no

malice even though the defendant took the adverse action of terminating the plaintiff from a preferred

business program). If Matesic were right, the qualified privilege—which, recall, is a privilege against

liability for injurious statements—would never apply.

So, Block's comments in the Letter, though critical of Matesic, aren't evidence that Block

*principally* wanted to harm Matesic's *reputation*. They were directed, instead, to helping the Tower One

community evaluate Matesic's competence to serve on the Board. Here are a few pointed examples

of this:

- "I thought, however, that you are entitled to know a few more things about Mr. Matesic and Ms. Abbatt to *help you decide if* [*you*] *want them to be your new directors*." 2023 Letter at 1 (emphasis added).

- "But there is more you should know when *you are assessing whether they are deserving of your vote*." *Id.* at 2 (emphasis added).

- "I do not believe that peace and harmony will ever be restored and our building *properly and professionally managed* if we return to the old order." *Id.* at 3 (emphasis added).

- "I leave it to your sound judgment to decide if Mr. Matesic and Ms. Abbatt are *worthy of your vote*." *Ibid.* (emphasis added).

Block, in short, wanted the Tower One residents to understand why *he believed* that Matesic (and

Abbatt) should be thrown out of office. *See* Block's Oct. 24, 2023 Dep. at 195:19–24 (Q: "So when

you . . . wrote your letter about [Matesic] on April 2023 . . . that was meant to keep him from getting

elected, correct?" A: "Absolutely."). That's a perfectly proper reason to send a letter to a collection of

condo residents in the lead-up to a condo-board election. Aside from the act of voting itself, few

things are more fundamental to democratic systems than our freedom to voice our honestly held views

about a particular candidate's fitness for office. *Cf. Garrison*, 379 U.S. at 74–75 ("[S]peech concerning

public affairs is more than self-expression; it is the essence of self-government."). So, while Block

certainly wanted to persuade his fellow condo owners to oust Matesic from the Board, Matesic hasn't produced any evidence that Block's "primary motive" was to hurt his reputation.

Nor does any of the *specific language* Matesic complains about in the 2023 Letter come close to demonstrating "express malice." The first statement is just Block's opinion that Matesic and his friends supported policies that damaged, rather than restored, the property's value. That cuts at the very heart of what it means to express your opinion about a candidate for office in a public or private election. If that's malicious, then anything is. The second statement simply reiterates Block's disagreement with Matesic and Abbatt's "failed ways of managing [the] building." Nothing to see there. And the third objects—perhaps in an overly sensitive way—to the statements the Board made in its own December 18 Email. Advancing an objection to a statement that was made by people in power lies, again, at the core of what it means to live in a free society. Matesic hasn't found a single case (nor have we) suggesting that any of these statements could reasonably be construed as malicious. And he's adduced no evidence—not from any expert, Tower One resident, or even from his own Board—for his view that these statements demonstrated "express malice."[75]

Finally, Matesic has offered no evidence of Block's conduct (outside these statements) that might evince some malicious intention. In the end, Block was, to use the Defendants' words, a disgruntled resident who expressed his honest, good-faith opinion about the failures of Matesic's administration of the building. Matesic may not have liked this critique, but he's adduced no evidence that any of Block's statements were malicious.

We therefore **GRANT** Block's Amended Counterclaim MSJ as to Count I (defamation *per se*); Count II (defamation *per quod*), but only as it relates to the 2023 Letter; and Count III (defamation by

---

[75] Again, when we denied Block's motion to dismiss Matesic's Amended Counterclaim, we were open to the possibility that Matesic might introduce some evidence that would confirm his view that these statements (or Block's conduct in connection with these statements) were malicious. By now, it's clear, he's failed to do that.

implication). In other words, only one part of Matesic's *per quod* claim survives Block's qualified-privilege challenge—and it's that final subclaim we'll analyze next.

### c.   Matesic Fails to Show Damages from Block's 2023 Text Messages

As we've said, Matesic also grounds his defamation *per quod* claim (Count II) in Block's 2023 Text Messages. Again, these are four text messages Block exchanged on November 8, 2023, with three Tower One residents—all of whom appear to be his friends.[76] The first two messages are from Block: In the first, Block sent his three friends a link to a news article about the prosecution of the Gambino crime family; in the second, Block added the caption: "My new case. Can you believe?" Exhibit C to the Amended Counterclaim [ECF No. 189] at 28. The third message is a response from one of the Tower One residents, who wrote: "I saw the article in the post and was wondering who got it." In the fourth message, Block replied: "Send it to Matesic and Rhuelman and Melvin." *Ibid.* According to Matesic:

> Block sent [this] concerning series of text messages to three unit owners at Tower One boasting about a news article describing a case he was recently assigned pertaining to the prosecution of an organized crime syndicate on charges that include racketeering conspiracy, extortion, and witness retaliation.
>
> [ . . . ]
>
> Block sent the Text Message, which states, "Send it to Matesic and Rhuelman and Melvin," insinuating that Matesic is a criminal guilty of similar acts.

Amended Counterclaim ¶¶ 62–63; *see also id.* ¶ 81("The Text Message constitutes and was intended by Block to be an innuendo that Matesic is a criminal."). Block has moved for summary judgment on this aspect of Count II because (he says) Matesic has adduced no evidence of special damages for his claim

---

[76] Block tells us that the other three individuals on the text-message thread were Ron Holzer, Sean Dana, and Matt Giffuni. *See* March 8, 2024, Declaration of Frederic Block [ECF No. 234-6] ¶ 9.

of defamation *per quod*. *See* Block's Amended Counterclaim MSJ at 1, 23–24. As a result, he argues, we must grant summary judgment on Count II. We agree.

There's no dispute that Matesic is bringing Count II *per quod*. "Under Florida law, a claim for defamation may be categorized in one of two ways: defamation *per quod* or defamation *per se*." *Flynn v. Cable News Network, Inc.*, 2023 WL 5985193, at *4 (M.D. Fla. Feb. 22, 2023) (Scriven, J.). A publication is only defamatory *per se* if it's defamatory "considered alone and without innuendo." *Ibid.* (citing *Richard*, 62 So. 2d at 598). Matesic characterizes the 2023 Text Messages as "telling the recipients . . . through innuendo that [he] is a criminal." Matesic's Resp. at 13. He's thus "*not* claiming that Block's implication is defamatory *per se*." *Id.* at 14 (emphasis added). By process of elimination, then, his claim must be for defamation *per quod*.

Because Matesic is bringing Count II *per quod*, he must allege (and eventually prove) special damages. *See Daniels*, 2020 WL 533927, at *5. The "chief characteristic of special damages is a realized or liquidated loss." *Blythe v. Fifth Third Bank*, 2010 WL 11432601, at *6 (M.D. Fla. Jan. 19, 2010) (Sharp, J.) (citing *Falic*, 347 F. Supp. at 1268). Matesic argues that he "*has* alleged special damages to support his defamation *per quod* claim"—namely, attorneys' fees. Matesic's Resp. at 14 (emphasis added). But insofar as he merely "*alleges* defamation *per quod* without any special damages being *proved*, . . . this deficiency is sufficient to grant summary judgment." *Hughes v. Wal-Mart Stores E., LP*, 846 F. App'x 854, 859 (11th Cir. 2021) (emphasis added); *Frey v. Minter*, 829 F. App'x 432, 434 (11th Cir. 2020) (affirming a grant of summary judgment against a defamation *per quod* plaintiff who "did not present evidence of special damages (such as lost profits), which he was required to do").[77]

---

[77] *Hughes* and *Frey* arose under Alabama and Georgia law, respectively, but that difference is immaterial here. As the Eleventh Circuit observed in *Frey*, "[b]oth Florida and Georgia require proof of special damages for a plaintiff to sustain a claim of defamation *per quod*," 829 F. App'x at 434—and Alabama has a nearly identical regime.

Matesic doesn't even try to carry his burden here. He doesn't identify a scrap of evidence supporting his claim for special damages. *See generally* Matesic's Resp. As Block correctly points out, Matesic's burden wasn't especially heavy: "evidence here may have come in the form of a simple declaration, a bill, a credit card statement, or any number of other documents or sources of information within Matesic's ready grasp." Block's Reply in Support of his MSJ at 9. Matesic could have come forward with evidence that he "lost employment opportunities" or that he would have to incur the "cost of repairing his reputation online." *Daniels*, 2020 WL 533927, at *5–6. Again, he didn't do any of that. He assumed the burden of proving special damages at summary judgment when he alleged (in our view, absurdly) that Block's 2023 Text Messages defamed him. We won't relieve him of that burden now.[78]

We therefore **GRANT** Block's Amended Counterclaim MSJ as to the portion of Count II of the Amended Counterclaim that's premised on Block's 2023 Text Messages.

*       *       *

---

[78] It's not clear whether Florida law treats attorneys' fees as special damages for the purpose of defamation actions, but we think the better reading is that it doesn't. As a threshold matter, "the chief characteristic of special damages is a realized or liquidated loss," *Blythe*, 2010 WL 11432601 at *6, but Florida law regards attorneys' fees as "unliquidated damages," *Paramo v. Floyd*, 154 So. 3d 477, 478 (Fla. 2d DCA 2015). Also, under the "bedrock principle known as the American Rule," "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). Florida's courts have recognized a limited exception to this principle in slander-of-*title* actions, where attorneys' fees *can* qualify as special damages. *See, e.g.*, *Glusman v. Lieberman*, 285 So. 2d 29, 31 (Fla. 4th DCA 1973) (citing *Lehman v. Goldin*, 36 So. 2d 259, 260 (Fla. 1948)); *see also Bonded Inv. and Realty Co. v. Waksman*, 437 So. 2d 162, 164 (Fla. 2d DCA 1983) ("Attorney's fees may be a proper element of special damages *in a slander of title action*." (emphasis added)). The rationale there is that, because a cloud on a title to property can only be dispelled through a lawsuit, "the costs to remove the cloud on the title are considered special damages." *Jenkins v. Plaza 3000, Inc.*, 134 So. 3d 1127, 1131 (Fla. 4th DCA 2014). Neither federal courts applying Florida law nor Florida courts themselves have extended that rationale to attorneys' fees in ordinary defamation-*per-quod* actions—and Matesic conspicuously doesn't cite any case to the contrary. *See* Matesic's Resp. to Block's MSJ at 14–15. We're not surprised. As Block rather reasonably observes, Matesic's argument "would convert every *per quod* claim into a *per se* claim, disrupting Florida doctrines carefully erected to limit the litigation of defamation." Block's MSJ Reply at 9.

In conclusion, we hereby **ORDER and ADJUDGE** as follows:

1. Matesic, Abbatt, and Gerstin's SAC MSJ [ECF No. 224] is **GRANTED**. Block shall take nothing from his action.

2. Block's Amended Counterclaim MSJ [ECF No. 218] is **GRANTED**. Matesic shall take nothing from his action.

3. Matesic's Amended Counterclaim MSJ [ECF No. 215] is **DENIED as moot**.

4. Block's Motion to Reopen the Case [ECF No. 273] is **DENIED as moot**.

5. This case shall remain **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on June 26, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record